**TABLE OF CONTENTS**

Page

INTRODUCTION……………………………………………………………………...1

FACTS………………………………………………………………………………….2

I. Procedural History…………………………………………………………….2

II. Plaintiffs' Factual and Employment Settings………………………………….2

III. Off-the-Clock Work Performed by the Plaintiffs……………………………..3

A. Pre-tour Work…………………………………………………………..3

B. Lunch Break Work……………………………………………………...7

C. Post-tour Work…………………………………………………………8

D. Defendant Knew or Should Have Known Plaintiffs Were Performing Off-the-Clock Work…………………………………………………………..9

ANALYSIS…………………………………………………………………………10

II. FLSA Decertification Standard ............................................................. 10

A. Courts in the Seventh Circuit Use a Two-Step Analysis to Determine Whether Plaintiffs Should Proceed Collectively ............................................................. 10

III. Plaintiffs' Similar Factual and Employment Settings ............................................. 12

A. Defendant Ignores Plaintiffs' Similar Factual and Employment Settings……….12

B. Plaintiffs Labored Under a Common Policy of Plan that Led them to Perform Off-the-Clock Work……………………………………………………...12

1. Plaintiffs are Not Required to Show a Common Policy of Plan……………………..13

2. Plaintiffs Have Shown a Common Policy or Plan to Violate the FLSA…….13

i. The "Open and Available" Expectation…………………………...14

ii.      Adherence and Average Handle Time…………………………………16

iii.     Defendant's Rounding Policy………………………………………..17

I.     The Defenses Illinois Bell Plans to Raise are Either Not Unique to Each Individual Plaintiff or Can be Resolved by Bifurcating the Case Into Liability and Damages Phases……………………………………………………………………...18

II.    Fairness and Procedural Concerns Favor Trying this Case Collectively…………….23

CONCLUSION…………………………………………………………………………25

# TABLE OF AUTHORITIES

**CASES**                                                                    **Page(s)**

**Allen v. McWane, Inc.,**
2:06-cv-158, 2006 WL 3246531 (E.D. Tex. Nov. 7, 2006) .......................................19

**Anderson v. Mt. Clemens Pottery Co.,**
328 U.S. 680 (1946)................................................................................................19

**Austin v. CUNA Mutual Ins. Society,**
232 R.R.D.601 (W.D. Wis. 2006)..........................................................................10

**Basco v. Wal-Mart Stores, Inc.,**
00-3184 Section "k" (4), 2004 WL 1497709 (E.D. La. July 2, 2004).......................20

**Bell v. Farmers Insurance Exchange,**
9 Cal. Rptr. 3d 544 (Cal. Ct. App. 2004) ................................................................23

**Bishop v. AT&T, Corp.,**
256 F.R.D. 503 (W.D. Pa. 2009) ........................................................................12, 15

**Bradford v. Bed Bath & Beyond, Inc.,**
184 F. Supp. 2d 1342 (N.D. Ga. 2002) ...............................................................13, 21

**Brennan v. Qwest,**
No. 07-2024 (ADM/JSM), 2009 WL 1586721 (D. Minn. June 4, 2009) .................12, 16-17, 18

**Burch v. Qwest Commc'ns. Int'l., Inc.,**
--F.Supp. 2d --, 06-3523 (MJD/AJB), 2009 WL 5812530 (D. Minn. Dec. 16, 2009).....15, 16, 19

**Burch v. Qwest Comms. Intern., Inc.,**
500 F. Supp. 2d 1181 (D. Minn. 2007)....................................................................15

**Chao v. Akron Insulation and Supply, Inc.,**
184 Fed.Appx. 508 (6th Cir. 2006)..........................................................................20

**Chao v. Gotham Registry, Inc.,**
514 F.3d 280 (2d Cir. 2008).................................................................................20-21

**Crawford v. Lexington-Fayette Urban County Gov't,**
No. 06-299-JBC, 2008 WL 2885230 (E.D. Ky. July 22, 2008) ...........................24, 25

**Dolan v. Project Costr. Corp.,**
725 F.2d 1263 (10th Cir. 1984) ...............................................................................10

**Donovan v. New Floridian Hotel, Inc.,**
676 F.2d 468 (11th Cir. 1982) ...................................................................22

**Dooley v. Liberty Mut. Ins. Co.,**
307 F.Supp. 2d. 234 (D. Mass. 2004) .........................................................20

**Doornbos v. Pilot Travel Centers, LLC,**
No. 04-CV-00044 (BEN/BLM) (S.D. Cal. April 27, 2005) .......................18

**Dunlop v. Carriage Carpet Co.,**
548 F.2d 139 (6th Cir. 1997) ....................................................................24

**Falcon v. Starbucks Corp.,**
580 F.Supp. 2d 528 (S.D. Tex. 2008) ...................................14, 17, 21, 22, 24, 25

**Fegley v. Higgins,**
19 F.3d 1126 (6th Cir. 1994) ....................................................................10

**Fisher v. Michigan Bell Telephone Co.,**
-- F. Supp. 2d --, 09-10802,  2009 WL 3427048 (E.D. Mich. 2009)..............12, 15, 17

**Frank v. Gold'n Plump Poultry, Inc.,**
No. 04-CV-1018, 2007 WL 2780504 (D. Minn. Sept. 24, 2007)...................16, 20, 22

**Garcia v. Salamanca Grp., Ltd.,**
No. 07-cv-4665 (N.D. Ill. Mar. 24, 2008) .................................................10

**Grayson v. K Mart Corp.,**
79 F.3d 1086 (11th Cir. 1996) ..................................................................11

**Heckler v. DK Funding, LLC,**
502 F. Supp. 2d 777 (N.D. Ill. 2007) ........................................................10

**Hoffman La-Roche v. Sperling**,
493 U.S. 165 (1989).............................................................................10, 24

**Jirak v. Abbott Labs, Inc.,**
No. 07 C 3626, (N.D. Ill. Jul. 22, 2008) ...................................................10

**Johnson v. Koch Foods, Inc.,**
657 F. Supp. 2d 951 (E.D. Tenn. 2009).....................................................16

**Kasten v. Saint-Gobain Performance Plastics Corp.,**
556 F. Supp. 2d 941 (W.D. Wis. 2008) .................................................20, 21

**Kautsch v. Premier Comm.,**
No. 06-cv-04035-NKL (W.D. Mo. Jan. 31, 2008) ........................................................16, 24, 25

**Kelly v. Alamo,**
964 F.2d 747 (8th Cir. 1992) ...................................................................................................10

**Martin v. Tony & Susan Alamo Found.,**
952 F.2d 1050 (8th Cir. 1992) .................................................................................................22

**McLaughlin v. DialAmerica Mktg., Inc.,**
716 F. Supp. 812 (D.N.J. 1989) ...........................................................................................22, 23

**Mielke v. Laidlaw Transit, Inc.,**
313 F. Supp. 2d 759 (N.D. Ill. 2004) .......................................................................................10

**Morgan v. Family Dollar Stores, Inc.,**
551 F.3d 1233 (11th Cir. 2008) ...............................................................................11, 12, 13, 18

**Moss v. Crawford & Co.,**
201 F.R.D. 398 (W.D. Pa. 2000) ...............................................................11, 12, 18, 20, 24

**Nerland v. Caribou Coffee Co.,**
564 F. Supp. 2d 1010 (D. Minn. 2007)...............................................................10, 21, 24

**Pendlebury v. Starbucks Coffee Co.,**
518 F.Supp. 2d 1345 (S.D. Fla. 2007) ..................................................................13, 24

**Proctor v. Allsups Convenience Stores, Inc.,**
250 F.R.D. 278 (N.D. Tex. 2008) ...........................................................................23

**Reich v. Waldbaum, Inc.,**
833 F. Supp. 1037 (S.D.N.Y. 1993)........................................................................22

**Rodolico v. Unisys Corp.,**
199 F.R.D. 468 (E.D.N.Y. 2001) ...........................................................................11

**Scott v. Aetna Services, Inc.,**
210 F.R.D. 261 (D. Conn. 2002).............................................................................13

**Thiessen v. Gen. Elec. Capital Corp.,**
267 F.3d 1095 (10th Cir. 2001) ...............................................................11, 12, 18, 21

**Underwood v. NMC Mortgage Corp.,**
245 F.R.D. 720 (D. Kan. 2007)...............................................................................19

**Vennet v. American Intercontinental Univ. Online,**

No. 05 c 4880, 2005 WL 6215171 (N.D. Ill. Dec. 22, 2005) ....................................................... 14

**Wilks v. Pep Boys,**
No. 3:02-0837, 2006 WL 2821700 (M.D. Tenn. 2006)............................................. 11, 15, 21, 25


## STATUTES

29 U.S.C. § 216(b) ........................................................................................1, 2, 10, 11, 14, 23

29 U.S.C. § 254.... ................................................................................................................ 20

## OTHER AUTHORITIES

29 C.F.R. 785.24 ................................................................................................................... 20

## <u>INTRODUCTION</u>

The evidence developed in discovery has further established the facts which led the Court to grant conditional certification. Plaintiffs were required to be ready to take a call at the start of their tours, which resulted in them performing work off-the-clock beforehand. Furthermore, Defendant's adherence and average handle time policies caused Plaintiffs to perform off-the-clock work before and after their tours and during their lunches. Defendant's time rounding policy also systematically failed to compensate Plaintiffs properly for all of their time worked.

