Rebuttal Report on the Estimate of Unpaid Work at Illinois Bell Telephone
between April 1, 2005 April 1, 2008

in Re: Constemecka Russell
vs. Illinois Bell Telephone Company
In the United States District Court, Northern District of Illinois
08CV1871

Prepared for
Nichols Kaster, PLLP

4600 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
612-256-3288 direct
612-338-4878 fax
877-448-0492 main

Robert A. Bardwell, Ph. D.
Bardwell Consulting
4801 W. Yale Ave.
Denver, Colorado 80219
(303) 934-3851
October 8, 2009



EXHIBIT
42

# Table of Contents

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

1. Introduction and Summary of Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    Context of the Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    Summary of Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

2. Detailed Analysis Method: Calculation of Unpaid Work Hours . . . . . . . . . . . . . . . . . . 4
    Recording Unpaid Work Hours by Activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Estimate of Unpaid Hours . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Data Deficiencies Hide Additional Unpaid Hours . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Gaps in Data May Hide Additional Unpaid Hours . . . . . . . . . . . . . . . . . . . . . . . . . . 5

3. Response to Claims Made by Dr. Lamoreaux . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    Errors Resulted From Deficient Time Zone Data Production . . . . . . . . . . . . . . . 6
    Correction of Multiple-Count Errors Result in Minute Reduction in Estimate . . . . . . . . 7
    Continuing Deficiencies in Production of Total View Code Data Cause Inaccuracies . . . 7
    Excluded Opt-Ins . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Time Limitations On Participation In Lawsuit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Dropping All Data Without an ATTUID . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Alleged Assumptions and their Impact on the Analysis . . . . . . . . . . . . . . . . . . . . . . 8

4. Dr. Lamoreaux' "Alternate Analysis" Contradicts Defendant's Records . . . . . . . . . . . . . 9
    Dr. Lamoreaux Excludes Level 2 Unpaid Hours . . . . . . . . . . . . . . . . . . . . . . . . . . 10
        Table 1: Average Unpaid Work Minutes / Day . . . . . . . . . . . . . . . . . . . . . . . . . 10
        Detailed Analysis vs. Lamoreaux "Alternate Analysis" . . . . . . . . . . . . . . . . . . . 10
    Misleading Claim that Average is More Accurate than Precise Enumeration . . . . . . . . 10
    Dr. Lamoreaux' "Alternate Analysis" Identifies Additional Unpaid Work Time . . . . . . 11
    Detailed Method and Alternate Analysis Consolidated . . . . . . . . . . . . . . . . . . . . . . 12
        Table 2: Total Unpaid Work Hours By Combined Detailed + Alternate Analysis
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    Rounding of Times Deprives Plaintiffs of Hours Worked . . . . . . . . . . . . . . . . . . . . 13
    Additional Unpaid Hours from Initial Log In . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
        Table 3: Additional Unpaid Hours for Initial Computer Login . . . . . . . . . . . . . . 14
    Damages Computed from Consolidated Analysis, Rounding and Initial Log In . . . . . . . 14

6. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

7. Data Sources and Documents Reviewed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    Data and Documentation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

8. Consultant Background and Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Attachment 1: Activity Codes by Paid/Unpaid . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Attachment 2: Unpaid Time Due to Rounding ..................................... 18

Attachment 3: Frequency of RAC-F Server Codes .................................... 19

Attachment 4: Curriculum Vitae ............................................... 20

©Bardwell Consulting 2009

# 1. Introduction and Summary of Findings

This report presents my revised estimate of unpaid work time by plaintiff and opt-in plaintiffs while employees of Illinois Bell Telephone Company between April 1, 2004 and April 1, 2008. The estimate of unpaid work time uses the method from my preliminary report submitted on August 5, 2009, modified in response to defendant's production of additional information. The estimation methodology provided in this report is sufficient to provide an accurate accounting of unpaid work time, and is appropriate for estimation of damages.

I also address questions raised by Dr. David Lamoreaux in his *Report in the Matter of Constemecka Russell, et al.* v. *Illinois Bell Telephone Company* dated September 21, 2009 ("Lamoreaux Report"). I demonstrate that the majority of the criticisms of my method made by Dr. Lamoreaux originated from deficient data production by defendant. Dr. Lamoreaux adopts my methodology for computing unpaid work time. I also demonstrate that Dr. Lamoreaux' "alternate" analysis yields inaccurate results. Analyses in this report incorporate all justified corrections to my methodology suggested by Dr. Lamoreaux.

Section 1 contains background information on the context of the analysis and a Summary of Findings. Section 2 explains the procedure used to determine the number of unpaid work hours used in both my reports and adopted by Dr. Lamoreaux. Section 3 addresses Dr. Lamoreaux' criticisms of my analysis and Section 4 demonstrates that Dr. Lamoreaux' "Alternate Analysis" contradicts defendant's records. Section 5 presents the results my revised analyses. Section 6 contains a brief conclusion. Section 7 lists the sources of data used in this report and Section 8 addresses my qualifications and compensation.

## Context of the Analysis

This case is a collective action brought under the Fair Labor Standards Act of 1938,[1] to recover unpaid overtime compensation claimed by plaintiff and potential class members. Plaintiff Consetemecka Russell was an employee at Illinois Bell Telephone Company at Arlington Heights, Illinois from June 6, 2006 through February 15, 2008.[2] This report provides a preliminary estimate of the number of unpaid hours plaintiff and opt-in plaintiffs worked during the study period, April 1, 2004 through April 1, 2008.

The proposed class includes all "similarly situated individuals who were, or are, employed by defendant in customer service, sales, and similar positions in defendant's call centers who were not paid for some or all of their preliminary and postliminary work activities and/or were not provided the meal and rest breaks to which they are entitled."[3] Plaintiff further claims that defendant did not pay employees for time to log into their computers and were denied appropriate breaks due to work load.

---

[1] 29 U.S.C. §§ 201 – 219.

[2] This reflects the maximum date range in Plaintiff's employee data provided by Defendant, so Plaintiff's employment may have extended beyond this period.

[3] *Collective Action and Complaint*, page 2.

©Bardwell Consulting 2009

Defendant failed to provide useable records for almost one-quarter of the opt-in plaintiffs, and provided data with known significant gaps for those employees for whom they did provide data. In addition, the data exhibits inconsistencies that indicate many records may be missing, creating gaps throughout the provided data. These gaps would likely contribute to an underestimate of unpaid work. The nature of these data and of the analysis used to identify unpaid work hours means that each gap in the data prevents our discovering additional periods of unpaid work. This report may be revised or augmented if defendants cure the deficiencies in their data production.

### Summary of Findings

In summary, the method and results presented in this report are sufficient to provide an accurate accounting of unpaid work time, and are appropriate for estimation of damages. The principal results are:++[not finished]

- My method was he method was and continues to be based on all available data produced by defendant. All material corrections required to my original analysis are the result of gaps or errors in defendant's data production at the time my first report was authored.

- The estimate of unpaid work hours from defendant's data range from ++.

- Additional unpaid hours may be lost from the analysis due to defects in defendant's data. These hours are estimated at over ++ additional unpaid hours.


## 2. Detailed Analysis Method: Calculation of Unpaid Work Hours

### Recording Unpaid Work Hours by Activity

Activities of employees at Illinois Bell are tracked by the Total View computerized time-tracking system. In addition to the advanced scheduling, and tracking of actual daily activities provided by Total View, the activities of employees of Illinois Bell are monitored and recorded by several additional computer systems. Employees are required to log into and out of several different data and security systems before and after work, and before and after scheduled breaks and other company activities. When available, these databases provided a detailed record of the movements and activities of employees.

The analysis method used in my initial report, which I will call the Detailed Analysis Method, utilizes databases from these programs provided by defendant. This same analytic method is used in this report and in Dr. Lamoreaux' report. In the Detailed Analysis Method the time records produced by defendant are examined to identify periods during which employees were at the work place and engaged in some recorded activity. For each of these periods, I determine wether the employee was being paid for that duration. I developed a computer program that scans through the the over eight million employee time records minute by minute and tabulates unpaid periods by activity. This technique allows the computation of the total unpaid hours for each activity.

**Estimate of Unpaid Hours**

The method described above was applied to all data provided by defendants for the analyses in my original report, and applied with revisions in this report. The method accumulates unpaid gaps in 65 separate counters for each of the 397 employees with adequate data. The gaps are separated into two Levels: Level 1 for those that were most likely to be associated with unpaid work, and Level 2 those less likely.

Gaps are grouped by the type of event that started the gap. For example, all gaps with a TCS Login event are added together. Under the assumption that TCS Login events are likely to be associated with an employee starting work, the value for the counter is included in the Level 1 hours, those most likely to contribute to unpaid work totals. An example of unpaid hours included in Level 2 are periods that either begin or end with a Door Badge Swipe event. These periods are totaled together in Level 2 since they may be less definitely associated with unpaid work.

**Data Deficiencies Hide Additional Unpaid Hours**

Gaps in data may represent additional hours of unpaid work time. Defendant provided data with 509 employee identification numbers for the opt-in plaintiffs. From these 509 opt-in plaintiffs they provided time records for only 414 employees. Of these employees 18 had inadequate or defective Total View records, preventing an analysis for those employees. Therefore, approximately one-forth of the opt-in plaintiffs could not be included in the analysis because of deficiencies in defendant's data production.

Of the remaining 397 employees, records for most included gaps in one or more of the databases which are all required for a complete employee history. For example, the plaintiff's records started on June 6, 2006, and ended on February 15, 2008. However, plaintiff's Total View records were missing until August 23, 2006. Therefore the first six weeks could not be included in the analysis because of missing Total View records.

**Gaps in Data May Hide Additional Unpaid Hours**

In addition to data omissions that can be identified because of gaps in the data provided, there maybe an unknown number of additional missing records which would likewise be associated with unpaid hours. For example, the plaintiff regularly arrived at work early and logged on to her computer before her first Total View record indicating paid work time. However, for many days in the records provided by defendant, no login record is recorded at all. This may indicate that login records were inconsistently recorded or provided to plaintiffs.

Every day that the plaintiff logs in early to her computer, but the event was not provided to us by defendant, additional unpaid work time would be lost to our analysis. There are significant inconsistencies in all of the databases delivered except for perhaps the Total View database. This indicates that there may be substantial unpaid work time that is not included in our analysis because of deficiencies in defendant's data production. These missing hours could be included in our analysis if defendant would provide a more complete database. Alternatively, I propose using a model of typical days to infer significant gaps, which would provide a corrected estimate of total unpaid work hours. This analysis may be produced in a subsequent report if defendant fails to

augment their data.

## 3. Response to Claims Made by Dr. Lamoreaux

In his report critiquing my preliminary analysis, Dr. Lamoreaux offers three general types of criticism:

1.  The estimate of unpaid hours presented in my preliminary report was adjusted by me at or shortly before my deposition;

2.  There were additional computational errors in my preliminary analysis; and

3.  My analysis is based on the incomplete data provided by defendant's counsel.

In response to these criticisms I offer the following:

1.  I adjusted my preliminary analysis long before my deposition. All documentation relating to those revisions were produced to defendant on August 18, 2009, shortly after production of my initial report on August 5, 2009.

2.  All computational errors such as multiple-counting of unpaid periods have been addressed and all findings presented in this report reflect those revisions.

3.  Defendant's deficient data production was the most significant factor affecting the accuracy of my initial analysis. I discuss examples of incomplete, delayed, and inconsistent production below.

**Errors Resulted From Deficient Time Zone Data Production**

Dr. Lamoreaux claims I, "improperly assumed that all of the time stamp data were synchronized and failed to make necessary time zone adjustments for 758,186 records."[4]

This error was clearly the result of either incorrect or deficient data production. Defendant provided over 8 million records whose most critical element was a time stamp and failed to notify plaintiff that these time stamps were inconsistently recorded. Apparently, Dr. Lamoreaux had additional communication with defendant that he incorporated into his program:

*   "I was informed that the WOW time stamps reflect Pacific Standard Time."[5]

*   "In order to identify the correct time zone for each server log-in, I was provided a chart that

---

[4]Lamoreaux Report, p. i.

[5]Lamoreaux Report, p. 8.

showed the time zone for each of the servers."[6]

Defendant's counsel and Dr. Lamoreaux misleadingly imply I should have known these time stamps were inconsistent. He writes, "In an April 27, 2009 letter to plaintiffs' counsel, Illinois Bell's counsel provided details about the RAC-F data fields. The letter specifically indicated that one of the variables in the RAC-F data could be used to identify the geographic location of the server (which was 'not necessarily the location of the user')."[7] In fact, defendant's communication on the RAC-F data provided an incomplete, misleading account of the time zone issue.

In her email dated April 27, 2009, defendant's counsel writes of the RAC-F server codes, "The first character typically indicates the geographic location of the server." As is clearly demonstrated in the table of RAC-F server codes and their frequency in defendant's databases presented in Attachment 7, codes with the same first character are often located in different time zones. This deficiency in defendant's data production resulted in thousands of employee records for which the time zone could not be identified.

Only after my deposition did defendant produce adequate information embedded in Dr. Lamoreaux' computation to permit us to make the defendant's data consistent. By reverse-engineering his program, I was able to determine the proper recoding of the time zones. Therefore, Dr. Lamoreaux' claims that my methodology was improper are erroneous. Defendant's data production was improper and was the sole cause for these errors. The findings I present in this report are fully adjusted for differences in time zone among computer servers.