In spite of these facts, Defendant now moves for decertification. Defendant's main tactic is to scavenge the record for any shred of testimony which could possibly be juxtaposed against other testimony in the hopes of convincing the Court that trying this case as a collective action would be unmanageable. However, the evidence shows that the Plaintiffs are similarly situated. Plaintiffs worked in the same division of the same company in the same state doing the same jobs under the same employment policies, and they worked off-the-clock for the same reasons.

Put differently, when the three factors which courts balance on a motion for decertification are applied here, the result must be a denial of decertification. First, the Plaintiffs have similar employment and factual settings and they all labored under the same policies which lead them to work off-the-clock. Second, the defenses which Defendant plans to raise to Plaintiffs' claims can be dealt with at trial through representative testimony or through bifurcation of the liability and damages phases of the trial. Third, the fairness and procedural considerations underlying 29 U.S.C. 216(b) militate strongly in favor of certification, through which Plaintiffs can pool their resources so the parties, and the Court, will not have to labor through hundreds of individual trials all in order to determine whether Defendant paid Plaintiffs for all their time worked.

1

Decertification must be denied. Cases like this, where hundreds of individuals have relatively small claims against their employer, are exactly what was contemplated by the Supreme Court in setting out the requirements of a collective action in <u>Hoffman La-Roche v. Sperling</u>, 493 U.S. 165, 170 (1989). This case can and should remain certified for purposes of collective trial.

<u>FACTS</u>

### I. <u>PROCEDURAL HISTORY</u>.

Plaintiff Constemecka Russell filed her Complaint on April 1, 2008. (Dkt. 1.) On Sept. 15, 2008, the Court granted Plaintiff's motion for conditional certification pursuant to 29 U.S.C. § 216(b) of the FLSA. (Dkt. 60.) The Court certified a class of employees at Defendant's Consumer Markets call centers who "worked in sales, service and similar positions" in the prior three years who did not receive pay for time spent working off-the-clock performing tasks before and/or after their scheduled shifts and during their unpaid breaks. <u>Id</u>. Discovery proceeded on a representative basis, with the Court permitting Defendant to depose seven percent, or forty-one of the Plaintiffs.[1] (Dkt. 163.) Defendant now moves for decertification.

### II. <u>PLAINTIFFS' FACTUAL AND EMPLOYMENT SETTINGS.</u>

Between 2005 and 2008, Illinois Bell operated four consumer call centers, all within Illinois. (Ex. 1, No. 2.) These call centers are or were located in this cities of Arlington Heights, Oak Brook,[2] Rock Island and Chicago.[3] (Dkt. 41, 3.) Plaintiffs are current and former customer service representatives and customer consultants who worked in these four consumer call

---

[1] As the Court noted, Defendant selected the "vast majority" of these deponents. (Dkt. 63, at 3.)

[2] The Oak Brook call center closed in 2007. (Dkt. 41 at n. 8.)

[3] The Arlington Heights, Oak Brook and Chicago call centers are all within the Northern District of Illinois, Eastern Division. The Oak Brook call center is in the Central District of Illinois.

centers. (Ex. 1, No 1.) The job duties of customer service representatives and customer consultants working within these call centers were identical. (Ex. 2: Kepner, Rule 30(b)(6) witness 11.) Individuals in both job titles were employed to respond to residential customers' inquiries, provide customer service and sell Defendant's products on the phone. (Ex. 1, No. 6.)

All of the Plaintiffs are, or were, members of Local 21 of the International Brotherhood of Electrical Workers. (Id., No. 3.) All of the Plaintiffs were subject to the terms of the same collective bargaining agreement. (Ex. 1, No. 4; Ex. 5.) The Plaintiffs were all subject to the same code of business conduct and attendance philosophy. (Ex. 1, Nos. 16-17; Exs. 4, 3.)

Defendant tracked the "adherence" of the Plaintiffs, which is a measurement of how closely their work activity matched their predetermined schedule.[4] (Ex. 1, Nos. 9-10; Ex. 6: Ganahl 31-32; Glover 14-18; Davila, Rule 30(b)(6) witness 12; White 21.) Defendant tracked the times Plaintiffs logged in and out of Illinois Bell's phone system and their status (including whether they were available to take a call) at any given time. (Ex. 1, No. 11.) Furthermore, Defendant tracked the average call length or "average handle time" of the Plaintiffs at each call center. (Ex. 7 (Frison 34-35; Glover 21-22; K. Howard 46-47; Davila ((30(b)(6) 17; White 48.))

At each of the four call centers, Illinois Bell organized the Plaintiffs into "teams." (Ex. 1, No. 12.) Each of the teams reported to midlevel manager called a "coach." (Id.) Each coach monitored the adherence of the members of their team and, in turn, Illinois Bell monitored the adherence of each coach's team. (Id., No. 13.) Each of the Plaintiffs also had their average handle time monitored by their coach. (Id., No. 21.) Illinois Bell then monitored the average handle time of each of coach's team. (Id., No. 22.) Average handle was time is part of Plaintiffs' PAR score, which Defendant used to as its principal method of performance

---

[4] For example, Kisalan Glover, who worked as a coach at the Arlington Heights, Oak Brook and Chicago call centers, monitored the adherence and average handle time of his team at all three centers. Ex. 6.

3

evaluation.[5]    An employee's failure to meet PAR could lead to discipline and discharge.[6]

Plaintiffs were also paid the same way.  They were paid for their scheduled tour, unless an

exception was entered or a deviation from the schedule was otherwise reported.  (Id., No. 8.)

## III. OFF-THE-CLOCK WORK PERFORMED BY THE PLAINTIFFS.

The Plaintiffs testified that they performed work off-the-clock for Defendant before their

tours, after their tours, and during their lunch breaks.  They testified that Defendant's expectation

that they be ready to take a call at the start of their tour, as well as adherence and average handle

time policies lead to their off-the-clock work.  Defendant's time rounding policy also uniformly

deprives Plaintiffs of compensation for all of their time worked.

### A.  Pre-tour Work.

Plaintiffs spent their days taking incoming phone calls from Defendant's residential

customers.  To perform this job, there were a number of computer applications they needed.

These computer applications included: TCS, WOW (wireless ordering wizard), CP-SOS, Uverse,

DISH Tool, cellular, express pay, CRM, email, schedule viewer and a different ACON program

for each state they serviced.[7]  Most of these systems required a username and password.[8]

Illinois Bell management made clear to the Plaintiffs that they were expected be ready to

take a call, or in call center parlance, be "open and available," at the start of their tour.[9]

---

[5] Ex. 44 (C. Barnes 44; Ganahl 41-42; Heaney 54).

[6] Ex. 45 (C. Barnes 50-51; Gaynor 68; Grace 46-48).

[7] Ex. 8 (C. Barnes 95-96; Berger 105; Nemcik 83; Gaynor 123-24; Heaney 82-83; Hunter 61-62; Jacoby 94-96; LaMarr 100-02; Moten 20-22; Newborn 54-56; Rashall-Jones 57-59; Shapiro 130-33; Skinner 101-02; Smigo 88-89; Swinney 141-50; Terdic 100; Thomas 32-35; and Ward 60-63).