### Correction of Multiple-Count Errors Result in Minute Reduction in Estimate

Dr. Lamoreaux claims my analysis, "double-counts and triple-counts (or more) thousands of alleged unpaid work time intervals."[8] Dr. Lamoreaux discovered a minor programming error that was corrected in all findings presented in this report. As noted by Dr. Lamoreaux, this correction resulted in a reduction of 667 hours or less than three tenths of one percent in the estimate of unpaid work hours.[9]

### Continuing Deficiencies in Production of Total View Code Data Cause Inaccuracies

Dr. Lamoreaux claims I, "assumed that rest breaks are unpaid, when in fact, rest breaks are paid. Moreover, Dr. Bardwell's methodology of calculating alleged unpaid time is prone to errors when an employee does not take their scheduled lunch break or rest breaks exactly when scheduled." Although I have repeatedly requested a definitive tabulation of which Total View Activity Codes represent paid time and which do not, defendant has failed to produce this information. Defendant provided an incomplete record of paid versus unpaid classification subsequent to Dr. Lamoreaux'

---

[6]Lamoreaux Report, p. 11.

[7]Lamoreaux Report, p. 9.

[8]Lamoreaux Report, p. i.

[9]Lamoreaux Report, p. i.

report from which I inferred that some of my original classifications were incorrect.[10] A list of the Total View Activity codes and my revised classifications for them appear in Attachment 1. Defendant's deficient data production is the cause of the misclassification of time coded "Break" and all related errors. The findings presented in this report have been adjusted to reflect my revised classifications of Total View Activity codes based on additional, though inadequate, data produced by defendant.

**Excluded Opt-Ins**

According to Dr. Lamoreaux, "...eight of the opt-ins included in Dr. Bardwell's analyses have been dismissed from the lawsuit."[11] The analysis used to generate all findings in this report excludes opt-ins dismissed from the lawsuit.

**Time Limitations On Participation In Lawsuit**

Dr. Lamoreaux writes that my report, "does not take into account the relevant limitations period for each individual, calculated from the date he or she filed a consent form to participate in the lawsuit."[12] Although I take no position regarding FLSA time limitations on individuals' participation in this lawsuit, I have developed additional programming to assist the court in adjusting my findings for both two and three-year limits. Results in this report are presented with those limits where appropriate.

**Dropping All Data Without an ATTUID**

In his report, Dr. Lamoreaux claims I, "included records from the Total View, WOW, TCS and RAC-F systems in which the employee number (ATTUID) was missing. By doing so, Dr. Bardwell effectively assumed that all of those data records were related to the same unidentified person."[13] Eliminating these records would reduce the estimate of unpaid work time by 0.1 percent.

**Alleged Assumptions and their Impact on the Analysis**

Dr. Lamoreaux attributes to me in his report a number of assumptions that I did not make. He claims:[14]

Dr. Bardwell's methodology assumes all of the following, which may not be factually accurate: 1) he assumes that the computer data is reliable and complete for those time periods

---

[10]In her email dated October 7, 2009, Defendant's Counsel Leslie Dent indicates Dr. Lamoreaux used the document *IEX TotalView Exception Codes.doc* to determine which TotalView activities are paid and which are not. However, this document provides only a partial explanation. For instance, there is no indication in the document of whether the code "Leave of Absence" represents paid or unpaid leave.

[11]Lamoreaux Report, p. 17.

[12]Lamoreaux Report, p. 18.

[13]Lamoreaux Report, p. 17.

[14]Lamoraux Report, p. 1.

in which such data is available;

This is incorrect. I state in my initial report that there significant gaps in the data provided by defendant. I also tabulated an estimate of the additional unpaid hours that we could not include in our analysis because of this missing data.

2) he assumes that the data is sufficient to generate a reliable and accurate extrapolation for periods in which data is missing;

This misrepresents my estimation of the impact of missing data. I use the available data to estimate the impact of missing data, but do not opine regarding the reliability or accuracy of those estimations. However, any defects in extrapolation resulting from Defendant's failures to produce complete and accurate data will inevitably result in underestimation of unpaid hours. It is inappropriate to accept a reduction in the estimate of unpaid hours simply because Defendant's data production was deficient. Though the total number of unpaid hours must be extrapolated from the limited data produced, we know that the estimate will be more reliable and more accurate than accepting a known under estimate generated by ignoring missing data.

3) he assumes that any computer activity is compensable (payable) and continuous work activity under the FLSA; 4) even if the computer activity were considered compensable under the FLSA, he assumes that Illinois Bell was aware of these activities; and 5) he assumes that his measures of alleged "unpaid" activity exceed what would be considered "de minimis" under the FLSA.

I make no assumptions regarding the FLSA or compensability. I classify work time coded by Defendant's records as computer activity as Level 1, activity most likely associated with unpaid work time.

## 4. Dr. Lamoreaux' "Alternate Analysis" Contradicts Defendant's Records

In Section 4 of his report, Dr. Lamoreaux abandons the methodology of the rest of his analyses, and presents an, "Alternate Estimate of Alleged Time." In this section Dr. Lamoreaux makes critical changes without stating them clearly, contradicting the analysis that he used in other parts of his report.

In addition, Dr. Lamoreaux achieves the mathematically impossible: making the average multiplied by the number of occurrences not equal to the total. In his "Alternate Analysis," Dr. Lamoreaux uses the same method that he and I both adopted to compute the average unpaid time per day for an employee. He then multiplies that average by the number of days worked by that employee. However, he derives a very different estimate of total unpaid time by the employee than he did previously, using the same method he used to compute the average! This is a mathematical contradiction sufficient to discredit this section in Dr. Lamoreaux' report.

**Dr. Lamoreaux Excludes Level 2 Unpaid Hours**

In his "Alternate Analysis" Dr. Lamoreaux also discreetly makes a critical change that makes this section inconsistent with the rest of his report and my own. He reports unpaid time *only for Level 1*, relegating to a footnote the fact that he has eliminated all Level 2 unpaid time. Dr. Lamoreaux reports Level 2 hours in all previous sections so that all previous tabulations of total unpaid time would equal the sum of Level 1 and Level 2 unpaid hours.

In this section Dr. Lamoreaux misleadingly switches to reporting only Level 1 time as the total unpaid hours. This can be seen in his adoption of approximately four minutes as the average unpaid work time ( 4:08 to 4:20). This reflects only the average Level 1 unpaid work time per day. The average Level 2 unpaid work time is approximately 9 minutes (Table 1) so that the average total unpaid work time using Dr. Lamoreaux' "Alternate Analysis" would be approximately 10 minutes per day *less than used in his other analyses.*

| Table 1: Average Unpaid Work Minutes / Day Detailed Analysis vs. Lamoreaux "Alternate Analysis" | | | |
|---|---|---|---|
| **Method** | **Level** | | **Total** |
| | **1** | **2** | |
| **Detailed Analysis** | 5.13 | 9 | 14.04 |
| **Lamoreaux "Alternate Analysis"** | 4.08 | 0 | 4.08 |
| **Deficiency** | (1.05) | (9) | (9.96) |

**Misleading Claim that Average is More Accurate than Precise Enumeration**

Dr. Lamoreaux' discreet elimination of Level 2 hours has a large impact. In contrast, his second change is actually not a change at all, though he leads us to believe it is a significant improvement in method. He implies that switching to an average will improve accuracy, and states that it "would be more appropriate, however, to compute an employee-specific average amount of alleged time by calculating a unique estimate for each of the opt-ins in the data based on each individual's specific records."[15]

This seems to imply that both of our analyses used a generic, non-individual, average time, and thereby suffered some imprecision. On the contrary, *each of our analyses counted unpaid minutes*

---

[15] Lamoreaux Report, page 27

*individually for every person from records that were maintained individually for every person.* None of our analyses were based on the application of an average. I arrived at my results by meticulously counting the seconds of unpaid work time for each individual in every day worked in over eight million records.

Dr. Lamoreaux' insinuation that he will improve on our results by using "employee-specific" average is misleading on at least two accounts:

1.     If he uses consistent records to compute the employee-specific average, and consistent records to determine the number of days the employee worked, he would arrive at precisely the same number of unpaid hours calculated by both him and me using the method I developed. This is a mathematical fact necessitated by the very definition of average: Average x Number = Total. This follows because Average = Total / Number. In his analysis the average is the average unpaid time per day. The number of occurrences is the number of days worked and the total is the total unpaid work time.

2.     Dr. Lamoreaux' claim that he could improve our counting of unpaid minutes by extrapolating from an average also contradicts fundamental statistics. Statistical theory, and in fact common sense tell us that extrapolations based on an average have a margin of error that results from variations in the universe being counted than a simple average cannot incorporate. Only in the degenerate case described above would an extrapolation from an average be as accurate as, and in fact equal to, the total resulting from summing every instance individually.

**Dr. Lamoreaux' "Alternate Analysis" Identifies Additional Unpaid Work Time**

Dr. Lamoreaux states that his "Alternate Analysis" computes averages by, "[c]alculating individual averages using Dr. Bardwell's methodology".[16] Combined with the facts above, it is apparent that if Dr. Lamoreaux employs the same method he previously used to compute the average unpaid work time per day he should arrive at the same total unpaid hours. Multiplying the average by each employee's record of days worked from their employment history should result in the same estimate of unpaid hours as were derived from the minute by minute records of the employees activities on the job.

## 5.  Revised and Consolidated Estimate of Unpaid Hours

This section provides a corrected estimate of unpaid hours and damages, combining the two analysis methods: the method used in my original report and adopted by Dr. Lamoreaux, and Dr. Lamoreaux' "Alternate Analysis." The combination of the two methods combines the advantages of both: accuracy from the first, and completeness for the second. I preserve wherever available the accuracy of the first method, which is the result of detailed enumeration of minutes of unpaid work time. From the second method I use estimates of unpaid hours for employees that are missing from the

---

[16]Lamoreaux Report, page 27

detailed enumeration because of gaps in defendant's data.

**Detailed Method and Alternate Analysis Consolidated**

Any discrepancies between Dr. Lamoreaux' "Alternate Analysis" and the analysis the he and I used elsewhere in our reports must indicate *unpaid hours missed by one of these methods.* For example, we know that every unpaid hour counted in the method that Dr. Lamoreaux and I used is time the employee was engaged in activities while at work, documented by defendant's Total View and other computer systems. We know that there are gaps in the computer records used in that analysis so it is inevitable that there are unpaid hours which are not recorded by identified by that method.

Except for minor exceptions claimed by Dr. Lamoreaux, *every hour counted by that method must be accounted for because it is the result of records documenting specific employee actions and activities at work.* Each hour can be identified as unpaid or paid, but it must be accounted for. No "Alternate Analysis" can possibly erase these hours.

Likewise, Dr. Lamoreaux' "Alternate Analysis," which multiplies average unpaid work time per day by days worked, though it cannot contradict unpaid hours demonstrated by the Total View analysis, can legitimately add unpaid hours missed by the Total View analysis. For example, records for the plaintiff were missing several months of Total View records, thereby necessarily lowering the Total View estimate of unpaid hours. This period of missing data could appropriately be filled by Dr. Lamoreaux' alternative method which would estimate unpaid hours for that period from the remainder of the plaintiff's records.

In addition, the records produced by the defendant failed to include approximately 100 opt-in plaintiffs. The Total View records of unpaid hours could not include these plaintiffs. Dr. Lamoreaux claims that he corrected this omission by applying the average unpaid hours computed for employees with data, to those for whom data was missing. Each of these examples suggest a method for constructing a complete record of unpaid hours combining Dr. Lamoreaux' Alternate method with our original Detailed Total View method.

The results of this combined Detailed/Alternate method are summarized in Table 2, 3 below. The total number of unpaid work hours calculated by this method is 50,428 and 55,866 using two and three-year limits on participation in the lawsuit, respectively.

©Bardwell Consulting 2009

| Table 2: Total Unpaid Work Hours By Combined Detailed + Alternate Analysis | | | |
|---|---|---|---|
| **Method** | **Level** | | **Total** |
| | **1** | **2** | |
| **2-Year Limit** | | | |
| Detailed Analysis | 18,794 | 29,696 | 48,490 |
| Hybrid Detailed/Alternate Analysis | 19,348 | 31,080 | 50,428 |
| **3-Year Limit** | | | |
| Detailed Analysis | 18,826 | 32,744 | 51,570 |
| Hybrid Detailed/Alternate Analysis | 21,586 | 34,280 | 55,866 |

**Rounding of Times Deprives Plaintiffs of Hours Worked**

Departure times of employees were rounded. When an employee left prior to eight minutes after the hour, half hour or quarter hour, the time was rounded down to the nearest quarter hour. If the employee left eight minutes or more after the quarter hour, the time was rounded up to the quarter hour. This practice would necessarily disadvantage employees, since scheduled departure times would usually be on the hour, half hour or quarter hour.

Since departure rates would be decreasing after the scheduled departure time, more employees will have their time rounded down than up. That is, more employees are leaving the workplace closer to the end of a shift than at later periods. For this reason more employees will find their time being rounded down – because they leave prior to the cutoff time – than will find their time being rounded up. The effect, in the aggregate, will be to deprive employees of recorded work time.

I analyzed this effect by comparing the scheduled and actual departure times for employees. The scheduled time is used to determine payroll so the effect of rounding could easily be ascertained. If the employee's time was rounded down, the scheduled time would reflect zero minutes, whereas the actual time would reflect between zero and seven minutes, fifty-nine seconds. If the arrival time was rounded up, then scheduled time would reflect fifteen minutes, while the actual time would reflect between 8 and 15 minutes.

The results of this analysis are shown in Attachment 6 below. Although some employees benefitted from rounding, the net result of rounding was over 4,700 unpaid work hours. There are at most 3,806 hours of time recorded in the Detailed Analysis between the last computer activity and a badge swipe, though many of these hours did not occur at the end of the day. Total View records are often

the last record of the day. Therefore there are up to 4,715 hours of additional Level 1 hours, at least 900 of which are not moved up from Level 2 hours.