[8] Ex. 9 (Berger 106-07; Gaynor Dep. 124; and Gunsolley 116-17).

[9] Ex. 10 (C. Barnes 84-85; S. Barnes 115-16; Gaynor 120 *("Q. You're logging into the system before your tour starts?  A. Yes, to be open and available to accept calls, because that's an expectation.");* Gunsolley 114-15; Heaney 87; K. Howard 64-65; Hunter 61 *("It's required that we're ready to rock and roll, be green at 8:00 am.");* Ingram 63-64 *(discussing the meaning of "open and available");* Jacoby 85-86; Russell 59-60; Skelton 29; Stoner

4

Conversely, if Plaintiffs were not "open and available" to take a call at the start of their tour, they would get "talked to" by management.

> [I]f we weren't open and taking a call right at 8:00 or the start of our shift and we were in call work, we would start to get called in on our line asking us what the problem was:  Why weren't we open? Why weren't we taking a call?  And so you -- you know, you got talked to about it or, you know, so you had to be  ready.

(Ex. 11: Smigo 86-87.)  For this reason, the Plaintiffs logged on to these computer applications before the start of their tours, on their own time.  Then, at the moment their tours were supposed to begin, Plaintiffs logged into CTI, Defendant's phone system.  As Plaintiff Moten explained,

> [W]hen we log in to the system, you open up and you're green and that means you're open for a call.  When you go red, you're still open in CTI but you're not open for a call to come through.  So it's like I can sit there in red, I may be doing something else.  So they don't want you to do that.  They want you to always be open and available for calls to come through.

(Ex. 12: Moten 39-40.)   Numerous Plaintiffs testified that their coaches told them that they needed to be ready to take a call at the start of their tour.[10]   Emails produced in discovery confirm this. (Ex. 14: Onken Dep. 57-60, 65-67., Dep. Exs. 4, 7.)  One of Defendant's managers confirmed that open and available to take a call meant logged into the systems that they would need throughout the day.[11]   (Ex. 15: Ganahl 28.)  Manager Rieger described coaching regarding

---

59-62, 82-83  (*Rock Island Union Steward Donna Stoner testified that there were a lot of complaints, going on for years, from employees about having to log into computer applications before the start of their tour.*); Swinney 155-56; and Wells 148-49).

[10] Ex. 13 (S. Barnes 75-79; Burton 101-107 *(discussing how every manager him to be "open and available at the start of his tour;)* Brewer 210-14 *("A manager told me throughout my five years of being employed there that in order for me to be open and available, you need to have all your applications up and running in order to take customers at the start of your tour.");* Nemcik 65-66; Cruz 58 *("Q: Did your coach require you to be logged into every program you might need during the day at the start of your tour?  A: Yes, definitely.");* Frison 50-51; Gaynor 127, 132 *(discussing how every manager he ever had always told him to have his applications open before the beginning of his tour;)* L. Howard 52-55 *(all of his managers told him to be open and available at the start of their tour;)* Ingram 124-25; Jacoby 85-86 *("[T]hat's what they say, be ready to work at 7:00, logged in.");* Morgan 80-81; Russell 170-73; Stoner 83; Tillman 103-04; and Wells 32-33 *(discussing how she was harassed by management about being open and available at the start of her tour.),* 117-18).

[11] Defendant argues that Plaintiffs could have pulled up their computer applications while they were on their first call, but that was prohibited.  It was considered a "customer mistreat."  (Ex. 43: K. Howard 64-65).

the beginning of the tour this way: "[H]urry up and get online, you know, as fast as you can and help the customers because they're waiting." (Ex. 16: Rieger 52.)  Defendant has had a practice of using walkie-talkies and instant messaging to notify coaches when representatives are not open and available at the start of their tours.  (Ex. 17: Reatherford 45-47.)  Other Plaintiffs were told expressly that they needed to open up their computer applications before the start of their tour.[12]  Manager Ganahl testified that when was a customer service representative she logged into their systems before her tour. (Ex. 19: Ganahl 19-24.)  Due to this expectation, Plaintiffs arrived at work early and logged into these computer applications before the start of their tours, thus performing work for Defendant without compensation.[13]  On average, Plaintiffs spent approximately ten minutes each day performing this work.[14]  After the complaint was served in this matter, Defendant began prohibiting this pre-tour work in the four call centers.[15]

Defendant's adherence and average call handle time policies also caused Plaintiffs to perform this uncompensated work.  (Ex. 23: Morgan 65; Terdic 190.)  Plaintiffs do not dispute

---

[12] Ex. 18 (Burton 121 *("They actually said that you needed to be logging into your systems and have everything pulled up before your tour starts")*; Gunsolley 40-43; Newborn 56; Papo 35-39; Peart 37 *("We were told we had to be ready to take calls and all the systems open by the time of the start of the tour.")*; Peoples 68-69, 75-76;  Shapiro 138-40; Thomas 34-35 *(senior management told him that he needed to have all of his systems open before the start of his tour.");* and Thompson 92-93).

[13] Ex. 20 (C. Barnes 80-82; Burdon 91-93; and Skelton 25-26 *(Non-party technical associate Skelton testified that call center employees told her they logged in before the start of their tours.)*).

[14] Ex. 21 (C. Barnes 110 (15 mins.); S. Barnes 100-01 (10 mins.); Brewer 209 (5 mins.) Burton 97-98 (10-15 mins.); Byrnes 58-60 (the union did a time study of how long it took to log in and found that took seven minutes at both Oak Brook and Arlington Heights); Casco 122-23 (8 mins.); Edwards 163-64 (3-7 mins.); Frison 50 (10 mins.); Gaynor 122-23 (7-8 mins.);  Gunsolley 131 (9 mins.); K. Howard 17-18 (15 mins.); L. Howard (12-15 mins.); Heaney 99 (10 mins.); Hunter 64 (15 mins.); Hurt 138 (arrived 15 minutes early and began logging in); Ingram 77-78 (10 mins.); Jacoby 101-02 (5-15 mins.); H. Johnson 79-84 (9-14 mins.); LaMarr 106-08 (3-5 mins.); Moten 27 (6-8 mins.); Newborn 56 (4-7 mins.); Papo 86 (5-10 mins.); Peart 38 (5 mins.); Peoples 77-78 (15-20 mins.); Rashall-Jones 60 (9 mins.); Russell 178 (10 mins.); Shapiro 142-43 (10-13 mins.); Skinner 85-86 (9-15 mins.) 96-97; Smigo 89-91 (10 mins.); Swinney 149-51 (4-9 mins. if the computer did not have to be rebooted.); Terdic 61-62 (10 mins.); Thomas 27 (7-10 mins.); Ward 61-63 (4 mins.); and Wells 32-33 (8 mins.)).

[15] Ex. 22 (Berger 81; Edwards 88; Kepner 30(b)(6) 29-30; Rieger 41-43; Skelton 12-13 (Mr. Skelton is a non-plaintiff technical associate in Rock Island)).

that there was a three minute "grace period" – that applied equally to the Plaintiffs – for purposes of Defendant's *tardy* policy.  (Ex. 1, No. 18.)  However, if Plaintiffs were even one minute late in making themselves open and available to take a call, their adherence would be negatively impacted. (Ex. 24: Heaney 113.)  For that reason as well, Plaintiffs logged into their computer applications before the start of their tours.  (Ex. 25: C. Barnes 84.)  Emails produced by Defendant illustrate the demands of Defendant's adherence policy on Plaintiffs.  (Ex. 47.)

Similarly, since Defendant monitored each of the Plaintiffs' average handle time, Plaintiffs had another systematic disincentive to logging into their computer applications after the beginning of their tours.  (Ex. 26: Skinner 101-02.)  In other words, the Plaintiffs did not wait until after the start of their tours to log onto their computer applications in part because if they did, they would be extending the length of their calls and thus impacting their average call handle time.  Emails produced by Defendant also show the demands of its average handle time policy.  (Ex. 27.)  As Manager Onken said, "If AHT overall is lower, the company could be more profitable, so then in turn, all of our jobs are more secure."  (Ex. 28: Onken 25-26.)