**Additional Unpaid Hours from Initial Log In**

Opt-in plaintiffs report 10 to 15 minutes of time is spent each morning logging in to their computer systems. This time could be recorded in part as gaps between door badge swipes and computer login events, or, if no door event is present, only part of this time will be recorded, starting at the first computer event.

In the first case, part of the time will be logged by the Detailed Analysis as a Level 2 Door-to-Computer event, and part will be logged as a Level 1 Computer-to-Computer event. In the second case, only part of the time will be logged as a Level 1 Computer-to-Computer event. In this case, the remainder will not have been recorded by any data records and must be estimated. Table 3 records the range of additional Level 1 and Level 2 unpaid work hours estimated for this initial computer login.

| Table 3: Additional Unpaid Hours for Initial Computer Login | | | | | |
|---|---|---|---|---|---|
| **Source** | **Days** | **Login Time Minutes** | **Total Login Hours** | **New Level 1 Hours** | **Level 2 to Level 1 Hours** |
| **10 Minute Login** | 177,428 | 10 | 29,571 | 10,350 | 4,436 |
| **15 Minute Login** | 177,428 | 15 | 44,357 | 15,525 | 6,654 |

**Damages Computed from Consolidated Analysis, Rounding and Initial Log In**

Damages are calculated from the above estimates of unpaid hours, combined with payroll records from which average hourly pay rates were computed for each employee during each relevant pay period. Damages are computed for two and three year limits, and applied at the rate of one and one-half the standard hourly rate for hours over 40 hours per week. The results are recorded in Table 4.

# 6. Conclusion

In summary, the method and results presented in this report are sufficient to provide an accurate accounting of unpaid work time, and are appropriate for estimation of damages. The method is based on all available data produced by defendant, and is shown to be consistent with defendant's pay records.

# 7. Data Sources and Documents Reviewed

This report may be revised and a supplemental report submitted if additional information is provided. I have used the following information in this analysis:

**Data and Documentation**

1. Badge swipe data for Ms. Russell, the named plaintiff: [R-NKA0029016]: records access to the building by swiping a Prox-Key badge.
2. Available badge swipe data for the select opt-in plaintiffs: [R-0NKA0030881-R-NKA003088].
3. Total View data for Ms. Russell: [R-NKA0030886] Provides Scheduled and Actual periods (including beginning, ending and duration times) with Activity Codes.
4. Total View data for select opt-in plaintiffs: [R-NKA0031253].
5. WOW login/logout data for Ms. Russell [R-NKA033829] Computer application login/logout records.
6. WOW login/logout data for select opt-in plaintiffs: [R-NKA0031254-R-NKA0031255 and R-NKA0033829].
7. TCS login/logout data: [R-NKA0031254-R-NKA0031255 and R-NKA0033829] Computer application login/logout records.
8. RAC-F data for Ms. Russell: [R-NKA0030885]: RAC-F provides security services for the network server system, recording access to applications requiring a password.
9. RAC-F data for select opt-in plaintiffs: [R-NKA0030885,R-NKA0034932-R-NKA0034957].
10. Employee payroll history
11. Letter from David E. Schlesinger to Andy Bardwell, May 1, 2009.
12. Letter from William C. Barker at Paul Hastings to David E. Schlesinger at Nichols Kaster, January 29, 2009: RAC-F data description.
13. Letter from Leslie Dent at Paul Hastings to David Schlesinger at Nichols Kaster, April 27, 2009.
14. Letter from Erika Patrick at Paul Hastings to David Schlesinger at Nichols Kaster, July 13, 2009.
15. Supplemental Total View data for Geraldine Jacoby GJ2623, Tramere Millbrook TM3631, Terri Clair TC2348, and Helen Patten HJ1352.
16. Letter from Erika Patrick at Paul Hastings, June 12, 2009 describing data columns.
17. Collective Action Complaint.

18. Depositions of Barbara Pasternak - Technical Assistant - January 28, 2009.
19. Depositions of Michelle Zollman - Executive Director of Payroll Services for all of AT&T - April 29, 2009.
20. Depositions of Kim Kovacich - Business Manager I - January 28, 2009.
21. Affidavit of David E. Schlesinger dated April 16, 2009, including excerpts of from opt-in plaintiff depositions.
22. Listing of RAC-F servers and time zone location (LPAR vs Time zone.txt)
23. David Lamoreaux, Ph.D. *Report in the Matter of Constemecka Russell, et al.* v. *Illinois Bell Telephone Company*. September 21, 2009.
24. Programming and output files for Lamoreaux Report (17 files produced on 9/28/2009)
25. Russell.mdb (pay data)
26. 9_14_09 Opt-in List for M DuMond(62678160_2).csv
27. 2009 08 17 Crosswalk.csv
28. Letters from defendant's counsel to plaintiff's counsel in 2064261366_3039758513_42721673-1-29+4-27+5-1 LettersReData.tif
29. Legal Respone on wage types 09-16-09.xslx
30. TotalView Midwest Consumer Exception Codes (IEX TotalView Exception Codes.doc)

## 8. Consultant Background and Compensation

I have been retained as an expert witness in this case. I possess a Ph.D. in Mathematical Statistics and have been endorsed as an expert in the field of statistics. I have been retained by plaintiffs and defendants to perform statistical evaluations evaluation of employment practices, and have testified as an expert in the area of statistics in United States District Court for the District of Colorado, United States District Court, Nevada, and the Circuit Court of the Sixth Judicial Circuit, Pinellas County, Florida. My curriculum vitae is attached. Cases in which I have testified as an expert at trial or by deposition within the preceding four years are indicated in my curriculum vitae in bold and are bulleted (▶). My publications in the previous ten years are listed in my curriculum vitae.

My hourly rates are $350 per hour for testimony and preparation, $250 for consultation and research.

Robert A. Bardwell, Ph.D.

*[signature]*

## Attachment 1: Activity Codes by Paid/Unpaid

| Activity Code | Original Inferred Classification | Revised Classification (Approximated From Defendant Production) |
|---|---|---|
| 2-Way Communication | Paid | Paid |
| Absence-not paid | Unpaid | Unpaid |
| Absence-paid | Paid | Paid |
| ACB-evidence | Paid | Paid |
| ACT Training | Paid | Paid |
| ADA | Paid | Paid |
| Admin | Paid | Paid |
| AIT BUS/PacBell Fax | Paid | Paid |
| Bi/Desk Share Closed | Paid | Paid |
| Break | Unpaid | Paid |
| Break Overtime Paid | Paid | Paid |
| CAP U EWD NOT PD | Unpaid | Unpaid |
| Closed Key Order Wrk | Paid | Paid |
| Co Ex not paid | Unpaid | Unpaid |
| Collection Faxes | Paid | Paid |
| Commitment | Paid | Paid |
| Company Activity | Paid | Paid |
| Continuation Trng | Paid | Paid |
| CSC-Help Desk Outage | Paid | Paid |
| CSC-Spec Proj Avail | Paid | Paid |
| CUSTOMER CALLBACK | Paid | Paid |
| Customer Loyalty | Paid | Paid |
| Customer Skills Tmg | Paid | Paid |
| DEVELOPMENT TDM | Paid | Paid |
| DIALER MANAGED | Paid | Paid |
| Disability | Paid | Paid |
| Disability/FMLA | Paid | Paid |
| Dismissal/resign | Paid | Unpaid |
| EAST CONS CCVS | Paid | Paid |
| Emp Dev- Closed | Paid | Paid |
| Emp req not paid | Unpaid | Unpaid |
| ESCT | Paid | Paid |
| EWD CO NP | Unpaid | Unpaid |
| EWD CO Pd | Paid | Paid |
| EWD not pd | Unpaid | Unpaid |
| EWD paid | Paid | Paid |
| Fire Drill/Emergency | Paid | Paid |
| Flex-Time Made Up | Paid | Paid |
| Flex-Time Off | Paid | Unpaid |
| Flex Closed Same Day | Paid | Paid |
| Flex Open Same Day | Paid | Paid |
| Flex Out Same Day | Paid | Unpaid |
| FlexTime MadeUp-Clsd | Paid | Paid |
| Floating holiday | Paid | Paid |
| FLUPS | Paid | Paid |
| FMLA | Paid | Paid |
| FMLU | Paid | Unpaid |
| Funeral | Paid | Paid |
| Help Dsk Loan Open | Paid | Paid |
| Hol - Off | Paid | Paid |
| Hol - Open | Paid | Paid |
| Huddle | Paid | Paid |
| Jury duty/subpeona | Paid | Paid |
| Lead Person | Paid | Paid |
| Leam Session Tmg | Paid | Paid |
| Leave of absence | Paid | Paid |

## Attachment 2: Unpaid Time Due to Rounding

| attuid | Unpaid Time Due to Rounding (Hours) | Average Number of Days Per Week Rounded Down |
|---|---|---|
| aa3531 | 2.1 | 3.00 |
| ab1245 | -17.7 | 1.73 |
| ab3194 | 13.4 | 2.62 |
| wg1731 | 9.3 | 3.12 |
| wm1474 | 10.2 | 1.79 |
| wp2175 | 15.8 | 2.30 |
| wp9151 | -15.3 | 1.88 |
| ww1973 | 9.3 | 2.56 |
| yc3614 | 9.7 | 2.15 |
| yg1981 | 20.9 | 2.69 |
| yg2947 | 14.6 | 2.27 |
| Total | 4714.5 | |

©Bardwell Consulting 2009

## Attachment 3: Frequency of RAC-F Server Codes

| | Frequency of Occurrence in Employee Data | Time Zones Determined From Dr. Lamoreaux's Computer Codes |
|---|---|---|
| AM6A | 93 | Western |
| AM6B | 12 | Western |
| AM6E | 461 | Western |
| AM6F | 3 | Western |
| AN00 | 611 | MidWestern |
| AR00 | 308 | MidWestern |
| ASYS | 667 | Western |
| AT00 | 916 | MidWestern |
| BC00 | 581 | MidWestern |
| BR00 | 387 | MidWestern |
| BT00 | 503 | MidWestern |
| CC00 | 679 | MidWestern |
| CC60 | 152,561 | MidWestern |
| CN00 | 237 | MidWestern |
| CPU1 | 1 | MidWestern |
| CSYS | 78 | MidWestern |
| HA00 | 4 | MidWestern |
| HAJB | 1,201 | Eastern |
| HBCG | 460 | Eastern |
| HBKI | 2 | Eastern |
| NC00 | 4 | MidWestern |
| PMCA | 73 | MidWestern |
| PMD0 | 9 | MidWestern |
| PMD1 | 2,735 | MidWestern |
| PMD2 | 1 | MidWestern |
| PMFF | 75 | MidWestern |
| RM03 | 17 | MidWestern |
| RM0A | 4,789 | MidWestern |
| RM21 | 1,598 | MidWestern |
| SALA | 848 | Eastern |
| SBEG | 512 | Eastern |
| SM92 | 147,928 | Western |
| SM9A | 4,210 | Western |
| SMA1 | 476,842 | Western |
| SYS5 | 22 | MidWestern |
| Total | 8,703,819 | |

## Attachment 4: Curriculum Vitae

**PERSONAL:**

ROBERT A. BARDWELL
4801 W. Yale Ave.
Denver, Colorado 80219
(303) 934-3851

**EDUCATION:**

| | | | |
|---|---|---|---|
| University of Colorado, Boulder | Ph.D. | Mathematics | 1985 – 1989 |
| University of Colorado, Denver | B.A. | Philosophy | 1981 – 1982 |
| University of Chicago | | | 1969 – 1971 |

**PROFESSIONAL EXPERIENCE:**

| | |
|---|---|
| Statistical consulting | 1989 – present |
| University of Colorado instructor and teaching assistant | 1985 – 1989 |
| Research, consulting and statistical programming | 1976 – 1986 |

**PUBLICATIONS:**

- Bardwell, Robert A., Paul Klite, and Jason Salzman. "Local TV News: Getting Away with Murder." *Harvard International Journal of Press/Politics*, 2(2): 102-112 (1997).
- Max, Wendy, Dorothy P. Rice, Eric Finkelstein, Robert A. Bardwell, Steven Leadbetter. "The Economic Toll of Intimate Partner Violence against Women in the United States." *Violence and Victims*, 19 (3) (June 2004).

**RESEARCH, CONSULTING, AND STATISTICAL PROGRAMMING:**

- Federal Election Commission, 2009
  Retained to developed enhanced version of the sampling program we developed for the Federal Election Commission to monitor contributions and expenditures for all Federal elections.
- Nichols Kaster, PLLP, Minneapolis, Minnesota, 2009-
  Retained as expert witness by plaintiffs in California overtime class action, to analyze computerized work records to determine unpaid work time in re Cervantez v. Celestica.
- Fisher & Phillips LLP, Denver, Colorado, 2009 -
  Retained as expert witness for defendants re alleged gender discrimination in hiring in re Hana Teissler M.D. v. Colorado West Healthcare System and Community Anesthesia Consultants PLLC,, Case No.: 2008cv213, Mesa County Court, Colorado.
- Stephen R. Bruce, Washington, D.C., 2009 -
  Retained as consultant for plaintiffs to evaluate damages in ERISA claim in Kafafi v. Hilton Hotels.
- Hilder & Associates, P.C., Houston, Texas, 2009 -
  Retained as consultant for defendant to evaluate damages in claim against Momentum EMS.
- Springer and Steinberg, P.C, Denver, Colorado, 2009 -
  Retained by plaintiffs to design a random sampling method to evaluate numersosity and potential damages in claims of copyright infringement in re: Heileman et. al. V. Houghton Mifflin Harcourt Publishing Co., Civil Action No. 08-cv-775-MSK-CBS, United States District Court, Colorado.
- Nichols Kaster, PLLP, Minneapolis, Minnesota, 2009-
  Retained as expert witness by plaintiffs in unpaid work time class action, to analyze eight million computerized work records to determine unpaid work time in re Constemecka Russell, et al. v. Illinois Bell Telephone Company, Inc., Case No. 08-cv-1871, United States District Court, Northern District of Illinois, Eastern Division.
- ▶ William & Rhodes LLP, Denver, Colorado, 2009-
  **Deposed** as expert witness for plaintiffs to in alleged gender discrimination in hiring and promotions in re Monica White v. Tom Vilsack, United States Department of Agriculture, Civil Action No. 08-cv-1874-MSK-KMT, and Anita Luster v. Tom Vilsack, United States

Department of Agriculture, Civil Action No. 08-cv-2399-PAB-KMT, United States District Court, Colorado.