### B.  Lunch Break Work.

The incentives created by Defendant's adherence and average call handle time policies also caused the Plaintiffs to perform off-the-clock work during their unpaid lunch breaks.[16] Given the expectation that Plaintiffs be open and available assisting customers on the phone as dictated by their schedule, and keep their calls in line with average handle time requirements,

---

[16] Ex. 29 (Jacoby 92-93; J. Johnson 156-57; Morgan 31-32; Rashall-Jones 67-69; and Smigo 39 (*"If the customer hangs up and I close my line to whatever I'm working on, that extends the handle time for that call."*)).

Plaintiffs often had to resort to performing work during their lunch breaks.[17]  This lunch break work typically consisted of completing off-line work like completing customer orders.[18]

### C.  Post-tour Work.

Just as all of the Plaintiffs were paid for their scheduled tour unless an exception was reported, all of the Plaintiffs were subject to Defendant's eight-minute rounding rule.

> Illinois Bell applies an 8-minute rounding rule to Service Representatives' and Sales Consultants' daily total of scheduled work hours.  In other words, if the Total View data reflects 8 hours and 8 minutes of scheduled work hours for a day, the employee is compensated for 8 hours and 15 minutes . . . If the Total View data reflects 8 hours and 7 minutes of scheduled work hours for a day, the employee is compensated for 8 hours . . .

(Mansfield Dec. at ¶ 4, Dkt. 217-5.)  Because Plaintiffs were automatically routed calls whenever they were available, and were told to remain available until the end of their tour, Plaintiffs frequently found themselves caught on a call extending beyond the end of their tour.[19]  Because most of these calls took less than eight minutes, Plaintiffs were systematically, and uniformly, deprived of compensation for post-tour work.[20]  (Ex. 42, at 13.)  Moreover, even though such time would appear on Plaintiffs' adherence reports, Plaintiffs were not paid for the time unless they reported it on an overtime form.  (Ex. 46: J. Stewart 10-11; Pasternak 13-21.)

---

[17] Ex. 30 (C. Barnes 96-97; Casco 141-43; Gaynor 180-81; Gunsolley 51-52; K. Howard 65-67; L. Howard 59-64; Hurt 62-66, 143-44; Jacoby 144; Moten 42-44; Skinner 131-32; and Wells 94-96 *(discussing how employees were discouraged from making themselves unavailable to complete customer orders)*).

[18] Ex. 31 (C. Barnes 89; Casco 130-31; Gaynor 160; Gunsolley 127; LaMarr 113-14; Morgan 32-33; Newborn 60-61; Rashall-Jones 68; Russell 261-62; Shapiro 150-54; Smigo 111-15; and Terdic 114-15).

[19] Ex. 32 (Burton 79-80; H. Johnson 135; Frison 56; K. Howard 77-80; L. Howard 71-76;  Nemcik 103-04; Jacoby 144-45; Morgan 75-76; Moten 49-51; Papo 20-23 *("More often than not, though, you get stuck on a call that is five, six minutes; it's almost done on a daily basis")*; Rashall-Jones 74-75; Rieger (manager) 57-58; Shapiro 99-103; Skinner 85-86; Thomas 27-29; Ward 68; and Wells 91-92 *("Q. How often do you get stuck on a customer call past the end of your tour? A. I would say probably three to four times a week.  Q. Okay.  And of those three to four times a week, how often do those calls go less than seven minutes past the end of your tour? A. Three to four times a week.")*).  Emails produced by Defendant show how Plaintiffs were prohibited from making themselves unavailable to accept calls during their tours.  (Ex. 33.)

[20] Union Steward Stoner testified that employees frequently complained to her about Defendant's rounding policy. (Ex. 34: Stoner 66-69.)

### D. Defendant Knew or Should have Known Plaintiffs were Performing Work Off-the-Clock.

Defendant knew or should have known that the Plaintiffs were performing work off-the-clock. First, three of Defendant's managers received an email in 2006 from a senior manager in Defendant's labor relations labor relations department that shows Defendant knew about the off-the-clock work Plaintiffs were performing before their tours. (Ex. 35: Reatherford 56-65, Dep Ex 1.) Second, numerous Plaintiffs testified that their managers told them explicitly to open their computer applications before the start of their tours, and so they had to have known it was occurring. (See footnotes 10 and 12, *supra*.) As Union Steward Louella Byrnes testified when she was asked why she did not tell management about employees working before the start of their tours, "Well, because management encouraged them to be open and available before the start of their tours, so that they could be online when their tours started." (Ex. 36: Byrnes Dep. 22.) When asked how management encouraged employees to be open and available at the start of their tours, she testified, "They would walk around and say that." (Id.) Byrnes also testified that the union told Defendant how long it took to log into the systems. (Ex. 36: Byrnes 59.) Karen Battisfore, another union steward, testified that on more than one occasion she spoke to Defendant's labor relations department about managers instructing employees to be "open and available" at the start of their tours. (Ex. 37: Battisfore 47-48, 56-58, 61.) Additionally, many Plaintiffs testified that their managers knew they were performing work off-the-clock.[21] Manager Rieger even admitted she saw people logging in before the start of their tours. (Ex. 39: Rieger 46-47.) Finally, as noted above, Defendant's adherence reports contained records of employees working after their tours. Nevertheless, Plaintiffs were not paid unless they reported it on an overtime form.

---

[21] Ex. 38 (Burton 190-191; Cruz 51-52; Gunsolley 126, 159-161; Hurt 153-155; Skinner 118.)

9

## ANALYSIS

### I. FLSA DECERTIFICATION STANDARD.

#### A. Courts in the Seventh Circuit use a Two-Step Analysis to Determine Whether Plaintiffs Should Proceed Collectively.

An action under the FLSA may be maintained against "any employer . . . by any one or more employees for and on behalf of himself or themselves and other employees similarly situated." 29. U.S.C. § 216(b). Although the Seventh Circuit has not established a procedure for considering FLSA certification, district courts in this circuit typically proceed through a two-step process.[22] See Austin v. CUNA Mutual Ins. Society, 232 F.R.D. 601, 605 (W.D. Wis. 2006); Dkt. 60 (citing Garcia v. Salamanca Grp., Ltd., No. 07-cv-4665, 2008 WL 818532, at * 2 (N.D. Ill. Mar. 24, 2008) (collecting cases)). At the first stage, a plaintiff must show that she is similarly situated to the putative plaintiffs. See Dkt. 60 (citing Mielke v. Laidlaw Transit, Inc., 313 F. Supp. 2d 759, 562 (N.D. Ill. 2004)). Conditional certification will be granted, and notice to the putative plaintiffs may be allowed, if the plaintiff makes this "modest factual showing." See Dkt. 60 (citing Heckler v. DK Funding, LLC, 502 F. Supp. 2d 777, 779 (N.D. Ill. 2007)).

Following the close of discovery, "the defendant may ask the court to reevaluate the conditional certification to determine whether there is sufficient similarity between the named and opt-in plaintiffs to allow the matter proceed to trial on a collective basis." See Dkt. 60 (citing Jirak v. Abbott Labs, Inc., No. 07 C 3626, 2008 WL 2812553, at *2 (N.D. Ill. Jul. 22, 2008) (quotation omitted)). "At this point, the district court has a much thicker record than it had

---

[22] Defendant argues that "legislative history demonstrates that the term 'similarly situated' is meant to be read narrowly." Def's Mem. at 10. In support of this proposition, Defendant cites the overruled case of Dolan v. Project Costr. Corp., 725 F.2d 1263, 1266-67 (10th Cir. 1984). However, since the Supreme Court decided Hoffmann-LaRoche v. Sperling, 493 U.S. 165 (1989), which provides the basis for courts to manage collective actions under the FLSA and ADEA, this has not been the law. See e.g. Nerland v. Caribou Coffee Co., 564 F. Supp. 2d 1010, 1025 (D. Minn. 2007) ("Federal courts observe that the FLSA is designed to be a remedial statute, and that it 'should be given a broad reading, in favor of coverage.'") (citing Kelly v. Alamo, 964 F.2d 747, 749-50 (8th Cir. 1992) and Fegley v. Higgins, 19 F.3d 1126, 1132 (6th Cir. 1994)).

at the notice stage, and can therefore make a more informed factual determination of similarity. The second stage is *less lenient*, and the plaintiff bears a heavier burden." Morgan v. Family Dollar Stores, Inc., 551 F.3d 1233, 1261 (11th Cir. 2008) (emphasis added). "Notably, even at the decertification stage, *similarly* situated does not mean *identically* situated." Wilks v. Pep Boys, No. 3:02-0837, 2006 WL 2792218, at *3 (M.D. Tenn. 2006) (citing Moss v. Crawford & Co., 201 F.R.D. 398, 409 (W.D. Pa. 2000) (emphasis in original)); See also Grayson v. K Mart Corp., 79 F.3d 1086, 1096 (11th Cir. 1996). "[T]he similarly situated requirement of 29 U.S.C. § 216(b) is considerably less stringent than the requirement of Fed. R. Civ. P. 23(b)(3) that common questions predominate." Rodolico v. Unisys Corp., 199 F.R.D. 468, 481 (E.D.N.Y. 2001).