▶ Stephen R. Bruce, Washington, D.C., 2009 -

Retained and **Deposed** as expert witness for plaintiffs claiming violation of the ADEA and ERISA by replacing a defined benefit retirement plan with a cash balance plan in a manner that freezes the benefits of older, longer-service employees during a "wear-away" period, in re Wade. E. Jensen and Donald D. Goff, individually and on behalf of all others similarly situated, v. Solvay Chemicals, Inc., Solvay America, Inc., Solvay America Companies Pension Plan, Civil Action No. 06-CV-273 (ABJ/WCB), United States District Court, District of Wyoming.

● Initiative Legal Group, LLP, Los Angeles, 2009-

Retained as expert witness by plaintiffs in California overtime employment class action, to testify regarding the appropriate use of sampling to estimate damages and provide evidence of commonality in re Esteban Zamora, et al., v. Balboa Life & Casualty, LLC and Countrywide Home Loans, Inc., Case No.: BC360026, Superior Court of California, County of Los Angeles.

●Hoskin, Farina & Kampf, P.C., Grand Junction, Colorado, 2008

Retained as expert witness for defendants to rebut claim of age discrimination in hiring and compensation of teachers in the Mesa County Valley School District from 2001 to 2008 in Re: Phillips v. Mesa County Valley School District No. 51, Case No.: 2007cv505, Mesa County Court, Colorado.

▶ Stephen R. Bruce, Washington, D.C., 2008 -

Retained and **Deposed** as expert witness for plaintiffs claiming violation of the ADEA and ERISA by replacing a defined benefit retirement plan with a cash balance plan in a manner that freezes the benefits of older, longer-service employees during a "wear-away" period, in re Phillip C. Engers, Warren J. McFall, Donald G. Noerr, and Gerald Smit, individually and on behalf of all others similarly situated, v. AT&T Corporation and AT&T Management Pension Plan, Civil Action No. 98-CV-3660 (SRC/CCC), United States District Court, District of New Jersey (Newark).

● Governor's Energy Office, Colorado, 2008

Received grant to build a commercial version of the OptiMiser software developed by Bardwell Consulting. OptiMiser provides economic and engineering analysis of building retrofit packages, integrating efficiency measures and renewable energy technologies. Financial tools include present value analysis of benefit-cost ratios, internal rate of return, and years to positive cash flow. OptiMiser creates and evaluates a full range of near-optimal solutions for energy retrofits, offering a flexible and efficient tool for the energy analyst, minimizing required data entry and fully integrating renewable energy technologies.

● Glustrom and LaPlaca, Denver, Colorado, 2008

Submitted testimony on existing utility incentives and the regulatory structure before the Public Utilities Commission of the State of Colorado, Docket No. 08I-113EG.

▶ Joseph M. Sellers, Cohen, Milstein, Hausfeld & Toll P.L.L.P., New York, 2008 -

Retained and **deposed** for plaintiffs regarding the impact of underwriting on black applicants in re Patricia Amos, et al. v. GEICO Corporation, et al., Civil Action No. 06-cv-1281 (RHK/JSM), United States District Court, District of Minnesota.

▶ Glustrom and LaPlaca, Denver, Colorado, 2007-8

Created econometric models of electrical generating resources demonstrating the impact on levelized costs of modeling assumptions. Submitted written testimony and **testified** in PUC hearings re: (1) models showing improper resource selection resulting from use of high discount rates in present value modeling; (2) a statistical decomposition of error in Energy Information Administration forecasts of natural gas showing high levels of bias; (3) an alternative forecast of natural gas prices based on petroleum costs and demand and production forecasts; and (4) Monte Carlo modeling of levelized costs demonstrating the

risk associated with resources from escalating fuel, $CO_2$ and water costs, poorly monetized costs of other emissions, and escalation of capital costs for IGCC and nuclear resources. Submitted Answer testimony, Cross-Answer testimony, oral testimony, and material for a Statement of Position in Hearings before the Public Utilities Commission of the State of Colorado in the application by the Public Service Company of Colorado for Approval of its 2007 Colorado Resource Plan, Docket No. 07A-447E.

- Nichols Kaster & Anderson, PLLP, Minneapolis, Minnesota, 2007-8
  Retained to identify potential Muslim class members using custom Muslim name identification program.

▣ Stephen R. Bruce, Washington, D.C., 2007 -
  Retained and **Deposed** as expert witness for plaintiffs claiming violation of the ADEA and ERISA by replacing a defined benefit retirement plan with a cash balance plan in a manner that freezes the benefits of older, longer-service employees during a "wear-away" period, in re Wayne Tomlinson, et al. v. El Paso Corporation and El Paso Pension Plan, Civil Action No. 4-cv-02686-WDM-CBS, United States District Court, for the District of Colorado.

- Minami Tamaki LLP, San Francisco, California, 2007-8
  Retained as expert witness for plaintiffs in race discrimination in hiring class action, in re Albert Crews et al. v. Cisco Systems, United States District Court, Northern District of California.

- Hagens Berman Sobol Shapiro Llpreko LLP, Los Angeles, 2007-
  Retained as expert witness by plaintiffs in California overtime employment class action, to testify regarding the appropriate use of sampling to estimate damages and provide evidence of commonality in re Randall et al. v. Costco Wholesale Corporation, Case No.: BC 296369, California Superior Court.

- REKO LLP, Toronto, Ontario, 2007-
  Retained as expert witness by plaintiffs in nationwide overtime employment class action, to design a stratified random sample to estimate damages and provide evidence of commonality in re Fresco v. Canadian Imperial Bank of Commerce, File No. 07-W-334113PC2, Ontario Superior Court, Canada.

- Institute for Environmental Solutions, Denver, 2007-9
  Retained as sampling and research design consultant on *The Tree Project*, a community-scale research program to assess the environmental impact of urban tree cover. Assisted with the integration of available scientific tools, and the development of new measurement protocols, and consulted on the design of the spacial sampling plan for the initial survey in Golden, Colorado.

- FIMAC Solutions, Inc., Denver, 2007-8
  Retained to research and develop econometric analysis of core deposits for banking institutions. Developed a suite of analytic tools that, (1) provide less conservative projections of the decay rate of non-maturity deposits than those provided by regulatory agencies; (2) generate more accurate forecasts of account balances; and (3) include an index to evaluate risk form core deposit decline. These analytic tools employ appropriate times series and hazard rate analyses.

- Arius Energy, LLC, Denver, 2006-7
  Designed and developed web-based tool for individuals and communities to track their carbon footprint and energy consumption.

- Federal Election Commission, 2006-7
  Designed and developed sampling program used by the Federal Election Commission to monitor contributions and expenditures for all Federal elections. Program was developed as a web-based application that can also run on auditors' notebook computers. Program designs, draws and evaluates samples of transactions for audit. All results were tested against the American Institute of Certified Public Accountant statistical auditing programs.

- John Robert Holland, Denver, Colorado, 2007

Retained as expert witness by plaintiffs to evaluate the adverse impact of treatments for bed bug infestations on persons with disabilities in re <u>Charlotte McConnell, Willard McConnell and John McConnell v. The Tower at Speer, LLC, Marcy Payne, and Libby Burney</u>, District Court, City and County of Denver, Colorado.

- Nichols Kaster & Anderson, PLLP, Minneapolis, Minnesota, 2006-7
  
  Retained as expert witness by plaintiffs to evaluate the adverse impact of hiring, compensation, discipline and terminations decisions on Hispanic employees in re <u>Mendez et all v. Faribault Foods, Inc. and The Work Connection</u>, United States District Court, Minnesota.

- Cornish and Dell'Olio, Colorado Springs, Colorado, 2006-
  
  Retained as expert witness by plaintiff to evaluate the disparate impact of testing and terminations decisions on the women in the training academy for the Colorado Springs Fire Department, in re <u>Karyn S. Palgut v. The City of Colorado Springs</u>, Civil Action No. 06-cv-01142-WDM-MJW, United States District Court, Colorado.

- Legal Aid Society of Minneapolis, Minneapolis, Minnesota, 2006-
  
  Retained as expert witness by plaintiffs to evaluate the adverse impact of alternative pre-employment tests on Minneapolis Fire Cadet Selection Process; demonstrated adverse impact and proposed the remedy which was implemented, of augmenting pool of Stage II candidates with 55% additional protected class applicants.

- Killmer, Lane & Newman, LLP, Denver, Colorado, 2006-
  
  Retained as expert witness by plaintiffs to evaluate the impact of gender on utilization, hiring and promotions at Car Toys, Inc., in re <u>Monica Britton, et al. v. Car Toys, Inc., and Bruce Cameron</u>, Civil Action No. 05-CV-00726-WYD-PAC, United States District Court, Colorado.

- ▶ Shores, Williamson & Ohaebosim, LLC, Wichita, Kansas, 2006
  
  **Deposed** as expert witness by plaintiffs to evaluate the impact of gender on workforce utilization, promotions, terminations, and compensation at The Fresh Market, Inc., in re <u>Terrence Mcfadgon, Terra Mukes, Gloria Keith, and Starika Smith v. The Fresh Market, Inc.</u>, Case No.: 05-2151, United States District Court, Western District of Tennessee.

- University of Colorado Health Sciences Center, Denver, Colorado, 2005-
  
  Member of research team for *A Study of Immigrant Housing Conditions in Commerce City, Colorado*, to assess housing-related health risks affecting recent immigrant families with children. Responsible for construction of housing inventory and GIS profile of the study area; construction of the sample frame; design the sample of participating households; supervision of survey analysis, compilation of survey estimates, and contribution to resulting publications.

- ▶ McKenna Long & Aldridge LLP, Denver; Seyfarth Shaw LLP, Washington, D.C., 2005-
  
  **Deposed** as expert witness for defendants on the impact of age on separations at the Hershey Company, in re <u>Montagne, et al. v. The Hershey Company</u>, Case No.: 04-cv-1881-WYD-BNB, United States District Court, Colorado.

- ▶ The Carey Law Firm, Colorado Springs, Colorado, 2005-
  
  Retained, **deposed** and **testified** as expert witness by plaintiffs to estimate attorneys fees retained by the Colorado in Supplemental Security Income (SSI) Reimbursements, 1997 - 2005, in re <u>Chad Martinez and Larry King v. Colorado Department of Human Services and Otero County Department of Human Services</u>, Case No.: 02 CV 1066, District Court, City and County of Denver, Colorado.

- Cayman Islands Real Estate Brokers Association, Grand Cayman, Cayman Islands, 2005-2006
  
  Retained to conduct an econometric analysis of the impact of stamp duty rates on real estate transaction volume and value in the Cayman Islands from 1990 through 2004.

- Shores, Williamson & Ohaebosim, LLC, Wichita, Kansas, 2005-
  
  Retained as expert witness by plaintiffs to evaluate the impact of gender on workforce utilization, promotions, terminations, and compensation at Wichita Police Department in re

<u>Greta Semsroth, et al. v. City of Wichita, and Chief Norman Williams</u>, Case No. 04-1245-MLB, United States District Court, District of Kansas.

▶ King & Greisen, LLP, Denver, Colorado, 2005-

**Deposed** as expert witness by plaintiffs to evaluate race discrimination in layoffs in re <u>Freeman, et al. V. Roxanne White, et al.</u>, Case No.: 05CV164, United States District Court, Colorado.

● Burr & Smith, LLP, Tampa, Florida, 2005-6

Retained as expert witness by plaintiffs to design a stratified random sample of nationwide class to estimate damages and provide evidence of commonality in re <u>Kent Dunwiddie, Grant Lincoln, and Edward Gotowala, et al. v. Central Locating Service, Ltd., Corporation</u>, Case No.: 5:04CV315-OC-10GRJ, United States District Court, Middle District of Florida.

● Bennett Bigelow & Leedom, P.S., Seattle, Washington, 2005

Retained regarding health care regulatory dispute, to evaluate the application of non-linear regression model in calculating demand for kidney dialysis facilities.

▶ Strindberg Scholnick & Chamness, LLC, Salt Lake City, Utah, 2005

**Deposed** as expert witness for plaintiffs regarding race discrimination in workforce utilization, concentration and underrepresentation, in re <u>Terry H. Fullwiley v. Union Pacific Corporation and Union Pacific Railroad Company</u>, Case No. 2:04-CV-671DB, United States District Court, District of Utah, Central Division.

● White O'Connor Curry & Avanzado LLP, Los Angeles, California, 2005

Retained as expert witness for defendants to evaluate alleged age discrimination in terminations in re <u>Harold Moore Hennesy, et al. v. Infinity Radio Inc.</u>, Arbitration No. 77116Y0035804 BEAH, American Arbitration Association, Denver, Colorado.

▶ Colorado Center on Law and Policy, Denver, 2004

**Testified** as expert on computer systems and statistical modeling for plaintiffs, assessing adequacy of project management, testing, and preparation for release of the Colorado Benefits Management System (CBMS), which was designed to integrate administration of six Colorado and Federal benefit programs for all Colorado counties. Developed and presented model of caseload backlog resulting from CBMS implementation in re <u>Valerie Imani Hawthorne-Bey, et. al., v. Karen Reinerstson, Executive Director of the Colorado Department of Health Care Policies and Financing, et. al.</u>, Case No. 04-CV-7059, District Court, City and County of Denver, Colorado.