At the decertification stage, courts typically balance three factors, including: (1) the extent and consequence of disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations. Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095, 1102-03 (10th Cir. 2001) (citations omitted); See also Moss, 201 F.R.D. at 409; Morgan, 551 F.3d at 1261.

Although the Defendant is the moving party, Plaintiffs have the burden of establishing they are similarly situated. Grayson, 79 F.3d at 1096. District courts have broad discretion in considering certification of an FLSA collective action. See Morgan, 551 F.3d at 1260 (affirming the denial of a motion for decertification). A reversal of a district court's "fact-finding that Plaintiffs are similarly situated [will only occur] only if it is clearly erroneous – not simply because [an appellate court] might have made a different call." Id. (citations omitted).

This case is at the second stage. Now that the facts which lead the Court to grant Plaintiffs' motion for conditional certification have been developed, the fact that Plaintiffs are similarly situated is even clearer than it was at the notice stage.[23] When the factors considered at decertification are balanced, the result strongly favors allowing the Plaintiffs to try their case as a collective action. Defendant's motion for decertification must be denied.

## II. PLAINTIFFS' SIMILAR FACTUAL AND EMPLOYMENT SETTINGS.

### A. Defendant Ignores Plaintiffs' Similar Factual and Employment Settings.

The first factor that courts consider on a motion for decertification is "the extent and consequence of disparate factual and employment settings of the individual plaintiffs." Thiessen, 267 F. 3d at 1102-03; Moss, 201 F.R.D. at 409; Morgan, 551 F. 3d at 1261. Here, in a tacit admission that Plaintiffs are similarly situated with respect to their factual and employment settings, Defendant has completely ignored this factor in its briefing.[24] Def's Mem. at 10. See Brennan v. Qwest, No. 07-2024 (ADM/JSM), 2009 WL 1586721, at *3 (D. Minn. June 4, 2009) (Denying decertification where "[Defendant] does not unequivocally deny that the named plaintiffs and the opt-in plaintiffs have substantially the same responsibilities and perform substantially the same tasks.").

What Defendant does not mention is that the great similarity in Plaintiffs' factual and employment settings would promote the efficiency of trying this case as a collective action. All of the Plaintiffs worked in the Defendant's consumer call centers within Illinois. They all had the same job duties: responding to residential customers' inquiries, providing customer service

---

[23] Since conditional certification was granted in this case, conditional certification has also been granted against two other AT&T, Inc. subsidiaries on very similar facts. See Bishop v. AT&T, Corp., 256 F.R.D. 503 (W.D. Pa. 2009); Fisher v. Michigan Bell Telephone Co., -- F. Supp. 2d --, 09-10802, 2009 WL 3427048 (E.D. Mich. 2009).

[24] If Defendant chooses to raise this issue for the first time in its reply brief, Plaintiffs will be prejudiced. Should that occur, Plaintiffs may need to request a sur-reply.

and selling Illinois Bell products over the phone.  (Ex. 1, No. 6.)  They were all members of the same local within the same union.  They all were all divided into teams who reported to coaches.  They all had their adherence and average handle time measured by their coaches.  They were all subject to Defendant's code of business conduct and attendance philosophy.  See Morgan, 551 F. 3d at 1263 ("But Family Dollar ignores the overwhelming evidence showing that the Plaintiffs, as a group, shared a number of factual details with respect to their job duties and day-to-day work."); Bradford v. Bed Bath & Beyond, Inc., 184 F. Supp. 2d 1342, 1346 (N.D. Ga. 2002) (Denying decertification where "[t]he evidence submitted shows that the employment setting was similar for Plaintiffs. Each member of the class worked in a retail store selling household goods . . ."); Scott v. Aetna Servs., Inc., 210 F.R.D. 261, 265 (D. Conn. 2002) (Denying decertification where "[t]he record evidence suggests that the actual job duties of the plaintiffs are quite similar.").

Given these facts, most of which Defendant has admitted, it is no surprise Defendant has chosen to ignore this factor.[25]  See Pendlebury v. Starbucks Coffee Co., 518 F. Supp. 2d 1345, 1353 (S.D. Fla. 2007) (Denying decertification where "[i]n sum, Starbucks' own admissions demonstrate that store managers are similar in numerous ways.  The store managers all follow the same training protocols and all share the same duties and responsibilities.").  There is no escaping that the basic facts of Plaintiffs' employment are similar throughout the class.  Accordingly, the first factor weighs in favor of denying Defendant's motion for decertification.

**B. Plaintiffs Labored Under a Common Policy of Plan that led them to Perform Off-the-Clock Work.**

**1. Plaintiffs are *not* Required to Show a Common Policy of Plan.**

---

[25] See Ex. 1.

13

In avoiding a discussion regarding the Plaintiffs' similar factual and employment settings, Defendant chooses instead to argue that Plaintiffs have not alleged a common unlawful policy or plan to deprive them pay for all their time worked. Def's Mem. at 10. However, many courts do not even require this factor to be balanced on a motion for decertification. See Vennet v. Am. Intercontinental Univ. Online, No. 05 c 4880, 2005 WL 6215171 (N.D. Ill. Dec. 22, 2005) ("A *unified* policy, plan, or scheme, though is not necessarily required to satisfy the similarity situated requirement, especially if a collective action would promote judicial economy because there is otherwise an identifiable factual or legal nexus.") (collecting cases); Falcon v. Starbucks Corp., 580 F.Supp. 2d 528, 535 (S.D. Tex. 2008) (same); Pendlebury, 518 F.Supp. 2d at 1349 n.3 ("This standard, however, is more appropriately applied at the first stage of the analysis as implicitly recognized in Hipp and later confirmed in Anderson.") (citations omitted). Moreover, 29 U.S.C. 216(b) which provides that an employee may bring a claim on behalf of themselves and others "similarly situated," makes no mention of a required common policy or plan. Given this authority and in the absence of a contrary decree from the Seventh Circuit, Plaintiffs should not be required to show a common policy or plan here, particularly where their factual and employment settings are so similar.

### 2. Plaintiffs have shown a Common Policy or Plan to Violate the FLSA.

Nevertheless, at this stage, Plaintiffs have shown substantial evidence of at least three common policies or plans to violate the FLSA which bind them together. Each one of them provides an additional basis for the Plaintiffs to try thier case as a collective action.

### i. The "Open and Available" Expectation.

14

As the Court recognized at conditional certification, Plaintiffs have made a showing of a common policy or plan to violate the FLSA.[26] "As the Court understands it, Russell's theory of liability has always been that Illinois Bell required, but did not provide overtime compensation for, pre-shift and post-shift computer log-ons and log-offs and extra work during lunch and rest breaks to meet required quotas." Dkt. 60 at 7; See also Bishop, 256 F.R.D. at 507 (granting conditional certification on the same theory); Fisher, 2009 WL 3427048, at *5 (same).