● Newman & Newman, LLP, Seattle, Washington, 2004 –

Retained as expert witness for plaintiffs to design a sample of all Internet domain name registration changes over a two year period and to create an econometric model of the impact of the Internet domain name Wait Listing Service to be implemented by defendants in re <u>Registersite.com et al. V. Internet Corporation for Assigned Names and Numbers, Verisign, Inc., and Does 1-10</u>, Case File No. CV04-1368 ABC (CWx) 02-RB-2104 (CBS), United States District Court, Central District of California.

● King Clexton & Feola, Denver, Colorado, 2004 – 2005

Retained as expert witness for plaintiff to analyze the impact of race and national origin on promotions and compensation in re <u>Medhanie Gebreluel Werede v. Allright Holdings Inc.</u>, Civil Action No. 01-WM-1167, United States District Court, Colorado.

● Hale Hackstaff Friesen, LLP, Denver, Colorado, 2004 – 2005

Retained as expert witness for plaintiff to design and conduct a door-to-door survey of voters and voting behavior to determine the impact of disparate treatment of absentee ballots and to analyze evidence of voting rights violations in re <u>Jeffrey Vigil v. Carol Snyder, County Clerk, Adams County Colorado</u>, Case File No. 02-RB-2104 (CBS), United States District Court, Colorado.

▶ Nichols Kaster and Anderson, Minneapolis, Minnesota, 2003 – 2004

**Deposed** as expert witness for plaintiff regarding race discrimination in utilization, and terminations in re <u>Jarvis Jones v. St. Paul Companies, Inc.</u>, Case File No. 02-1305, United

States District Court, Minnesota.

▶ Nichols Kaster and Anderson, Minneapolis, Minnesota, 2003 – 2004

**Deposed** as expert witness for plaintiff regarding gender discrimination in utilization and salary and other compensation in re <u>Susan M. Veeder v. Cargill, Incorporated</u>, Civil No. 02-1711 (PAM/RLE), United States District Court, Minnesota.

▶ Killmer and Lane LLP, Denver, Colorado, 2003 – 2004

**Testified** for defendant regarding expert report analyzing race, ethnic, and age composition of the Juror Pools and bias in jury selection process in re <u>People of the State of Colorado v. Dante Lamar Owens</u>, Case No. 98-CR-2729, District Court, Arapahoe County, Colorado.

▶ DeFranco & Allen, LLC, Boulder, Colorado, 2003 – 2004

**Testified** for defendant as expert witness regarding race, ethnic, and age composition of the Juror Pools in Arapahoe County, Colorado. Constructed model of jury selection process revealing systemic bias in re <u>People of the State of Colorado v. Trevon Washington</u>, Case No. 98-CR-2459, District Court, Arapahoe County, Colorado.

▶ Thomas Feldman, Denver, Colorado, 2002 – 2004

**Testified** as expert witness for plaintiff to evaluate discrimination in layoffs related to filing worker's compensation claims in re <u>Denise J. Welsch v. Sundyne Corporation</u>, Civil Action No. 02-Z-468 (BNB), United States District Court, Colorado.

▶ Nichols Kaster and Anderson, Minneapolis, Minnesota, 1998 – 2003

**Deposed** as expert witness for plaintiff to evaluate race and ethnic discrimination in hiring, utilization, promotions, and salary in re <u>Maria Garcia, et al. V. Viratec Thin Films, Inc.</u>, Civil Number 01-1978 MJD/JGL, United States District Court, Minnesota.

▶ King Clexton & Feola, Denver, Colorado, 2002 – 2003

**Deposed** as expert witness for plaintiffs to analyze the impact of race and national origin on promotions and compensation in re <u>Solomon Goitom, Amune D. Meskele, Fowsi Ali, and Omar Nur v. Allright Holdings, Inc.</u>, Civil Action No. 01-WM-1353 (CBS), United States District Court, Colorado.

▶ Johnson, Blakely, Pope, Bokor, Ruppel & Burns, P.A., Tampa, Florida, 2001 –

**Testified** as expert witness for plaintiff to evaluate the impact of race on the quality of education and the relative impacts of poverty and race in re <u>William Crowley v. The Pinellas County School Board, et al.</u>, Case No.00-005667-CI-021, Circuit Court of Sixth Judicial Circuit, Pinellas County, Florida.

▶ Tegtmeier, Frank & Jones, LLC, Colorado Springs, Colorado, 2001

**Testified** regarding expert report analyzing race, ethnic, and age composition of the Qualified Jury Panel and bias in jury selection process in re <u>U.S.A. v. Rice</u>, United States District Court, Colorado.

▶ Gerash, Prugh & Gerash, L.L.C., Denver, Colorado, 2001

**Testified** regarding expert report for defendant analyzing race, ethnic, and age composition of the Qualified Jury Panel and bias in jury selection process in re <u>U.S.A. v. Carl Kenneth Kabat</u>, Case No. 00-CR-385-N, United States District Court, Colorado.

● Research Triangle Institute, Research Triangle Park, North Carolina, 2000 – 2001
Center for Disease Control, Washington, D.C.

Retained to lead project to analyze large and detailed national probability sample and compute statistical estimates and variances for incidence, prevalence, and total costs in *Cost Study of Intimate Partner Violence Against Women* being prepared for congress, and to conduct independent evaluation of the cost report.

● Register Machine Learning Technologies, Inc., Littleton, Colorado, 2000 – 2001

Retained to develop algorithms applying probability theory to improve performance of advanced genetic programming computer application.

▶ Kummer Kaempfer Bonner & Renshaw, Las Vegas, Nevada, 2000 – 2004

**Deposed and testified** as expert witness for plaintiff on the impact of race in hiring and promotions in re <u>Jordan v. County of Clark and Clark County Department of Aviation</u>, Case

No. CV-S-99-0688-HDM (RJ), United States District Court, Nevada.
- Gerash, Prugh & Gerash, LLC., Denver, Colorado, 1999 – 2001
  Prepared expert report for defendant analyzing race, ethnic, and age composition of the Qualified Jury Panel and bias in jury selection process in re U.S.A. v. Lawrence Sposato et al., Case No. 99 CR 232-S, United States District Court, Colorado.
- U. S. Equal Employment Opportunity Commission, Denver District Office, Colorado, 1999 – 2001
  Retained to analyze the existing model used to estimate labor market availability for a large number of store locations, and to design a corrected model; evaluated the impact of racial discrimination in hiring, and the estimated the resulting damages.
- ▣ Zarlengo & Kimmell, LLC, Denver, CO, 2000
  **Deposed** as expert for plaintiff on the impact of race on compensation and promotions at PacifiCare between 1997 and 1998 in re Antoinette Ingram v. FHP Health Care/PacifiCare, Case No. 98 BP 2795, United States District Court, Colorado.
- ▣ Holland & Hart LLP, Denver, Colorado, 2000
  **Deposed** as expert for defendant to evaluate alleged age discrimination in layoffs in re Hennesy, et al. v. Gates Rubber Company, Civil Action No. 99-M-1787, United States District Court, Colorado.
- Goldstein and Dodge, Denver, Colorado, 2000
  Submitted report assessing the bias in Division Independent Medical Examinations performed for the Division of Workers Compensation.
- Isaacson, Rosenbaum, Woods & Levy, P.C., Denver, Colorado, 1999 – 2000
  Retained as expert witness for plaintiff to evaluate ethnic and gender discrimination in hiring, promotions and terminations in re Nuvia Rodriguez v. Greyhound Lines, Inc., Civil Action No. 99-N-1596, United States District Court, Colorado.
- The Leventhal Law Firm, P. C., Denver, Colorado, 1999
  Submitted affidavit for plaintiff testifying to the limitations of the studies relied upon by defendant experts who discounted the possibility that injury resulted from rear-end collision, in re Czeslawa Sosnowska v. Kimberlee Hrbek Smith, Case No. 97CV1400, Denver District Court, Colorado.
- Feiger & Collison, P.C., Denver, Colorado, 1999 –
  Retained as expert witness for plaintiff to evaluate gender discrimination in promotions and terminations in re Blasio, et al. v. United Parcel Service, Case No. 98-M-1709, United States District Court, Colorado.
- Pacey Economics, Boulder, Colorado, 1999
  Retained to design and analyze samples of properties to be appraised in south Globeville neighborhood to estimate total property value for settlement of damages from heavy metals pollution from smelter.
- Collect America, Ltd., Denver, Colorado, 1999
  Retained to design and analyze samples of collections to be audited for approval of IPO.
- Nichols Kaster and Anderson, Minneapolis, Minnesota, 1998 –
  Retained as expert witness for plaintiff to evaluate race and ethnic discrimination in promotions and salary in re Augustine C. Crawford et al. v. Ceridian Corporation, Computing Devices International and General Dynamics Information Systems, Civil Number 97-2634, United States District Court, Minnesota.
- Center for Policy Research, Denver, Colorado, 1998 – 2000
  Retained as consultant on survey execution, weighting, and estimation for a large and detailed national probability sample for the National Violence Against Women survey; conducted sensitivity analyses and theoretical explication of the impact of sample weighting and revised methodology report throughout review by the Center for Disease Control.
- ▣ Curtis L. Kennedy, Denver, Colorado, 1997 – 2000
  **Testified and deposed** as expert witness for plaintiffs concerning alleged age discrimination

in re <u>James R. Henry v. US WEST, Inc. et al.</u>, Civil Action No. 96-N-724.United States District Court, Colorado.

- Boulder Police Department, Boulder, Colorado, 1998 – 1999
  Retained to evaluate probability associated with physical and circumstantial evidence, resulting in an unprecedented technique for identification of shot-shell pellet evidence in Case No. P83-7907, homicide of Sidney Wells.

▶ Mohr, Hackett, Pederson, Blakely, Randolph & Haga, P.C., Phoenix, Arizona, 1997 – 1999
  **Deposed** as expert witness for plaintiffs concerning alleged age discrimination in re <u>Jeney v. Quaker Oats</u>, Civil Action No. CIV 96-0822-PHX-RCB. Retained as expert witness concerning age discrimination in re <u>Gentile v. Quaker Oats</u>, <u>Coleman v. Quaker Oats</u>, <u>Tallariti v. Quaker Oats</u>, and <u>Russell v. Quaker Oats and Christenson v. Quaker Oats</u>.

- Miller, Lane, Killmer & Greisen, LLP. Denver, Colorado, 1998
  Retained as expert witness for plaintiff to evaluate race and ethnic discrimination in employment decisions in re <u>Visor et al, v. Sprint/ United Management Company</u>, Case Number 96-K-1730, U.S. District Court, Colorado.

- Johnson, Blakely, Pope, Bokor, Ruppel & Burns, P.A., Tampa, Florida, 1997
  Retained as expert witness for plaintiff to evaluate gender discrimination in allocation of stock option plan in re <u>Gosche v. West Publishing Company</u>, Case No. 97-Z-1954, U.S. District Court, Colorado.

- Johnson, Blakely, Pope, Bokor, Ruppel & Burns, P.A., Tampa, Florida, 1997 –
  Retained as expert witness for plaintiff to evaluate gender discrimination in allocation of stock and constructed econometric model of resulting losses in re <u>Patricia Winn Carter and Maxine M. Jones</u>, et al. v. West Publishing Company, Case No. 97-2537-CIV-T-26A, U.S. District Court, Middle District of Florida.

▶ Colorado Lawyers Committee, Denver, Colorado, 1997
  **Testified** as expert witness for plaintiffs concerning residency in land title dispute in re <u>Espinoza v. Taylor</u>, Case No. 81-CV-5, Culebra County District Court.

- Jefferson County Department of Human Services, 1997
  Retained to review the implementation of the NAOMI computer system at the Jefferson County Department of Human Services in response to persistent failures in prior launch of the system; the NAOMI system was used by most or all caseworkers in Jefferson County to do CWEST submissions only, but had been designed to integrate casework for multiple programs related to child welfare. Authored report analyzing failures in the prior launch of NAOMI, and submitted recommendations for disciplined implementation.

- Colorado Department of Human Services, 1997
  Retained to develop computer programs to analyze recidivism and issues relating to the quality of child welfare using data in CWEST, the Child Welfare information system for Colorado.

- Roman, Benezra, & Culver, Denver, Colorado, 1997
  Retained as expert witness for plaintiffs concerning gender and ethnic discrimination claim resulting from terminations in re <u>Chacon v. Public Service Company of Colorado</u>.

▶ Fox & Robertson, P.C., Denver, Colorado, 1997
  **Deposed** as expert witness for plaintiff to design and conduct a public survey to project number of persons who use wheelchairs that are denied access to retail stores in re <u>CCDC et al. v. Campbell-Ritter Corp. et al.</u>, 96-WY-2490-AJ, <u>CCDC et al. v. AnnTaylor Stores Corp. et al.</u>, 96-WY-2491-AJ, <u>CCDC et al. v. Nine West Group, Inc. et al.</u>, 96-WY-2492-AJ, and <u>CCDC et al. v. Hermanson Limited Partnership I</u>, 96-WY-2493-AJ, United States District Court, Colorado.

▶ Holland & Hart, Denver, Colorado, 1997
  **Deposed** as expert witness for defendant concerning alleged age discrimination in re <u>Ronald Kirkland v. Safeway Inc.</u>, 96-CV-0264-J, United States District Court, Colorado.

- Roman, Benezra, & Culver, Denver, Colorado, 1996 – 2000

Retained as expert witness for plaintiffs concerning age discrimination claim resulting from layoffs in re <u>Vaszlavik et al. v. Storage Technology Corporation</u>.