As set forth above, discovery has only further substantiated this claim. The Plaintiffs testified in concert that they were expected to be ready to take a call at the start of their tours either because Defendant told them to be "open and available" or because Defendant explicitly instructed them to open their computer applications before the start of their tours. At this stage in the case, this evidence is substantial; what happened here is far more than the "ambiguous" dictates of a few "rogue" managers as Defendant attempts to argue. Burch v. Qwest Commc'ns. Int'l., Inc., --F.Supp. 2d --, 06-3523 (MJD/AJB), 2009 WL 5812530, * 14 (D. Minn. Dec. 16, 2009) (Denying decertification where call center workers' "allegations that they were required to work pre-shift in order to boot up their computers and log in so that they could be ready to take a call at the start of their shifts is an allegation of a common policy or practice that can be shown

---

[26] Defendant continues to make much of its recent written policies prohibiting off-the-clock work. First, Defendant's 2007 Code of Business Conduct does not even mention off-the-clock work. See Ex. 40. Plaintiffs filed this case on April 1, 2008 and the first mention of this policy occurs in the August, 2008 Code of Business Conduct. See Ex. 4 at 18. Defendant cannot defend itself with post-litigation policy changes. Secondly, as the Court noted in its Order granting conditional certification, "[T]he mere fact that a company has a written overtime policy does not defeat conditional certification when a plaintiff provides countervailing evidence of a common policy of not paying for overtime." Dkt. 60 at 8 (citing Burch v. Qwest Comms. Intern., Inc., 500 F. Supp. 2d 1181, 1188 (D. Minn. 2007)). Even at the decertification stage, an employer cannot avoid an FLSA collective action through the mere submission of a written policy requiring compliance with the FLSA. See Wilks, 2006 WL 2792218, at *5 ("Given the plaintiffs' proffer of significant evidence supporting their contention that the defendant, despite its written policies, subjected them to impermissible time-keeping and overtime practices, the court finds that the plaintiffs have demonstrated their subjection to a common, impermissible practice in a manner that suffices to meet their burden at this decertification stage of the proceedings.") (citations omitted).

through common proof.").[27]  This case also is similar to <u>Johnson v. Koch Foods, Inc.</u>, in which

decertification was denied:

> Plaintiffs have submitted evidence that they are paid by production line time and
> that this payment does not capture donning and doffing, waiting, sanitizing or
> walking. They have shown that they must be washed and dressed when they take
> their places on the production line, but they are not paid until the line starts to run.
> The evidence submitted by plaintiffs also shows that production line time does not
> capture the time for doffing gear at the beginning of the meal break; donning gear
> at the end of the meal break; or washing and sanitizing during the meal break.
> Koch Foods deducts thirty minutes each day from plaintiffs' shift time for the
> unpaid meal break. Plaintiffs argue that because they are all subject to the same
> policy or plan, i.e. payment by production line time that does not capture tasks
> they must perform without compensation, they are similarly situated, and this
> commonality overcomes the factual and employment differences emphasized by
> Koch Foods.

657 F.Supp. 2d 951, 956 (E.D. Tenn. 2009).  Here, as in <u>Johnson</u>, Plaintiffs were expected to be

ready to begin a task at their scheduled start time and that led them to perform uncompensated

work before the start of their shift.  Here, as in <u>Johnson</u>, such a showing is sufficient to defeat a

motion for decertification.

### ii.  Adherence and Average Handle Time.

Plaintiffs have also shown a common policy or plan with respect to Defendant's

adherence and average handle time policies.  These demanding policies were another reason why

Plaintiffs logged into their computer applications before the start of their tours and performed

off-the-clock work after their tours and during their lunch breaks.  <u>See</u> <u>Brennan</u>, 2009 WL

---

[27] <u>Burch</u> is similar to this case in that it involves call center workers who worked off-the-clock due to a common
policy requiring them to be ready to take a call at the start of their shifts.  Defendant attempts to distinguish <u>Burch</u>
because it relies on <u>Frank v. Gold'n Plump Poultry, Inc.</u>, a donning and doffing case.  No. 04-CV-1018, 2007 WL
2780504, at *4 (D. Minn. Sept. 24, 2007).  Def's Mem. at 13, n. 11.  Defendant makes an unfounded assumption in
its attempt to distinguish <u>Frank</u>.  Defendant argues, "[p]resumably, if the <u>Frank</u> Court determined that one
employee's donning and doffing was work and not *de minimis,* that same determination would apply to all
employees donning and doffing the same or similar gear."  In fact, the <u>Frank</u> Court made no such determination.
Instead, the court noted, "Gold'n Plump's *de minimis* defense also raises legal questions susceptible of class-wide
resolution, such as how much time is *de minimis* as a matter of law and what characteristics time must have before it
can be considered *de minimis.*"  Exactly the same thing is happening here where Defendant protests that its *de
minimis* defense is individualized when in fact it presents legal questions that can be decided with respect to the
class as a whole.

1586721, at *5 (Denying decertification where "Plaintiffs . . . stated that they had to work off-the-clock without compensation in order to comply with Defendant's polices and meet the [productivity] standards."). Furthermore, the Plaintiffs have shown how these policies applied to them all universally. Plaintiffs have shown how they were divided into teams managed by coaches and that their coaches monitored their adherence and average handle time daily. Their coaches were then in turn monitored on their adherence and average handle time. See Falcon, 580 F. Supp. 2d at 541 ("Finally, Plaintiffs have made a strong showing that Starbucks' general policy of requiring ASMs to perform job duties that could not easily be completed within 40 hours while, at the same time, strongly discouraging overtime . . . failing to increase labor budgets, and basing bonuses, at least in part, on labor hours created an environment that at least strongly motivated managers to commit the alleged FLSA violations."). These uniform policies provide a secondary common policy or plan that binds the Plaintiffs together for the purposes of collective trial.[28]

### iii. Defendant's Rounding Policy.

As set forth above, Defendant maintained a time rounding policy which was common to the class. Because Plaintiffs were expected to be available to take a call until the end of their tours they frequently found themselves stuck on calls that were less than eight minutes long and were systematically denied pay as a result. See Fisher, 2009 WL 3427048, at *5 (finding a common policy or plan to violate the FLSA based upon the same rounding policy at issue here). Ignoring that its rounding policy is common to the class, Defendant argues that its rounding

---

[28] Defendant argues that its adherence policies do not require 100% adherence and that Defendant does not mandate off-the-clock work. However, as the Court pointed out at conditional certification, because the "FLSA defines "employ" as "suffer or permit to work . . . even if overtime work is not required by an employer, but merely permitted, the FLSA may be violated if an employee is not compensated for such work she performs . . . In all such cases it is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed. It cannot sit back and accept the benefits without compensating for them." Dkt. 60 at 10 (citations omitted).

policy is not illegal.[29]    However, Plaintiffs are not required to show that Defendant's policy is

illegal on a motion for decertification.[30]    See Doornbos v. Pilot Travel Centers, LLC, No. 04-

CV-00044 (BEN/BLM), 2005 WL 6166032, at *6 (S.D. Cal. Apr. 27, 2005) (Denying

decertification where "[Defendant] argues that to satisfy the "similarly situated" requirement,

Plaintiffs must show that the common policy violated the law.    A determination of whether

[Defendant's] policy violated the law, however, is not an issue properly considered on a motion

to decertify."); Brennan, 2009 WL 1586721, at *5 (same).    This is not a motion for summary

judgment; the issue on this motion was whether Defendant's rounding policy was common to the

class.    Based upon Defendant's declaration, this policy clearly was common to the class and it

provides a third common policy or plan which binds the Plaintiffs together for collective trial.

(Mansfield Dec. at ¶ 4, Dkt. 217-5.)

## III.    THE DEFENSES ILLINOIS BELL PLANS TO RAISE ARE EITHER NOT UNIQUE TO EACH INDIVIDUAL PLAINTIFF OR CAN BE RESOLVED BY BIFURCATING THE CASE INTO LIABILITY AND DAMAGES PHASES.

The second factor courts typically balance when considering a motion for decertification

is a consideration of the various defenses available to the defendant which appear to be

individual to each plaintiff.    See Thiessen, 267 F.3d at 1102-03; Moss, 201 F.R.D. at 409;

Morgan, 551 F.3d at 1261. Defendant contends that a collective trial would be a daunting

spectacle and wildly claims it plans to raise every conceivable defense to Plaintiffs' claims

apparently regardless of their viability.[31]    However, the reality is that given the Plaintiffs' burden

---

[29] The legal issue with respect to rounding, which applies to the class as a whole, is if it was "used in such a manner that [resulted], over a period of time, in failure to compensate the *employees* properly for all the time *they* have actually worked."  29 C.F.R. § 785.48 (2009) (emphasis added).