- Peacock & Myers, Albuquerque, New Mexico, 1996
  Retained in trademark infringement litigation to construct an econometric model of variable costs associated with production in re <u>Rogers, et al. v. Legin, et al.</u>

- Holland & Hart, Cheyenne, Wyoming, 1996
  Retained as expert witness for defendant concerning computation of lost earnings and age discrimination claim resulting from reduction in force in re <u>David Moffat v. Amoco Corporation</u>, Civil Action No. 95-CV-242-D, United States District Court, Wyoming.

- Mineral Management Services, U. S. Department of Interior, Denver, Colorado, 1996
  Retained to develop sampling plan, statistical algorithms and software to audit target selection and estimate royalty underpayment for statistical billing, and to compute median weighted gas valuation index.

- U. S. Department of Justice, District of Colorado, 1996
  Retained as expert witness for defendant concerning claim of age and gender discrimination in promotions in re <u>Edward F. Craig, Jr. v. Hazel R. O'Leary</u>, Civil Action No. 93-K-1828, United States District Court, Colorado.

- Gerash, Robinson & Miranda, P. C., Denver, Colorado, 1995
  Prepared expert report analyzing ethnic, gender, and age composition of the Qualified Jury Panel and bias in jury selection process in re <u>U.S.A. v. Hampton</u>, 95-CR-253-M, United States District Court, Colorado.

- ▶ Holland & Hart, Cheyenne, Wyoming, 1995
  **Deposed** as expert witness for defendant concerning age and ethnic discrimination claim resulting from reduction in force in re <u>Robert Nicol v. Amoco Corporation</u>, Civil Action No. 95-CV-115-D, United States District Court, Wyoming.

- Plaintiff Employment Lawyers Association, Denver, Colorado, 1995
  Conducted seminar on *Using Statistics to Prove Disparate Impact.*

- Jeffery Menter, Greenwood Village, Colorado, 1995
  Computed present value of lost earnings in re <u>Michael Marsh v. Delta Air Lines, Inc.</u>

- ▶ Bart Rice, P.C., Englewood, Colorado, 1995
  **Deposed** as expert for plaintiffs regarding age bias in severances in re <u>Mary Fields et al. v. Information Handling Services Inc.</u>, Civil Action No. 95-B-516, United States District Court, Colorado.

- Mineral Management Services, U. S. Department of Interior, Denver, Colorado, 1995
  Programmed method for aggregating transactions and computing median weighted gas valuation index; designed weighted, multi-stage, proportional sampling strategy for validating index using ratio estimation.

- Colorado Department of Social Services, Implementation Assistance Committee, 1995
  Retained to evaluate sampling strategy and survey analysis for measuring compliance with settlement agreement in re <u>L.P.M., et al. by their next friend David Littman v. Roy Romer and Karen Beye</u>, Civil Action No. 94-M-1417, United States District Court, Colorado.

- Mineral Management Services, U. S. Department of Interior, Denver, Colorado, 1995
  Authored report on the application of statistical sampling to audit target selection and royalty billing; programmed automated routines for designing the required samples, randomly sampling royalty transactions, and computing estimated underpayment.

- Macon Cowles & Associates, Boulder, Colorado, 1995
  Retained to analyze employee records for evidence of ethnic bias in promotions at the Denver Mint in re <u>Joe Sanchez v. Lloyd Bensten</u>, Civil Action No. 94-Z-1400.

- Mineral Management Services, U. S. Department of Interior, New Orleans, Louisiana, 1995
  Presented findings regarding methods for measuring gas, oil, and mineral royalty payment compliance and billing royalty underpayments based on statistical sampling to State and Tribal Audit Committee Conference.

- Sears, Anderson & Swanson, Colorado Springs, Colorado, 1994
  Evaluated disparities in salaries using multivariate regression.
- Holland and Hart, Denver, Colorado, 1993
  Consulted regarding discriminatory impact of investigative stops in re <u>Irvin v. Sungailia, et.</u>
  <u>al.</u>, Civil Action No. 93-M-1551.
- ▶ Paul A. Baca, Denver, Colorado, 1993 – 1994
  **Deposed** regarding disparate impact of promotional practices of Denver Police Department
  in re <u>Humphries v. Belo</u>, Civil Action No. 93-N-2731.
- Teamsters Local Union No. 435, Denver, Colorado, 1993 – 1994
  Analyzed discipline and termination policy and provided expert report for arbitration
  involving Supervalu Inc.
- Children's Legal Clinic, Denver, Colorado, 1993 – 1994
  Consulted on survey design of judges and guardians <u>ad litem</u>, and designed program for
  monitoring guardian <u>ad litem</u> representation of children in dependency and neglect hearings
  in the Denver Juvenile Court.
- Robinson, Waters, O'Dorisio and Rapson, Denver, Colorado, 1993 – 1994
  Retained as expert to analyze class-wide age discrimination in terminations at Martin
  Marietta Corporation Astronautics Group for consolidated cases in re <u>Marvin Wilkerson,</u>
  <u>et. al. v. Martin Marietta Corporation</u>, Civil Action No. 91-S-2078, United States District
  Court, Colorado.
- Donald P. MacDonald, Denver, Colorado, 1993 – 1994
  Consulted concerning alleged age discrimination in terminations in re <u>Ken Fortner v.</u>
  <u>Halliburton Energy Services</u>.
- Reginald H. Martin & Associates, Denver, Colorado, 1993 – 1994
  Retained to design statistical method for measuring gas, oil, and mineral royalty payment
  compliance for the Mineral Management Service of the United States Department of
  Interior, and to design and analyze methods for billing royalty underpayments based on
  statistical sampling.
- Serge L. Herscovici, Littleton, Colorado, 1993
  Consulted concerning alleged gender discrimination in re <u>Elizabeth Ponder v. Metromedia</u>.
- Rothgerber, Appel, Powers & Johnson, Denver, Colorado, 1993
  Retained as consultant on alleged age discrimination in terminations in re <u>Backlund et. al.</u>
  <u>v. Gates Corporation</u>.
- Pulmonary Consultants, Denver, Colorado, 1993
  Reviewed analyses of two studies of dust exposure and pulmonary function.
- ▶ Colorado Lawyers Committee, Voting Rights Task Force, Denver, Colorado, 1993 – 1994
  Conducted study of minority voting patterns in current and revised House District 60 using
  ecological regression and homogeneous case analysis; **deposed and testified** as expert
  witness in voting rights litigation in re <u>Jennie Sanchez, et. al. v. Colorado</u>, Civil Action No.
  93-S-963, United States District Court, Colorado.
- Serge L. Herscovici, Littleton, Colorado, 1993
  Retained as expert to prepare analysis of age discrimination in departmental terminations
  in re <u>Mildred M. Pittman, et. al. v. Martin Marietta Corporation</u>, Civil Action No. 92-M-
  1557, United States District Court, Colorado.
- World Gaming Corporation, Las Vegas, Nevada 1992 – 1994
  Computed probabilities and payoffs for new casino game.
- ▶ Paul A. Baca, Denver, Colorado, 1992 – 1994
  **Deposed** as expert on ethnic discrimination in promotions in re <u>Rodriquez, et. al. v. Denver</u>
  <u>Sheriff's Department, et. al.</u>, Civil Action No. 92- -2335, United States District Court,
  Colorado.
- Robinson, Waters, O'Dorisio and Rapson, Denver, Colorado, 1992 – 1993
  Retained as expert to prepare analysis of age discrimination in departmental terminations

in re <u>Marvin Wilkerson, et. al. v. Martin Marietta Corporation</u>, Civil Action No. 91-B-2078, United States District Court, Colorado.

- Colorado Lawyers Committee, Foster Care Task Force, 1992 – 1994
  Retained as expert consultant to analyze Foster Care Review database and prepared issues analysis in re <u>L.P.M., et. al. by their next friend David Littman v. Roy Romer and Karen Beye</u>, Civil Action No. 94-M-1417, United States District Court, Colorado.
- Causey, Demgen & Moore Inc., Denver, Colorado, 1992
  Designed stratified sample of inventory for Tattered Cover Bookstore audit.
- ▶ Robinson, Waters, O'Dorisio and Rapson, Denver, Colorado, 1992
  **Deposed** as expert concerning analysis of age discrimination in departmental terminations in re <u>Alivan Rea, et. al. v. Martin Marietta Corporation</u>, Civil Action No. 91-S-1242, United States District Court, Colorado.
- Kelly, Haglund, Garnsey & Kahn, Denver, Colorado, 1992 – 1993
  Retained as expert and prepared offer of proof concerning congressional redistricting in re <u>Martinez, et. al. v. Romer</u>, Civil Action No. 91-C-1972, United States District Court, Colorado.
- ▶ Robinson, Waters, O'Dorisio and Rapson, Denver, Colorado, 1992
  **Deposed** as expert in preparation of lost-earnings analyses for termination with alleged age and ethnic discrimination in re <u>Chan v. Apache Oil Corporation</u>, Civil Action No. 90-M-1898, United States District Court, Colorado.
- Lundy Foundation, Denver, Colorado, 1992
  Designed and analyzed survey of AIDS/ARC service providers and users and authored survey report.
- Colorado Lawyers Committee, Voting Rights Task Force, Denver, 1992
  Conducted model study of minority voting patterns in Denver Colorado using ecological regression. Designed Colorado State House District creating a minority opportunity district and prepared expert demographic analysis in re <u>Reapportionment of the Colorado General Assembly</u>, Case No. 92 SA 19, Supreme Court, State of Colorado.
- ▶ Robinson, Waters, O'Dorisio and Rapson, Denver, Colorado, 1991
  **Deposed** as expert witness in preparation of lost earnings analyses for termination with alleged age discrimination in re <u>Mark Bremmer v. Martin Marietta Corporation</u>, Civil Action No. 90-Z-828, United States District Court, Colorado.
- ▶ David A. Lane, Esq, Denver, Colorado, 1989
  Analyzed ethnic and age composition of the Qualified Jury Wheel and **testified** as expert concerning age bias in jury selection process in re <u>U.S.A. V. Laymon</u>, 89-CR-113, United States District Court, Colorado
- ▶ Colorado Professional Black Firefighters, Paul A. Baca, Esq., 1989
  Analyzed results of Denver Fire Department promotional exam for racial or ethnic bias and **testified** as an expert witness at the preliminary injunction hearing in re <u>Fuller V. Cisneros</u>, United States District Court.

00001

1      IN THE UNITED STATES DISTRICT COURT

2      NORTHERN DISTRICT OF ILLINOIS

3

4  CONSTEMECKA RUSSELL,     )

5  individually and on behalf   )

6  of others similarly      ) Case No.

7  situated,       ) 08-cv-1871

8      Plaintiff,   )

9    vs.      )

10 ILLINOIS BELL TELEPHONE   )

11 COMPANY,       )

12      Defendant.   )

13

14      The videotaped deposition of KAYLAN

15 HOWARD, called as a witness for examination, taken

16 pursuant to the Federal Rules of Civil Procedure of

17 the United States District Courts pertaining to the

18 taking of depositions, taken before KELLY M.

19 FITZGERALD, a Certified Shorthand Reporter of said

20 state, at Suite 3000, 191 North Wacker Drive,

21 Chicago, Illinois, on the 1st day of September, A.D.

22 2009, at 2:33 p.m.



**EXHIBIT 43**

**ILL - Howard, Kaylan 9/1/2009**        **Page 1**

00064

1 take another call prior to 7:00. So there were

2 times, you know, if the call came in, I had to take

3 it. So, I mean, I have no way of, you know,

4 calculating that time. Like I said, I was just

5 under the assumption that my system would just log

6 it, but I didn't know that it wasn't.

7 BY MS. PATRICK:

8  Q.  It would be several times per week that

9 you would have spent some number of minutes after

10 the end of your call -- I mean after the end of your

11 tour or on a call --

12  A.  Yes.

13  Q.  -- during this period of time?

14  A.  Yes.

15  Q.  But you don't know how -- how many

16 minutes?

17  A.  No.

18  Q.  Did you -- did you ever spend time before

19 your shift working without compensation?

20  A.  Yes.

21  Q.  Did you ever report that time on the

22 overtime sheet?

00065

1   A.   No.

2   Q.   Why not?

3   A.   Because I was not aware that I was

4   allowed to because it was always made to seem that

5   by my start time, I needed to be open and available.

6   Everything should already be pulled up, not pulling

7   it up, you know, because it was told to me that it's

8   considered a customer mistreat that I'm still trying

9   to pull up a system and then talking to a customer.

10   I couldn't sit in idle or wrap-up to bring up the

11   system. I had to be open and available. And that's

12   what it was always stressed to me. So it was never

13   consider overtime. I thought, I have to get in here

14   and pull up the system so I don't get written up or

15   getting in trouble -- get in trouble for it.

16   Q.   Did you ever spend any time working on

17   your lunch break for which you were not compensated?

18   A.   A couple of times where I had to make a

19   customer callback. And again, we couldn't sit in

20   wrap-up, couldn't sit in idle. So, you know, I'm

21   using my time to call this customer back or to

22   complete a order, fill out the order so that, you

00001

```
 1          IN THE UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF ILLINOIS

 3   CONSTEMECKA RUSSELL,        )

 4   individually and on behalf  )

 5   of others similarly situated,)

 6           Plaintiff,   )

 7      -vs-             ) Case No. 08-cv-1971

 8   ILLINOIS BELL TELEPHONE    )

 9   COMPANY,                )

10           Defendant.   )

11

12          The deposition of CYNTHIA BARNES,

13   called as a witness for examination, taken

14   pursuant to the Federal Rules of Civil Procedure

15   of the United States District Courts pertaining

16   to the taking of depositions, taken before

17   MICHELLE M. PAOLETTI, a Notary Public within and

18   for the County of Cook, State of Illinois, and a

19   Certified Shorthand Reporter of said state, CSR

20   No. 84-4531, at Suite 30th Floor, 191 North

21   Wacker Drive, Chicago, Illinois, on the 19th day

22   of May, A.D. 2009, at 9:17 a.m.
```



**ILL - Barnes, Cynthia 5/19/2009**          **Page 1**

00044

1  service a customer and get them off the phone as

2  quickly as possible. There was no actual "You've

3  got three minutes," "You've got five minutes"

4  because the situations vary.