[30] If a *facially illegal* policy or plan was actually required for certification of 216(b) action, virtually no case would ever have been certified because no employer would ever put such a policy or plan in writing.

[31] In making this argument, Defendant relies heavily on the unreported case of Basco v. Wal-Mart Stores, Inc., 00-3184 Section "k" (4), 2004 WL 1497709, at *4 (E.D. La. July 2, 2004).  Def's Mem at 19.  The Basco Court faced

on liability, trying their claims together will not be difficult. See Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687-88 (1946) (holding that "where the employer's records are inaccurate or inadequate . . . an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work *as a matter of just and reasonable inference*.") (emphasis added). Regardless, Illinois Bell's purported defenses fall into two categories. They are either legal arguments which would apply across the board to Plaintiffs' claims or they simply involve the measure of damages. Despite Defendant's arguments, claims like those of the Plaintiffs are frequently, and manageably, tried on a class wide basis.[32]

The majority of the defenses Illinois Bell plans to raise are purely legal questions which are common to all class members and are properly resolved on a class-wide basis.[33] See Burch, 2009 WL 5812530, * 15 (finding that many of the same defenses that Illinois Bell plans to raise here are "either legal questions that can be resolved on a classwide basis or defenses that relate to the amount of damages, not liability."). For example, Defendant's *de minimis* defense and its

---

an attempt to conditionally certify a group of employees in various positions with various job duties. Id. at 8. The anomalous Basco case is not persuasive here because Plaintiffs have similar duties and similar reasons for working off-the-clock. See Underwood v. NMC Mortgage Corp., 245 F.R.D. 720, 723 (D. Kan. 2007) (declining to follow Basco where even though the plaintiffs worked in different locations with different managers at stores across the country, plaintiffs showed they performed the same job and were subject to the same policy regarding their work schedule); Allen v. McWane, Inc., 2:06-cv-158, 2006 WL 3246531, at * 3 (E.D. Tex. Nov. 7, 2006) (distinguishing Basco where the plaintiffs showed a uniform policy of not paying for donning and doffing protective gear across the country); Falcon, 580 F.Supp. 2d at 541 (distinguishing Basco and declining to decertify the class).

[32] See Frank, 2007 WL 2780504, at *4 (denying decertification where "Gold'n Plump exaggerates the factual differences among employees on various shifts and in different departments. If one zooms in close enough on anything, differences will abound; even for a single employee doing a single job, the amount of time that she spends donning and doffing on Monday will differ, at least minutely, from the amount of time that she spends donning and doffing on Tuesday. But plaintiffs' claims need to be considered at a higher level of abstraction."); Moss at 201 F.R.D. at 410 (denying decertification where Plaintiffs worked at multiple locations where "variations in the plaintiffs' duties, job locations and hourly billing rates do not differentiate the collective basis of the class to the extent that it defeats the primary objectives of a § 216(b) action.").

[33] Although the merits are not at issue on a motion for decertification, Defendant also dramatically overstates the viability of these defenses. If and when this motion is denied, Plaintiffs plan to move for summary judgment on many of Illinois Bell's purported defenses.

defense that some activities do not constitute compensable work are legal questions that are properly resolved on a class wide-basis.[34]  Frank, 2007 WL 2780504, at *4 (holding that the issue of whether donning and doffing is work and the issue of how much time is *de minimis* are legal issues that are properly resolved on a class-wide basis).  Defendant's statute of limitations defense is also not individualized.  See Moss, 201 F.R.D. at 411 (Denying decertification where "the statute of limitations will not be a particular defense raised against a specific plaintiff; rather it will be asserted against every member of the class.").  By the same token, Defendant's arguments that it is entitled to off-set premium pay against overtime owed, that certain work performed is not compensable under because it is "preliminary" under the Portal-to-Portal Act and that some of the employees performed personal tasks while their computers were booting up will be applied across the board and would not be efficiently pursued in decertified cases.[35]

Defendant also contends that it has a defense regarding whether Plaintiffs "unreasonably failed to avail themselves of curative steps provided by Defendant to be compensated for that work."  Def's Mem. at 19 (quoting Basco).  However, because Defendant had knowledge of Plaintiffs' off-the-clock work as a whole, it must compensate Plaintiffs for that work even if they did not make a special request for payment. See, e.g., Chao v. Gotham Registry, Inc., 514 F.3d

---

[34] Defendant's *de minimis* defense is not viable as a matter of law.  See Kasten v. Saint-Gobain Performance Plastics Corp., 556 F.Supp. 2d 941, 954 (W.D. Wis. 2008) ("To trigger the *de minimis* exception, an employer must show not merely that the time involved is minimal but that it would be difficult to measure the time in light of the realities of the industrial world.").  Here, where Defendant is capable for tracking each minute its employees work through its adherence policy, the *de minimis* defense is not available.  Incidentally, Defendant's defense that work performed during lunch periods and before and after scheduled tours does not constitute compensable work is inconsistent with Defendant's August, 2008 Code of Business Conduct, which says such work is compensable.  See Ex. 4 at 18.

[35] Defendant's argument that it did not violate the FLSA if some of the Plaintiffs did "personal tasks" while their computers were booting up is also not legally viable.  See e.g., Chao v. Akron Insulation and Supply, Inc., 184 Fed.Appx. 508, 511-12 (6th Cir. 2006) ("To the extent that employees were waiting at times during some mornings, and drinking coffee and socializing while they waited, the wait was for defendant's benefit and the time could not be utilized effectively by the employee, making it compensable.").  Defendant's Portal-to-Portal Act defense is also not legally viable. Under the Portal-to-Portal Act, work is compensable if it is "an integral and indispensible part of the employee's principal activities."  29 U.S.C. § 254; 29 C.F.R. 785.24.  Logging onto computer applications constitutes such work.  See e.g. Dooley v. Liberty Mut. Ins. Co., 307 F.Supp. 2d. 234, 243 (D. Mass. 2004) (checking email and returning phone calls from home was a principal activity).

280, 288 (2nd Cir. 2008) (holding that the employer's rule that employees must seek pre-approval before working overtime did not exempt the employer from FLSA liability when employees worked overtime without seeking pre-approval but with the employer's knowledge).

To the extent that some of Defendant's possible defenses may be individual to a particular Plaintiff (e.g., Defendant's argument that some of the off-the-clock work Plaintiffs' performed should be calculated as straight time rather than overtime), they largely involve the measure of damages and do not warrant decertification.  See Kasten, 556 F.Supp. 2d 941, 957 (refusing to decertify where the amount of damages would be individual to each plaintiff); Bradford, 184 F.Supp. 2d at 1351 (same).  Instead, there are two possible solutions to address these potential issues without requiring decertification.  First, the Court could bifurcate the trial into liability and damages stages, creating efficiency because the liability determination can be made once and applied to Plaintiffs as a group.  Second, the Court may utilize representative testimony, along with other evidence, including expert witness testimony, to try the case collectively.

Several courts have bifurcated FLSA cases into liability and damages stages in order to allow a case to proceed collectively while preserving the opportunity to make an individualized analysis of the damages due to each individual plaintiff.  See, e.g., Nerland, 564 F. Supp. 2d at 1025 (recommending bifurcation of a FLSA misclassification case); Thiessen, 267 F.3d at 1107 (stating that the employer's individualized defenses could be dealt with during the second stage of the trial in an ADEA case); Falcon, 580 F. Supp. 2d at 541 ("the Court is willing to consider bifurcating the liability and damages stages of the trial if it will be in the interest of judicial economy"); Wilks, 2006 WL 2821700, at *7 (stating that it would "consider a bifurcation of the case into a liability stage, where the parties could address the alleged existence of an

impermissible policy or practice, and a damages one, where they could … debate the impact of that policy or practice on individual plaintiffs"). If necessary, bifurcating the instant case will allow the Court to consider Defendant's illegal practices in the liability stage. The damages stage would then explore how these illegal practices affected each Plaintiff. See Frank, 2007 WL 2780504, at *4 (stating that although damages may vary, this does not diminish the presence of the employer's illegal practices).