5       You know, one customer might call to

6  pay the bill, so, you know, so that could take a

7  minute; whereas, someone else might have a little

8  bit more.

9       So really there was no set time but

10  then also with the average handling time, the

11  AHT, that had to be under a certain percentage.

12  So your calls throughout the day would actually

13  kind of balance out, you know, because you would

14  have the quick calls and then you would have the

15  long calls and they would want you to have -- you

16  know, we had our monthly goal of AHT so -- and I

17  guess in a way, you know, as long as you stay

18  under that, then you would pass par and

19  everything like that.

20  Q.  What were the monthly goals for AHT?

21  A.  Well, it would change. It would

22  change. But, most of the time, they wanted you to

00001

1      IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
2          EASTERN DIVISION

3  CONSTEMECKA RUSSELL,      )
   individually and on behalf   )
4  of other similarly situated  ) NO. 1:08-cv-1871
   individuals,         ) Judge Kennelly
5              ) Magistrate Judge
        Plaintiffs,  ) Cox
6             )
     v.       )   EVIDENCE
7             ) DEPOSITION OF
  ILLINOIS BELL TELEPHONE     ) DAPHNE GANAHL
8  COMPANY, INC.,       )
             )
9        Defendant.  )

10

11

12

13

14

15

16      EVIDENCE DEPOSITION OF DAPHNE GANAHL,

17  taken at the Holiday Inn, 226 17th Street, Rock

18  Island, Illinois, on February 12, 2009, commencing

19  at 8:20 a.m., before Julie K. Edeus, Certified

20  Shorthand Reporter and Notary Public in and for the

21  State of Illinois, in pursuance to agreement of the

22  parties in the above-entitled action.

23

24

25

00041

1 A. It's performance achievement review.

2 Q. And how frequently are sales associates

3 reviewed using -- using PAR?

4 A. Monthly.

5 Q. And how long has Illinois Bell been using PAR?

6 A. I'm not sure.

7 Q. No idea?

8 A. I would say it's about three years. It started

9 when I was a representative -- a sales rep, so I

10 believe it's three years.

11 Q. Now, my understanding is that adherence is not

12 part of PAR today?

13 A. Correct.

14 Q. Has it ever been part of PAR?

15 A. No.

16 Q. Never?

17 A. Not that I'm aware of.

18 Q. Okay. Now, before the Company used PAR was

19 there another performance evaluation system that

20 was used or --

21 A. Yes.

22 Q. And do you know what that was called?

23 A. I don't. All I recall is being listened to

24 four calls per month and sort of graded on those

25 calls.

00042

1 Q. So adherence has never been part of PAR?

2 A. Right.

3 Q. Has average handle time ever been part of PAR?

4 A. Yes.

5 Q. Is it a part of PAR now?

6 A. Yes.

7 Q. All right. Any other things that you look at

8 every day in order to determine if your sales

9 associates are doing well?

10 A. Not anything different than what I stated.

11 Q. Okay. I just wanted to make sure we had a

12 complete list.

13 A. Sure.

14 MR. SCHLESINGER: Okay. Do you want to

15 take a break?

16 MR. HART: Well, if it's a good time, but

17 we can go on if you'd rather hit another

18 section.

19 MR. SCHLESINGER: Let's go on.

20 All right. Let's talk a little bit about

21 the office layout, all right?

22 A. Okay.

23 Q. Do you work in a cubicle?

24 A. Yes.

25 Q. And are you near the other coaches?

00001

```
1           IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF ILLINOIS

3    -------------------------x

4    CONSTEMECKA RUSSELL,      )

5    individually and on behalf )

6    of others similarly        ) Case No. 08-cv-1871

7    situated,            )

8            Plaintiff,  )

9        v.          )

10                    ) Judge Matthew F. Kennelly

11   ILLINOIS BELL TELEPHONE   ) Magistrate Judge

12   COMPANY,             ) Susan E. Cox

13           Defendant.  )

14   -------------------------x

15       The videotaped deposition of THOMAS P. HEANEY,

16   taken on behalf of the Defendant in the above-entitled

17   cause pending in the United States District Court for

18   the Northern District of Illinois pursuant to the

19   notice and the Federal Rules of Civil Procedure before

20   Christy S. Schisler, RMR, on February 10, 2009, at the

21   hour of 2:51 p.m., at 226 17th Street, in the City of

22   Rock Island, County of Rock Island, State of Illinois.
```

00054

1 gather --

2    A. Right.

3    Q. -- what your experience has been --

4    A. Uh-huh.

5    Q. -- and what your understanding is.

6    A. Yup.

7    Q. Have you--. I -- I take it that you're

8 -- you're well within the adherence expectation,

9 then.

10    A. Yes.

11    Q. So you've never been disciplined on the

12 basis of adherence.

13    A. Not on the basis of adherence, no.

14    Q. Okay. Reliability?

15    A. No.

16    Q. Now, I--. Am I correct that you

17 receive monthly evaluations?

18    A. Yes.

19    Q. And is the evaluation process called

20 "PAR"?

21    A. Yes.

22    Q. What all is included in PAR, if you

00001

1      IN THE UNITED STATES DISTRICT COURT

2      FOR THE NORTHERN DISTRICT OF ILLINOIS

3  CONSTEMECKA RUSSELL,      )

4  individually and on behalf   )

5  of others similarly situated,)

6          Plaintiff,    )

7    -vs-          ) Case No. 08-cv-1971

8  ILLINOIS BELL TELEPHONE      )

9  COMPANY,            )

10          Defendant.    )

11

12      The deposition of CYNTHIA BARNES,

13  called as a witness for examination, taken

14  pursuant to the Federal Rules of Civil Procedure

15  of the United States District Courts pertaining

16  to the taking of depositions, taken before

17  MICHELLE M. PAOLETTI, a Notary Public within and

18  for the County of Cook, State of Illinois, and a

19  Certified Shorthand Reporter of said state, CSR

20  No. 84-4531, at Suite 30th Floor, 191 North

21  Wacker Drive, Chicago, Illinois, on the 19th day

22  of May, A.D. 2009, at 9:17 a.m.



**ILL - Barnes, Cynthia 5/19/2009**                    **Page 1**

00050

1   A.  The adherence would be logging in and

2  out on time. Our adherence needed to at least

3  be, I believe, 95 percent for the month. So as

4  long as you logged in and out for lunch and

5  breaks on time, you would meet your adherence.

6    Q.  Were you typically able to meet the

7  adherence goal?

8    A.  Yes.

9    Q.  Were you ever disciplined on the basis

10  of your adherence?

11    A.  No.

12    Q.  You mentioned par; is that a form of

13  evaluation?

14    A.  Yes.

15    Q.  Did they have the par system the entire

16  time you worked for AT&T?

17    A.  Yes.

18    Q.  What were the categories or areas that

19  you were evaluated on in par?

20    A.  Par would have our sales, our calls

21  that they listen to. I believe they listen to

22  four or five calls and scored you on those each

00051

1  month; your AHT, and I believe that was it.

2  Three areas that you got graded on and it came up

3  to whatever the par goal was.

4     Q.  Did you typically meet the par goal?

5     A.  Yes.

6     Q.  Did you ever fail to meet the par goal?

7     A.  In the beginning of my start working at

8  AT&T, I believe I failed par two consecutive

9  months based on my sales not being there.  So we

10  were put on a -- when you do that, you get put on

11  a -- what you call it -- performance -- a PIP,

12  performance plan or something the way it goes; to

13  kind of help you get up there.

14       So, yeah, after that, I was meeting my

15  goals each month, the more I got familiar with

16  the product and how to handle the customers.

17     Q.  You mentioned earlier a three-day

18  suspension that had to do with a tardy; any --

19  were there any other times where you received

20  discipline while you were with the company?

21     A.  Uh --

22       MS. BRENNAN:  Objection, vague.

00001

1      IN THE UNITED STATES DISTRICT COURT

2      FOR THE NORTHERN DISTRICT OF ILLINOIS

3

4  CONSTEMECKA RUSSELL,          )

5  individually and on          )

6  behalf of others             )

7  similarly situated,          )

8        Plaintiffs,     )

9    vs.              ) Case No. 08-CV-1871

10  ILLINOIS BELL TELEPHONE      )

11  COMPANY,                )

12        Defendant.     )

13

14      The videotaped deposition of JOHN GAYNOR,

15  called for examination, taken before JENNIFER L.

16  WIESCH, CSR No. 84-4528, a Notary Public within and

17  for the County of Will, State of Illinois, and a

18  Certified Shorthand Reporter of said state, 191

19  North Wacker Drive, 30th Floor, Chicago, Illinois,

20  on the 11th day of July, A.D. 2008, at 8:19 a.m.

21

22

00068

1   A.  Yes, in 2008.  Actually, earlier in

2   2008, because that's when there was some

3   contracting work that was being done in my house.

4   Q.  Any other grievance that you filed

5   since you've been at AT&T?

6   A.  Yes.  I filed recently grievances

7   against AT&T concerning disciplinary action over

8   a performance evaluation program, called PAR,

9   that AT&T is enforcing.

10   Q.  What -- what's the grievance?

11   A.  The grievances is -- is objecting to

12   the disciplinary action over PAR.

13   Q.  Generally or did you receive some sort

14   of corrective action that you're responding to?

15   A.  The grievance is in -- as in a response

16   to corrective action, yes.

17   Q.  Okay.  And you said recently.  When did

18   you submit this grievance?

19   A.  The -- in the last 60 days, there's

20   been two grievances, because that's when the

21   corrective actions first went into effect.  The

22   first grievance would've been at the -- April

00001

1      IN THE UNITED STATES DISTRICT COURT

2      FOR THE NORTHERN DISTRICT OF ILLINOIS

3  CONSTEMECKA RUSSELL,    )

4  individually and on behalf  )

5  of others similarly     ) Case No.

6  situated,        ) 08-cv-1871

7      Plaintiff,   )

8    vs.       )

9  ILLINOIS BELL TELEPHONE   )

10  COMPANY,        )

11      Defendant.   )

12

13      The videotaped deposition of CHRISTINE

14  A. GRACE, called for examination, taken before

15  JENNIFER L. WIESCH, CSR No. 84-4528, a Notary

16  Public within and for the County of Will, State

17  of Illinois, and a Certified Shorthand Reporter

18  of said state, 191 North Wacker Drive, 30th

19  Floor, Chicago, Illinois, on the 18th day of

20  February, A.D. 2009, at 12:09 p.m.

21

22

00046

1  change from time to time?

2  A.  Uh-huh.

3  Q.  "Yes"?

4  A.  Yes.

5  Q.  And you don't recall --

6  A.  Excuse me.

7  Q.  -- what your adherence percentage

8  typically was, but it's your recollection that

9  you were within what the goal range was?

10  A.  Yes, I was.

11  Q.  And I assume, therefore, you have never

12  been disciplined on the basis of your adherence.

13  A.  Correct.

14  Q.  And you already spoke about PAR

15  evaluations.  How often did you get those

16  evaluations?

17  A.  For PAR?

18  Q.  Yes.

19  A.  You mean like not making PAR?

20  Q.  No.  How -- did you get some sort of

21  evaluation under PAR?  Did you get some sort of

22  report back to you telling you whether you were

00047

1 making PAR or not?

2    A. Oh, yes, monthly.

3    Q. Do you know what categories you were

4 being evaluated on in PAR?

5    A. Yeah, uh-huh.

6    Q. Can you tell me which -- what they

7 were, which ones you can remember?

8    A. I think -- I believe all of their

9 things were included in it; account handling

10 time, adherence, the number of calls taken, the

11 dollar amount you sold.

12    Q. You mentioned that you had filed some

13 grievances with regard to your PAR scores. Was

14 there a particular area under PAR that was --

15 seemed to be causing your scores to be low?

16    A. I would say the cell phone area was one

17 of the major ones, and Dish was probably second,

18 Dish Network.

19    Q. So did that have to do with the volume

20 of sales that you were making in cell phone and

21 -- and Dish areas?

22    A. Yes.

00048

1    Q.  And you mentioned the number of calls

2  that you handle was part of PAR.  What tip --

3  what was -- in a typical day, how many calls

4  would you normally handle?

5    A.  50 to 60.

6    Q.  Does that include only inbound calls or

7  also any outbound calls you would make?

8    A.  I don't know how they -- I don't know

9  if they included outbound.  I don't know.

10    Q.  Did you see a document that indicated

11  that you were taking about 50 to 60 calls per

12  day?

13    A.  Uh-huh.

14    Q.  And what document was that?

15    A.  It would be on your PAR sheet, I

16  believe.

17    Q.  Did you ever receive any formal

18  discipline during the time you were with the

19  company?

20    A.  Yes, for PAR.

21    Q.  Anything other than PAR?

22    A.  No.

00001

1           IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS

2                EASTERN DIVISION

3

   CONSTEMECKA RUSSELL,         )

4   individually and on behalf of   )
   other similarly situated      )

5   individuals,           )
                  )

6       Plaintiffs,   )
                  )

7      -vs-        ) No. 1:08-CV-1871
                  )

8 ILLINOIS BELL TELEPHONE COMPANY, )
   INC.,             )

9                   )
        Defendant.   )

10

11

12       Deposition of JAIME STEWART, taken before

13 TRACY L. BLASZAK, CSR, CRR, and Notary Public, pursuant

14 to the Federal Rules of Civil Procedure for the United

15 States District Courts pertaining to the taking of

16 depositions, at Suite 3000, 191 North Wacker Drive, in

17 the City of Chicago, Cook County, Illinois at 2:07 p.m.