Alternately, Plaintiffs' evidence allows for a collective trial without bifurcation. Courts managing FLSA cases routinely allow damages to be awarded on the basis of representative testimony. See, e.g., Martin v. Tony & Susan Alamo Found., 952 F.2d 1050, 1052 (8th Cir. 1992) (directing the district court to award back pay to the non-testifying plaintiffs based on representative testimony); Donovan v. New Floridian Hotel, Inc., 676 F.2d 468, 472 (11th Cir. 1982) ("[E]ach employee need not testify in order to make out a prima facie case of the number of hours worked as a matter of 'just and reasonable inference.'"); Falcon, 580 F. Supp. 2d at 540 (stating at decertification phase that, based on the record before the court, defendant's defenses could be raised adequately through the use of representative testimony); McLaughlin v. DialAmerica Mktg., Inc., 716 F. Supp. 812, 825 (D.N.J. 1989) ("Courts often permit FLSA collective actions to proceed on the basis of representative testimony when testimony is provided by a sufficient sample of the plaintiffs in a collective action.").

Plaintiffs' expert witness, Dr. Bardwell, will be available at trial to testify about the damages analysis he performed using Defendant's own records, to determine the amount of time Plaintiffs worked off-the-clock for Defendant without compensation.[36] See, e.g., Reich v. Waldbaum, Inc., 833 F. Supp. 1037, 1048-49 (S.D.N.Y. 1993) (finding that the Department of Labor's computer specialist had formulated a "reasonable" damages calculation when he

---

[36] Plaintiffs' expert reports are Exhibits 41 and 42.

calculated the hours worked by non-testifying employees based on the employer's records); McLaughlin, 716 F. Supp. at 816, 825-26 (awarding damages to non-testifying plaintiffs in FLSA suit based in part on the testimony of the compliance specialist who had developed "a computerized summary of all the available data" including the employer's business records). As the court stated in Bell v. Farmers Insurance Exchange in the context of suit for unpaid wages under California law: "'statistical sampling does not dispense with proof of damages but rather offers a different method of proof, substituting inference from membership in a class for an individual employee's testimony of hours worked for inadequate compensation." 9 Cal. Rptr. 3d 544, 574 (Cal. Ct. App. 2004). Here, Plaintiffs' damages can be fairly and efficiently calculated using Dr. Bardwell's damage calculations, which are based on the employment records of a sampling of Plaintiffs. Just as in McLaughlin, the expert's testimony "constitutes 'substantial other evidence' based upon which this Court may reasonably infer FLSA violations and award damages to non-testifying employees." 716 F. Supp. at 826.

Representative testimony is an appropriate case management tool here. Unlike in Proctor v. Allsups Convenience Stores, Inc., 250 F.R.D. 278, 284 (N.D. Tex. 2008), Plaintiffs have shown similar employment settings and have alleged a common policy or plan that lead them to perform off-the-clock work. Since Plaintiffs' testimony is sufficiently uniform and their FLSA allegations stem from Defendant's unlawful policies or practices, representative testimony is an appropriate mechanism to determine Defendant's liability and the damages due to Plaintiffs.

## IV. FAIRNESS AND PROCEDURAL CONCERNS FAVOR TRYING THIS CASE COLLECTIVELY.

"Even where factors (1) and (2) weigh in favor of decertification of a provisionally certified class, the district court must balance those factors with the fundamental purpose of 29 U.S.C. § 216(b): (1) lower costs to the plaintiffs through the pooling of resources; and (2) to

limit the controversy to one proceeding which efficiently resolves common issues of law and fact arising from the same alleged activity." Kautsch v. Premier Comm., No. 06-cv-04035-NKL, 2008 WL 294271, at *2 (W.D. Mo. Jan. 31, 2008) (citing Moss v. Crawford & Co., 201 F.R.D. 398, 410 (W.D. Pa. 2000) (internal quotations omitted)).

"When Congress enacted the FLSA, it intended it to be broadly remedial and humanitarian." Crawford v. Lexington-Fayette Urban County Gov't, No. 06-299-JBC, 2008 WL 2885230, at *11 (E.D. Ky. July 22, 2008) (citing Dunlop v. Carriage Carpet Co., 548 F.2d 139 (6th Cir. 1997)); See Falcon, 580 F. Supp. 2d at 539 (rejecting a defendant's fairness argument where "[d]ecertifying this class would be contrary to both of the purposes of Section 216 of the FLSA.") If the present action is pursued collectively, all Plaintiffs, and the Court system, will benefit. For Plaintiffs, this collective action affords them "the advantage of lower individual costs to vindicate rights by pooling of resources." Hoffman-La Roche Inc., 493 U.S. at 170. Likewise, without the ability to pool their resources, it is highly unlikely that many of the Plaintiffs in this case will be able to afford the costs of pursuing their claims on their own. See, e.g., Nerland, 564 F. Supp. 2d at 1026 (stating that the right of the defendant to defend against individualized claims on an individual basis must be balanced against the plaintiffs' rights to have their day in court); Pendlebury, 518 F.Supp. 2d at 1363 ("If decertification were granted, the federal court system potentially would have hundreds of individual lawsuits all dealing with the same issue. Defendant's suggestion that few Plaintiffs would refill is the precise reason Congress authorized class action treatment for these types of cases.")

Allowing the present action to proceed collectively saves time and resources. Discovery has been conducted on a representative basis. See Dkt. 163 (Order authorizing Defendant to take depositions of 7% of the Plaintiffs). Both parties' expert report have already been drafted

24

analyzing Defendant's data. If this case were decertified, this evidence would need to be considered in each individual trial. This would be an inefficient use of the parties' and the Court's time and resources because this case can be efficiently and fairly tried through bifurcation or using representative testimony. Just as in Wilks, "[b]ecause the plaintiffs' assertions about the defendant's purportedly improper time-keeping and pay practices play a predominant role in each of their claims, any requirement that each plaintiff prove his or her claims individually would waste more judicial time and resources than trying their cases individually would preserve." 2006 WL 2821700, at *8.

Although the FLSA's remedial nature alone does not justify denying Defendant's motion for decertification, "it does at least suggest that a close call as to whether plaintiffs are similarly situated should be resolved in favor of certification." Crawford, 2008 WL 2885230, at *11 (quoting Falcon, 580 F. Supp. 2d at 541). Balancing Plaintiffs' factual similarities, the Congressional purpose behind the FLSA, the economic expenses of trial, and the Court's time necessitates denying Defendant's motion for decertification.

## CONCLUSION

All of the factors balanced on decertification militate strongly in favor of trying this case as a collective action. As a result, the only practical and fair conclusion is that this case should proceed on a collective basis. Decertifying this case would be a significant waste of judicial resources, requiring the repeated presentation of the same evidence, all to determine the same issue of whether Defendant unlawfully failed to compensate Plaintiffs for all of their work time in violation of the FLSA. Such a result is "antithetical to the policy behind collective actions." See Kautsch, 2008 WL 294271, at *4. Given all of the relevant evidence and legal authority against decertification, Defendant's motion must be denied.

Dated: February 26, 2010                    NICHOLS KASTER, PLLP


                                            By: */s/David E. Schlesinger*
                                            James H. Kaster MN Bar #53946
                                            David E. Schlesinger MN Bar #0387009
                                            Megan I. Brennan MN Bar #0386550
                                            4600 IDS Center
                                            80 South Eighth Street
                                            Minneapolis, Minnesota 55402
                                            Telephone: (612) 256-3200
                                            Facsimile: (612) 338-4878

                                            DOUGLAS M. WERMAN (ARDC #6204740)
                                            WERMAN LAW OFFICE, P.C.
                                            77 W. Washington, Suite 1402
                                            Chicago, Illinois 60602
                                            Telephone:  (312) 419-1008
                                            Fax:  (312) 419-1025

                                            ATTORNEYS FOR PLAINTIFFS


## CERTIFICATE OF SERVICE

I, David E. Schlesinger, an attorney, do hereby affirm under oath that service of Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Decertify was accomplished pursuant to the Electronic Case Filing on this 26th day of February, 2010.

                                            */s/David E. Schlesinger*

Subscribed and sworn to before me
this 26th day of February, 2010.

*/s/Teresa Drexler*
 Notary Public - Minnesota

My Commission Expires January 31, 2012