18 on the 28th day of January, A.D., 2009.

19

20

21

22

23

24



EXHIBIT
46

**ILL - Stewart, Jamie 1/28/2009 (T.A.)**         **Page 1**

```
00001
  1         IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
  2                  EASTERN DIVISION

  3
     CONSTEMECKA RUSSELL,          )
  4  individually and on behalf of )
     other similarly situated      )
  5  individuals,                  )
                                   )
  6           Plaintiffs,          )
                                   )
  7         -vs-                   )  No. 1:08-CV-1871
                                   )
  8  ILLINOIS BELL TELEPHONE COMPANY, )
       INC.,                       )
  9                                )
                Defendant.         )
 10

 11

 12         Deposition of JAIME STEWART, taken before

 13  TRACY L. BLASZAK, CSR, CRR, and Notary Public, pursuant

 14  to the Federal Rules of Civil Procedure for the United

 15  States District Courts pertaining to the taking of

 16  depositions, at Suite 3000, 191 North Wacker Drive, in

 17  the City of Chicago, Cook County, Illinois at 2:07 p.m.

 18  on the 28th day of January, A.D., 2009.

 19

 20

 21

 22

 23

 24

 25
```

**ILL - Stewart, Jamie 1/28/2009 (T.A.)**      **Page 1**

00010

1  into the schedule. That gets fed over into TVI.

2  Q  Now, let's take a hypothetical situation, okay?

3  Let's suppose I'm a call center worker and I'm caught on

4  a call for ten minutes past the end of my scheduled

5  tour, okay?

6  A  Okay.

7  Q  Let's suppose that I don't report that on an

8  overtime sign-up sheet, okay?

9  A  Okay.

10  Q  Would that appear in TotalView?

11  A  No.

12  Q  Now, if you pulled an adherence report for that

13  person, would it appear there?

14  A  Yes.

15  Q  But that's not something -- is that something

16  you would see in your day-to-day work?

17  A  No, we don't pull adherence reports.

18  Q  You just look at -- do you just look at the

19  schedule?

20  A  We look at the schedule and the sheets that the

21  employees are handing in.

22  Q  So let's suppose that person that works that ten

23  minutes and then they don't report it, okay?

24  A  Okay.

25  Q  Then at the end of the day when you put together

00011

1  the -- you put together the schedule to be fed into TVI,

2  right?

3      A   Right.

4      Q   And you would add in overtime sign-up sheets?

5      A   Correct.

6      Q   And other exceptions, right?

7      A   Yes.

8      Q   And when you do that, you would not see that ten

9  minutes, right?

10     MS. DENT:  You're leading her.

11     MR. SCHLESINGER:  Q   That's fine.  This has all

12  been established, so I'm just trying to do a little

13  recap here.

14     A   If they hand in an overtime sheet, we add it

15  into the schedule and see it in the schedule feed over

16  into TVI.

17     Q   And if there is no overtime sheet?

18     A   We wouldn't see it.

19     Q   It wouldn't be fed into TVI?

20     A   Correct.

21     Q   And it wouldn't be fed into e-Link?

22     A   Correct.

23     Q   Just describe how TVI interacts with e-Link,

24  please.

25     A   Anything that is entered into TVI also feeds

00001

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                   EASTERN DIVISION

 3
    CONSTEMECKA RUSSELL,          )
 4  individually and on behalf of  )
    other similarly situated       )
 5  individuals,                   )
                                   )
 6          Plaintiffs,            )
                                   )
 7          -vs-                   )  No. 1:08-CV-1871
                                   )
 8  ILLINOIS BELL TELEPHONE COMPANY, )
    INC.,                          )
 9                                 )
              Defendant.           )
10

11          Deposition of BARBARA PASTERNAK, taken before

12  TRACY L. BLASZAK, CSR, CRR, and Notary Public, pursuant

13  to the Federal Rules of Civil Procedure for the United

14  States District Courts pertaining to the taking of

15  depositions, at Suite 3000, 191 North Wacker Drive, in

16  the City of Chicago, Cook County, Illinois at 12:58 p.m.

17  on the 28th day of January, A.D., 2009.

18

19

20

21

22

23

24

25
```

**ILL - Pasternak, Barbara 1/28/2009 (AHTA**          **Page 1**

00013

1  that takes them beyond their schedule tour until 5:10.

2   A   Uh-huh.

3   Q   Is that something that would show up in

4  TotalView?

5   A   No, because their schedule is 9:00 to 5:00.  It

6  wouldn't show in TotalView.  You'd have to look up --

7  they would have to fill out an overtime sheet or they

8  would have to tell someone that they were stuck on a

9  call.  I mean, we require them to fill out an overtime

10  sheet.

11   Q   Okay.

12   A   Because you wouldn't know.

13   Q   Right.  That's something I want to talk to you

14  about.  But let's put that aside for a minute and talk

15  about the overtime sheet.  Okay.  Another hypothetical.

16  Okay.  Let's suppose the call center employee is

17  supposed to work until 5:00 and they end up on a call

18  until 5:05.  Is that something that would show up

19  anywhere?

20   MS. DENT:  Object on form.

21   THE WITNESS:  It's not going to pop out at me

22  anywhere.  I would have no idea.

23   MR. SCHLESINGER:  Q   You wouldn't see it in

24  TotalView?

25   A   No.

00014

1    Q   It's not something you would know about --

2    A   No.

3    Q   -- unless that call center employee brought it

4    to your attention?

5    A   Right.

6    Q   Well, would that appear anywhere else to find

7    it?

8    A   You could find it in the log-in/log-out system.

9    Q   Okay.

10   A   Or you could find it if they asked you to check

11   their time.  And the log-in/log-out doesn't last very

12   long.  It's only there like two weeks or something like

13   that.  So you could do a report in TotalView that's

14   called the adherence report, sometimes they call it

15   SIT-SOT, and that shows open time.  So it would show --

16   it would show 5:05 if they were open with a customer.

17   Q   So that would appear in TotalView?

18   A   If you ran a report on it.

19   Q   If you ran a report on it?

20   A   Yes.  You wouldn't know it otherwise.

21   Q   That wouldn't be an exception to be entered into

22   TotalView, that would just be there automatically?

23   MS. DENT:  Object to the form, confusing.

24   MR. SCHLESINGER:  Q   You can answer.

25   A   The only time it would be an exception is if the

00015

1  coach had the person at their desk until like 5:05 and

2  they put that through and we would put overtime closed

3  for the five minutes -- the time beyond the tour, the

4  time beyond there, the stop time.

5    Q  Okay. So it's not -- when somebody is out of

6  adherence, that's not an exception?

7    A  No. An exception needs to be sent to cover when

8  they're out of adherence so that it makes their schedule

9  right, I guess, and they're not out of adherence.

10      If they're closed or if they're away from their

11  desk and it's not their break or their lunch, that's

12  when the coach sends an exception so that their time

13  that they are closed or away isn't counted -- I guess it

14  is counted against them. It shows up on something. But

15  I don't deal with adherence, either, so I don't know.

16    Q  Okay. Is there somebody else who deals with

17  adherence?

18    A  I think that's a coaching thing on their

19  reports.

20    Q  Okay. All right. So is it your job to make any

21  changes within TotalView -- is it your job to make any

22  changes within TotalView based upon whether somebody is

23  out of adherence?

24    A  I don't know what you mean to do that.

25    Q  All right. Let me just retract that. I'll try

00016

1   it a different way.

2       Is there a program that you work with called

3   CentreVu or CentreVu Supervisor?

4   A   That's Avaya.

5   Q   It's the same as Avaya?

6   A   Yes.

7   Q   And that's different than TotalView, right?

8   A   Right.

9   Q   And what does CentreVu Supervisor allow you to

10  see?

11  A   The log-in time and the log-out time for breaks,

12  lunch, end of tour, beginning of tour.

13  Q   But the data within it is separate from

14  TotalView?

15  A   Yes.

16  Q   Is it your job to make CentreVu Supervisor match

17  up with TotalView?

18  A   No.

19  Q   Is that anybody's job that you're aware of?

20  A   No, no.  The only time I know is if somebody

21  comes to me and says I worked extra yesterday and I

22  don't recall what time I logged out, or somebody will

23  call you on the phone while they're on lunch and ask

24  what time did I log out because they've forgotten.

25  Q   What if somebody comes back to you and they say

00017

1  I logged out ten minutes late, what time --

2     A   Yes, usually they ask the coach.

3     Q   What do you look at, CentreVu Supervisor?

4     A   Yes.

5     Q   Which is Avaya?

6     A   Right.

7     Q   And you look and it shows they logged out ten

8  minutes late or after the scheduled tour?

9     A   Right.

10    Q   Would that same ten minutes be in TotalView?

11    A   It would if they filled out an overtime sheet

12  and I put it in their schedule.  You mean if I do an

13  adherence report and ask for a report on that person, it

14  would show that ten minutes, too.  But I wouldn't do

15  that normally.  I mean, we don't do that to everybody.

16  I think the coaches probably have access to that.  But

17  it's up to each person to submit their time.

18    Q   Okay.  Let's -- let me make sure I understand,

19  okay?

20    A   Okay.

21    Q   I understand it's the employee's responsibility

22  to report that ten minutes?

23    A   Right.

24    Q   If they don't report it, they're not going to

25  get paid for it, right?

00018

1   A  Well, if they -- they can put it in late, it

2  doesn't have to be the same day. I mean, if they put

3  it -- if they remember like a week later, it can be

4  added and they can get it.

5   Q  Right. But if they don't --

6   A  We don't audit everybody's schedule like that.

7   Q  You don't audit everybody's schedule?

8   A  No, no, because there is not the time.

9   Q  Okay. So somebody logs out ten minutes late and

10  they don't ask you to fill out or they don't fill out an

11  overtime slip, okay?

12   A  Right.

13   Q  Would that ten minutes appear in TotalView?

14   A  No, not in the schedules if that's what you're

15  referring to. The only way I'm going to see it is if I

16  request, run a report and put that person's name and run

17  an adherence report. But I don't do that, so it's

18  like --

19   Q  So if you were to run an adherence report, would

20  you see the ten minutes?

21   A  You would see ten minutes beyond their tour.

22   Q  Okay. And you pull the adherence report from

23  TotalView, right?

24   A  Yes. The SIT-SOT adherence report is the one

25  that's available in TotalView.

00019

1   Q   So let's suppose that employee comes to you and

2   says I worked this ten minutes, I'm not sure exactly how

3   much, will you look, and we talked about how you would

4   pull a CentreVu report.

5   A   Right.

6   Q   Could you also pull an adherence report to find

7   that ten minutes?

8   A   It probably would match.  The difference is the

9   CentreVu has log out other, which means whatever,

10  bathroom, whatever, or it says log out break, log out

11  lunch, log out training.  The SIT-SOT just says closed,

12  closed, open, open, so you don't know what they're

13  doing.

14  Q   Okay.

15  A   Right.

16  Q   Let's suppose you log out -- a particular

17  employee who is taking an incoming call logs out three

18  minutes after the close of their -- or the end of their

19  scheduled tour, so 5:03 in this case.

20  A   Okay.

21  Q   Will that three minutes appear in TotalView?

22  MS. DENT:  Let me just object here.  When you say

23  log out, you say log out of the phone?

24  MR. SCHLESINGER:  Yes.

25  MS. DENT:  When you say that, just so we know that's

00020

1  what you mean.

2      THE WITNESS:  I get confused with when you say

3  TotalView.  Are you referring to the schedule I look at,

4  or are you referring to running a report?  Because there

5  is two different things.

6      MR. SCHLESINGER:  Q  I'll try to be more specific.

7      A  Okay.

8      Q  And you don't typically run reports from what I

9  understand.

10     A  No, no.

11     Q  You look at schedules because your job is to

12  fill the schedule and figure out --

13     A  Right, exceptions and tardies and overtime and

14  absence, illness.

15     Q  Okay.

16     A  That's what's added.

17     Q  So you're not thinking about whether somebody

18  worked a few minutes after the tour?

19     A  No.

20     MS. DENT:  Object to the form.  Maybe if you all

21  could make sure you don't talk over each other, it would

22  be easier for me to follow.  Thank you.

23     MR. SCHLESINGER:  Q  So the only time you're going

24  to notice somebody worked -- the only time you're going

25  to know if somebody worked past the end of their

00021

1  scheduled tour is if they tell you?

2     A   If they fill out an overtime sheet because they

3  don't verbally tell me.

4     Q   Otherwise, you're just not even looking at the

5  type of report day to day that would show you that,

6  right?

7     A   Correct.

8     Q   It's my understanding that there is a rounding

9  that goes on at Illinois Bell with respect to incidental

10  overtime?

11     MS. DENT:   Object to the form, it's vague.

12     MR. SCHLESINGER:   Q   Just tell me if this is

13  consistent with your understanding, okay?   If you work

14  less than 8 minutes, you don't get paid for -- after the

15  end of your tour, you don't get paid for it, but if you

16  work 8 or more minutes, you get paid for 15.

17     MS. DENT:   Object to the form.

18     MR. SCHLESINGER:   Q   Is that consistent with your

19  understanding?

20     A   Well, depends on how much -- maybe they worked

21  on their lunch hour, too, or before their start time.

22  So I think for one particular day your minutes would be

23  added together.

24     Q   And you can add them together yourself?

25     A   I don't need to -- well, unless it was a late

**ILL - Pasternak, Barbara 1/28/2009 (AHTA**          **Page 21**