**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **CONSTEMECKA RUSSELL, individually and on behalf of other similarly situated individuals,** ) ) ) ) | |
| **Plaintiffs,** ) ) | |
| **vs.** ) ) | **Case No. 08 C 1871** |
| **ILLINOIS BELL TELEPHONE COMPANY, INC.** ) ) ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Constemecka Russell, a former call center employee of Illinois Bell Telephone Company, has sued Illinois Bell under the Fair Labor Standards Act (FLSA), 29 U.S.C. 206 & 207, seeking unpaid overtime wages and other relief. On September 15, 2008, the Court conditionally certified the case as a collective action on behalf of Illinois Bell employees who "worked in sales, service and in similar positions during the past three years and who did not receive pay for time spent working off-the-clock performing tasks before and/or after their scheduled shifts and during their unpaid breaks." *Russell v. Ill. Bell Tel. Co.,* 575 F. Supp. 2d 930, 932-33 (N.D. Ill. 2008) (internal quotation marks and citation omitted).

During the course of discovery, Illinois Bell deposed twenty-four individual plaintiffs. On April 30, 2009, the Court permitted Illinois Bell to depose fifteen additional plaintiffs. *See Russell v. Ill. Bell Tel. Co.,* No. 08-1871, 2009 WL 1209025, at *1-2

(N.D. Ill. Apr. 30, 2009).

Before the Court is Illinois Bell's motion seeking to decertify the collective action. For the following reasons, the Court grants Illinois Bell's motion in part and denies it in part.

**Background**

Russell was a sales and service associate at Illinois Bell's consumer call center in Arlington Heights, Illinois from June 2003 to February 2008. Her work involved taking incoming calls from customers regarding service, equipment, and billing issues, as well as selling AT&T equipment, services and upgrades.

Russell received a base hourly wage, commissions, and bonuses. Her scheduled shift, or "tour," was nine hours long, including an unpaid one-hour lunch break and two paid fifteen-minute breaks. Russell contends, however, that she and other similarly situated Illinois Bell call center employees were required to perform unpaid work before and after their scheduled shifts and during meal breaks.[1]

With the Court's approval, Russell sent notice about the pendency of the case to all current and former hourly employees of Illinois Bell's call centers in Arlington Heights, Chicago, Rock Island, and Oak Brook "who worked in sales, service and in similar positions during the past three years and who did not receive pay for time spent working off-the-clock performing tasks before and/or after their scheduled shifts and during their unpaid breaks." *Russell,* 575 F. Supp. 2d at 932-33 (internal quotation

---

[1] In her original complaint, Russell alleged overtime pay for work completed during her "meal and rest breaks." Compl. ¶ 7. In their response brief, plaintiffs allege that the company's adherence and average handle time policies caused them to perform off-the-clock work during their unpaid lunches only.

marks and citation omitted).  In total, 487 plaintiffs opted into the litigation.

Sales and service representatives at Illinois Bell are organized into "teams," and each team reports to a mid-level manager called a "coach."  Illinois Bell requires its sales and service representatives to follow a pre-determined schedule throughout the duration of their tours.  The extent to which representatives follow their pre-set schedule each day is called "adherence."  Call centers establish an adherence schedule to ensure that representatives are available to answer incoming customer phone calls throughout the day.  *See* Onken Dep., Def.'s Ex. 34 at 32.  Illinois Bell states that it has never required 100 percent adherence to the schedule.  For instance, the Rock Island call center has an adherence goal of ninety-five percent, which means employees may deviate from their schedules for twenty-one minutes each day and still meet their adherence goals.

Illinois Bell has policies and mechanisms that allow employees time during their tours to do things other than answer customer calls without negatively affecting adherence.  For instance, an employee may request an "exception" from a superior when she experiences computer delays, takes paid sick time, meets with coaches, or attends training.  If an employee is answering phones and needs to address an issue offline, he may do so by requesting "call work," a term used to describe periods of time that representative goes "red" (or is no longer "open and available") while logged in the company's computer system.  Employees are typically paid for the entirety of their scheduled tour, unless an exception or other deviation is entered.

In addition to adherence, Illinois Bell is concerned about each employee's

"average handle time," which involves the amount of time a representative spends with a customer on the phone.  Employees are expected to average approximately seven to ten minutes per call over the course of a month.  *See* Pl.'s Ex. 47; Peoples Dep., Pl.'s Ex. 18 at 69; K. Howard Dep., Pl.'s Ex. 7 at 46.  Coaches monitor the adherence and average handle time levels of their own teams, and Illinois Bell monitors the average handle time and adherence scores of each coach's team.  An employee's average handle time forms part of his monthly performance evaluation or "PAR."  Plaintiffs allege that failure to meet PAR can result in discipline and discharge.

As hourly employees, sales and service representatives are eligible to be paid overtime compensation.  The company's Code of Business Conduct provides that

> [n]onexempt (overtime eligible) employees must accurately report all hours worked each day and each week and may not work overtime unless it is approved by a supervisor in advance.  However, all overtime hours worked by nonexempt employees must be paid regardless of whether they were approved.  Managers are prohibited from requiring or permitting nonexempt employees to work "off the clock."

S. Barnes Dep., Def.'s Ex. 4 at 50.

Among other things, the company's overtime policy requires compensating employees for:  (1) taking work home to complete, (2) performing work during lunch periods, (3) performing work before or after scheduled hours, (4) preparatory work prior to the start of a shift that is essential to their job, and (5) clean-up work after the end of a shift.  *Id.*  Employees are required to affirmatively enter an exception or overtime request.  At the Arlington Heights and Chicago call centers, for instance, overtime sheets have sections in which employees record overtime worked before their shifts,

4

during lunch, and after their shifts.  At the Rock Island call center, employees report in overtime logs exceptions for total overtime worked.  Overtime sheets or logs received then result in payment of overtime wages.

Defendants took the depositions of approximately forty plaintiffs.  Although several plaintiffs testified that they were familiar with the methods used to report overtime, they also stated that other company-wide practices required them to work unpaid overtime.  For instance, several plaintiffs testified that coaches and trainers instructed them to be "open and available" by the time their shift started.  A sales and service representative is considered "open and available" or "call ready" only when she has logged into the system and is ready to answer phone calls.  Plaintiffs allege that computers and applications took anywhere from three to twenty minutes to boot up and load.  Plaintiffs claim they inferred from the "open and available" instruction that they needed to log into their computers and applications prior to their start time.

Illinois Bell denies that supervisors ever require representatives to log in prior to the start of their tour.  Once a shift starts, Illinois Bell contends, employees have three minutes before they are marked tardy.  Because call center workers do not need to log into every application before the start of their shift in order to be call ready, Illinois Bell claims that the three minute grace period is sufficient.  The company also says that it allows exceptions for computer glitches.  In sum, Illinois Bell contends that call center workers were not required or compelled to log in prior to their start times.

Most plaintiffs testified that the computer and its applications take over three minutes to load.  As indicated above, they also claim their superiors require them to be

call ready by start time.  In an e-mail dated October 18, 2005, Matthew Onken, an Illinois Bell force manager, informed a sales and service representative that "Company Records indicate[d] [he was] late . . . by signing in after [his] start time.  [Onken requested that] [g]oing forward [he] be opened and available for customers at [his] scheduled start time."  Onken Dep., Pl.'s Ex. 14 at Ex. 4.  Plaintiffs claim that from such instructions, they understood that they needed to log in prior to the start of their tour.  Plaintiffs testified that although exceptions are allowed for computer problems, such exceptions are generally disfavored by supervisors (particularly in the mornings) and thus are rarely requested.  Some plaintiffs also testified that they needed to open most applications to be "call ready."  L. Howard Dep., Pl.'s Ex. 13 at 53-54; Peoples Dep., Pl.'s Ex. 18 at 68-69; K. Howard Dep., Pl's Ex. 30 at 65-67; Peart Dep., Pl.'s Ex. 18 at 37.

        In addition, some plaintiffs testified that they worked unpaid overtime during their lunch break in order to complete work incidental to answering customer phone calls.  For instance, they would call customers back during their lunch breaks, finalize notes in the system concerning a customer call, complete orders, or follow up with other customer service-related tasks.  Some plaintiffs testified that they needed to complete these tasks during their lunch break because their adherence and average handle time goals do not budget time to complete such customer service-related work.  Although some testified they were compensated or given exceptions for such tasks, others stated that they did not seek pay.  When asked why they did not report customer service-related overtime work, plaintiffs gave responses that fit into the following five categories: they understood that only time spent on calls with customers qualified for overtime; they

wanted to excel at their job and took pride in serving customers over breaks; filling out overtime sheets was inconvenient; they forgot to report overtime because they were in a rush to leave; or they assumed overtime was captured and paid by the system.

The evidence supports plaintiffs' contention that Illinois Bell resisted paying overtime for customer service-related work. In an e-mail dated August 18, 2006, Onken informed coaches that "if a Representative is working Flex Makeup or Overtime they need to be online and available for customers." Onken Dep., Pl.'s Ex. 14 at Ex. 7. The record also shows that Illinois Bell may have kept records of unpaid overtime worked. Katherine Williams stated that her call center keeps track of the overtime employees work and compensates in and out times, regardless of whether representatives submit a sheet. Williams Dep., Def.'s Ex. 56 at 52. Scott Kepner agreed that representatives "get paid . . . whether or not they report the exception" but noted that employees need to report exceptions for purposes of accuracy because a representative may leave for the day and forget to log out of the system. Kepner Dep., Def.'s Ex. 27 at 51-52.

Plaintiffs testified that the company expects them to complete notes and orders while on the phone with customers, despite the fact that some exceptions and call works are approved to complete such tasks. Some plaintiffs stated that too many call works on a representatives' record could lower their PAR and reflect badly on them. An email dated March 23, 2009 from a sales coach to his team states that there is "[z]ero tolerance for call work (1) sec[ond] [is] rounded up to the min[ute] - so if you are out for 1 sec[ond] that mean[s] that you are out of adherence for 1 min[ute]." Pl.'s Ex. 47. In another e-mail, a coach instructs his team that "[i]t is imperative that we are adhering to our schedules and only logging off for breaks, lunch, training or development." Pl.'s Ex.

33.

Illinois Bell requires its sales and service representatives to be "open and available" until fifteen seconds remain on their shifts. Hunter Dep., Def.'s Ex. 21 at 55. As a result, some plaintiffs testified, they often work past the end of their tour answering calls. Illinois Bell's overtime payment policies provide that work completed in less than eight minutes is unpaid. Once eight minutes of overtime work is performed, representatives are paid time-and-a-half on fifteen minutes, not just eight. Barbara Pasternak, a timekeeper, stated that she thinks increments smaller than eight minutes worked throughout the day are added together and paid if the time worked amounts to eight minutes. *See* Pasternak Dep., Def.'s Ex. 36 at 31-32.

Some plaintiffs testified that because they have to remain "open and available" through the end of their shifts, the last phone call answered takes them past the end of their shift. Such calls often do not take a full eight minutes to complete and therefore go uncompensated. Some plaintiffs also testified that they were not aware they would get pay for increments of time worked under eight minutes if they added up to eight minutes by the end of the day. Most plaintiffs with post-shift claims, however, stated their claims were based on the fact that calls regularly kept them at work past their shifts for less than eight minutes. One claimant testified that the time required to log out also kept him past his shift.

Plaintiffs now claim that they are owed pay for overtime worked from 2005 through 2008.

**Discussion**

The FLSA provides that employers must pay the time an employee works beyond forty hours in one work week at one and one-half times the employee's regular rate of pay. 29 U.S.C. § 207 (a)(1). Pursuant to the FLSA, "any one or more employees for and in behalf of himself or themselves and other employees similarly situated" may sue an employer through a collective action to recover unpaid overtime wages. 29 U.S.C. § 216(b). Although no provision in the FLSA provides for court-ordered notice of the pendency of an action, the Supreme Court has held that "district courts have discretion . . . to implement 29 U.S.C. 216(b) . . . in [FLSA] actions by facilitating notice to potential plaintiffs." *Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165, 169 (1989). Once an FLSA action is filed, district courts have "managerial responsibility to oversee the joinder of additional parties to assure that the task is accomplished in an efficient and proper way." *Id.* at 171; *see also Alvarez v. City of Chicago*, 605 F.3d 445, 449 (7th Cir. 2010) ("A district court has wide discretion to manage collective actions.").

Courts commonly apply a two-part test to determine whether an FLSA claim may proceed as a collective action. The Court ruled on the first part of the test when it conditionally approved the case as a collective action. *See Russell*, 575 F. Supp. 2d at 933-38. At the first stage, "[p]laintiffs only need to make a minimal showing that others in the potential class were similarly situated." *Mielke v. Laidlaw Transit, Inc.*, 313 F. Supp. 2d 759, 762 (N.D. Ill. 2004). Once notified, 487 plaintiffs joined the collective action.

The parties then engaged in discovery, and Illinois Bell triggered the second part of the test by moving to decertify the collective action. "At the second step . . . the court's inquiry is more stringent" because the factual record determines whether the plaintiffs are similarly situated. *Id.* The burden is on the plaintiffs to show that they are "similarly situated," as required by the statute. *Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 280 (N.D. Tex. 2008).

The FLSA does not define the term "similarly situated." The parties agree, however, that "[d]uring this 'second stage' analysis, a court reviews several factors, including (1) disparate [or shared] factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations." *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1103 (10th Cir. 2001) (internal quotation marks and citation omitted); *see also Mielke*, 313 F. Supp. 2d at 762. These factors help a court determine whether it can manage the case and bring about a fair and reasonably expeditious resolution of the collective action.

## I.    Shared factual and employment settings

Illinois Bell contends that a collective action is inappropriate because there are individual issues embedded in the case.[2]  Illinois Bell also contends that decertification

---

[2] In some cases, the variety of job duties, geographic locations, and salaries at issue may result in claims that are too individualized and difficult for the court to manage collectively. *See, e.g., Mielke*, 313 F. Supp. 2d at 762-63 (plaintiffs not similarly situated where "opt-in claimants work in thirty-eight different terminals, which are each operated by different local, autonomous managers and under different collective bargaining arrangements."); *Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 361 (D.N.J. 1987) ("In [other cases], the class or notice to the potential class members was

(continued...)

is appropriate because plaintiffs cannot show a company-wide policy or practice that violates the FLSA and deprives employees of overtime pay.

## A.    Predominating issues

In order to maintain a collective action, the plaintiffs must "demonstrate[ ] similarity among the situations of each plaintiff beyond simply claiming that the FLSA has been violated; an identifiable factual nexus that binds the plaintiffs together as victims of a particular violation of the overtime laws generally must be present." *Vennet v. Am. Intercontinental Univ. Online*, No. 05-4889, 2005 WL 6215171, at *6 (N.D. Ill. Dec. 22, 2005). Although certification requires a factual nexus, plaintiffs in a FLSA collective action need not be situated identically. *See Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1260 (11th Cir. 2008); *Brennan v. Qwest Commc'ns Int'l, Inc.,* No. 07-2024, 2009 WL 1586721, at *2 (D. Minn. June 4, 2009); *Jordan v. IBP, Inc.,* 542 F. Supp. 2d 790, 813 (M.D. Tenn. March 31, 2008).

The Seventh Circuit recently determined that certification may be appropriate despite individualized questions and circumstances, if common questions predominate. *Alvarez*, 605 F.3d at 449 ("[i]f common questions predominate, the plaintiffs may be similarly situated even though the recovery of any given plaintiff may be determined by

---

[2](...continued)
somehow limited by geographic location, employment position or approximate date of the employee's termination.  For all practical purposes, no such restriction has been imposed or suggested here.") ("This matter presents a scenario of not a single company wide [reduction in force (RIF)] but of twenty-eight [voluntary RIFs] affecting fourteen Xerox organizations and forty-seven [involuntary RIFs] affecting seventeen Xerox organizations.").  Because the plaintiffs in this case have similar job duties and because only four Illinois call centers are at issue, such differences among plaintiffs do not justify decertification here.

only a subset of those common questions."); *see also Luna v. Del Monte Fresh Produce (Southeast), Inc.,* 354 Fed. Appx. 422, 424 (11th Cir. 2009) (affirming where "[district] court . . . [denied certification because] . . . common questions did not predominate."); *O'Brien v. Ed Donnelly Enterprises, Inc.,* 575 F.3d 567, 585 (6th Cir. 2009) ("[T]he plaintiffs were similarly situated, because their claims were unified by common theories of defendants' statutory violations, even if the proofs of these theories are inevitably individualized and distinct."); *Chabrier v. Wilmington Finance, Inc.*, No. 06-4176, 2008 WL 938872, at *3 (E.D. Pa. April 4, 2008) ("The need for individual factual determinations is not fatal to certification of a FLSA collective action."); *Underwood v. NMC Mortgage Corp.*, No. 07-2268, 2009 WL 1322588, at *4 (D. Kan. May 11, 2009) (same).

### 1. Subclasses and bifurcation

Illinois Bell contends that certification is improper because not all plaintiffs claim to have performed pre-shift, post-shift, or lunch break work and, indeed, some testified that they did not work during their meals or before and after work. Illinois Bell also argues that individualized questions concerning the particular circumstances of each plaintiff make a collective action inappropriate.

Despite individualized issues, a collective action may be appropriate if common questions predominate, even the court decides to certify some claims and decertify others. *See Chabrier*, 2008 WL 938872, at *3 ("A showing that there are elements of plaintiffs' claim that differ, or that a small number of current plaintiffs are excluded cannot override the similarities present in most plaintiffs' claims and circumstances.").

12

Some courts group together individuals who share common claims, because "[r]esolving common questions as a class, even through the additional mechanism of sub-classes, remains inherently more efficient." *Fravel v. County of Lake*, No. 07-253, 2008 WL 2704744, at *3 (N.D. Ind. Jul. 7, 2008). In fact, the Seventh Circuit in *Alvarez* noted that district courts are not "forbid[den] from adopting the subclaim approach merely because the variety of subclaims renders the class 'heterogenous.'" *Alvarez,* 605 F.3d at 449.

Illinois Bell argues that the opt-ins plaintiffs do not all complain of the same conduct. But although not all plaintiffs claim pre-shift, post-shift, and lunch break overtime, most who were deposed claim overtime in one or more of those categories. Illinois Bell also contends that whether the activities alleged constitute "work" depends on a number of individual circumstances. Most plaintiffs allege, however, that logging in and out of their computers; addressing customer service-related tasks (e.g., ensuring that orders are properly entered in the system, calling back customers, etc.); and post-shift overtime amounting to less than eight minutes all went uncompensated. Thus, although there are individualized questions embedded in each category of unpaid overtime alleged, there are significant legal issues to be determined that are applicable to all or nearly all plaintiffs.

Illinois Bell relies on cases in which the claims were factually so individualized that the court was unable to create subclasses within the group. *See, e.g., Reed v. County of Orange,* 266 F.R.D. 446, 454 n.7, 455 (C.D. Cal. 2010) (plaintiffs sheriffs' deputies with varying responsibilities and duties had "claims [that] are simply too varied. [. . .] Plaintiffs' 'other' claims vary from assignment to assignment and individual to

13

individual."); *Smith v. T-Mobile USA, Inc.*, No. 05-5274, 2007 WL 2385131, at * 5 (C.D. Cal. Aug. 15, 2007) ("Plaintiffs' common allegation that Defendants unlawfully required them to work off-the-clock and denied them overtime pay arises out of different fact patterns."); *Gatewood v. Koch Foods of Miss., LLC,* No. 07-82, 2009 U.S. Dist. LEXIS 113896, at *53 (S.D. Miss. Oct. 20, 2009) ("[T]he putative class encompasses employees working in four different physical locations, numerous different departments, during three different shifts, over a period of six years, performing a wide variety of job duties. The maintenance of a collective action is complicated further by the fact that most plaintiffs have worked in multiple positions, departments, and for numerous supervisors who had differing techniques for logging work time. It is therefore not possible to fairly determine whether . . . they have been allegedly under-compensated on a class wide basis."); *Proctor*, 250 F.R.D. at 283 ("Plaintiffs' claims vary from store to store and manager to manager.").

The plaintiffs in this case, however, share a legal and factual nexus that is more specific than the general "claim that they were illegally denied overtime pay." *Smith*, 2007 WL 2385131, at *5. For instance, although the specifics vary, some plaintiffs say that while they performed pre-shift overtime work logging into their computers and waiting for them to boot up, they used some of that time on activities such as getting coffee, water, and meditating. Whether such activities are compensable because they were done while logging in can be determined on a lawsuit-wide basis. Moreover, as plaintiffs suggest, the number of minutes for which plaintiffs may recover for logging into the computers can be determined in the damages portion of a bifurcated case. In addition, determinations regarding whether logging in qualifies as "work" under the

14

FLSA and whether the log in/boot up time is uncompensable as "preliminary" to principle activities involve all or nearly all the opt-ins.

### 2.    Decertification of individualized claims

Illinois Bell contends that the action includes individualized claims, and it specifically identifies plaintiffs who have claims that are unlike those alleged by the others.  One plaintiff claims pay for time she spent blowing up balloons for the company, and another claims she should have been paid for time she spent checking her sales numbers.  Illinois Bell correctly asserts that there could be more stand-alone claims like these embedded in the collective action.  Plaintiffs provide no reason for keeping such claims within a collective suit.  Absent a factual nexus, the variety of different types of work various plaintiffs may allege is endless.  Moreover, individualized defenses applicable to each particular circumstance would be difficult for the Court to manage.  *See, e.g., Lusardi*, 118 F.R.D. at 363, 370-72.  The Court, therefore, decertifies individualized claims that do not fall under the following subclasses:  pre-shift work resulting from logging in computers; lunch break overtime used to address customer service-related tasks; and post-shift overtime amounting to less than eight minutes that went uncompensated.

A third plaintiff claims that she spent time reading promotional materials while walking to and from her car.  Illinois Bell contends that this, too, is an individualized claim.  Two other plaintiffs, however, stated they spent off-the-clock time reading promotional materials because they needed to know what promotions to offer callers.  C. Barnes Dep., Pl.'s Ex. 20 at 80; K. Howard Dep., Pl.'s Ex. 21 at 17.  Reading

promotional materials to be communicated to callers, therefore, is arguably customer service-related work. It also fits comfortably within the scope of the allegations in the complaint. Because tours primarily budgeted time for taking incoming calls, several plaintiffs testified that they used pre-shift, post-shift and lunch break time to do the following customer service-related work: completing or fixing orders, reading promotional materials, returning customer calls, and writing notes in the system. These activities, are eligible for inclusion in the customer service-related work subclass.

B.     Common policy or practice

Illinois Bell contends that although the claims can easily be subdivided into three general categories – pre-shift, post-shift, and meal break work – none derives from a common unlawful policy or practice. A common policy or practice "may take certain individualized . . . issues out of the case," which adds to the factual and employment settings the plaintiffs share. *Vennet,* 2005 WL 6215171, at *6. Though some courts require plaintiffs to show that they are similarly situated by identifying a company-wide policy or practice that violates the FLSA, *Castle v. Wells Fargo Fin., Inc.,* No. 06-4347, 2008 WL 495705, at *5 (N.D. Cal. Feb. 20, 2008); *Flores v. Lifeway Foods, Inc.,* 289 F. Supp. 2d 1042, 1045 (N.D. Ill. Oct. 30, 2003), others do not require a shared policy or plan where "a collective action would promote judicial economy because there is otherwise an identifiable factual or legal nexus." *Vennet*, 2005 WL 6215171, at *6; *see also Mielke,* 313 F. Supp. 2d at 763 ("[I]n the absence of a uniform policy or plan a collective action should only proceed when it promotes judicial economy."). The Court need not choose a particular approach at this time, but it will consider whether a

common policy or practice exists in this case.

Plaintiffs contend that members of the collective action worked unpaid overtime because they had to log in their computers prior to the beginning of their shift, address customer service-related issues incidental to incoming calls, and take calls through the end of their shifts, which resulted in uncompensated overtime because the calls generally took less than eight minutes to address.  Plaintiffs allege that company-wide practices, such as requiring call center workers to be "open and available" at the start of their shift, adherence and average handle time goals, and time-rounding policies caused plaintiffs to work overtime.

Illinois Bell does not dispute the existence of shared policies among the four call centers.  Instead, it explains why its policies do not violate the FLSA.  Relying on *Reed*, Illinois Bell contends that plaintiffs must provide "substantial evidence" that its policies and practices actually violate the FLSA.  *Reed* does not support that principle as a requirement for proceeding as a collective action; rather, the case simply requires evidence of a common policy.  *See Reed*, 266 F.R.D. at 450, 456.  Determination of whether plaintiffs have shown that Illinois Bell actually violated the FLSA is beyond the scope of a motion for decertification and is therefore discouraged.  *Doornbos v. Pilot Travel Centers LLC,* No. 04-44, 2005 WL 6166032, at *6 (S.D. Cal. Apr. 27, 2005) ("A determination of whether [Defendant's] policy violated the law . . .  is not an issue properly considered on a motion to decertify. [. . . ]  The only determinative issue is whether Plaintiffs' job duties were similar.") (internal quotation marks and citation omitted); *Brennan*, 2009 WL 1586721, at *5 ("The more fundamental problem with [defendant's] arguments . . . is that they are directed to the ultimate merits of Plaintiffs'

17

unpaid overtime claims [. . .]. The central question at issue in the decertification motion is whether the named plaintiffs and opt-in plaintiffs are similarly situated, not whether the FLSA was violated."). Plaintiffs allege that Illinois Bell's practices and policies caused them to work unpaid overtime, which if proven will establish a viable FLSA claim. The Court here addresses only whether the plaintiffs are similarly situated based on common practices or policies.[3]

Illinois Bell also contends that it had no policy that would cause plaintiffs to work off-the-clock. The company says its policies prohibited off-the-clock work, and it notes that opt-ins testified that they were specifically told by their supervisors or union representatives not to work off-the-clock. The Court has already determined, however, that lawful written (or verbal) policies will not shield the company from liability if plaintiffs can show other company-wide practices that may have been contrary to those policies and violated the FLSA. *Russell*, 575 F. Supp. 2d at 935.

Illinois Bell otherwise bases its decertification argument on cases in which the Court was unable to identify a common policy or practice. *See, e.g., Reed*, 266 F.R.D. at 460; *Brechler v. Qwest Commc'ns Int'l, Inc.,* No. 06-940, 2009 WL 692329, at *3 (D. Ariz. Mar. 17, 2009); *Proctor*, 250 F.R.D. at 282; *Castle*, 2008 WL 495705, at *6; *Salinas v. O'Reilly Auto., Inc.,* No. 04-1861, 2005 WL 3783598 at *5-6 (N.D. Tex. Nov. 17, 2005); *Basco v. Wal-Mart Stores, Inc.,* No. 00-3184, 2004 WL 1497709 at *7-8

---

[3] Both sides retained expert witnesses and submitted reports with data analyses that purport to support their respective position concerning whether plaintiffs performed unpaid overtime work. Because no summary judgment motion is before the Court at this time, the Court will not consider these reports at this point to determine whether Illinois Bell's practices and policies actually violated the FLSA.

(E.D. La. Jul. 2, 2004).  In those cases, plaintiffs could not show that there was a common practice or policy, because one or relatively few managers gave the unlawful instruction or varying unlawful instructions were provided, resulting in disparate individualized claims.

The evidence, as explained below, provides support for plaintiffs' contentions that pre-shift work was common because plaintiffs understood that they had to be "open and available" by the time their shift began; some plaintiffs worked during their lunch break because adherence and average handle time policies did not allow employees time to address customer service-related issues; and Illinois Bell's time-rounding and logout time policies caused some plaintiffs to perform unpaid post-shift work.

### 1.    "Open and available" policy

Plaintiffs claim that coaches required them to be able to answer incoming phone calls at the start of their shifts.[4]  Because the various software applications needed to answer calls and assist customers take several minutes to load, plaintiffs claim they logged into their computers prior to the beginning of their shifts.  They claim that although coaches were aware of the practice, pre-shift log in time went uncompensated.  Illinois Bell contends that employees who chose to log in prior their start time did so contrary to company policies and that the company had no reason to know employees engaged in that practice.

Illinois Bell contends that it did not instruct representatives to be "open and

---

[4] Notably, "[t]he law does not require that employees be compelled [or required] to work overtime to bring an FLSA claim; it is enough that the employer suffers or permits the work."  *Burch v. Qwest Comm'c'ns Int'l, Inc.*, 677 F. Supp. 2d 1101, 1115 (D. Minn. 2009).

available" at the start of their tours.  It relies on testimony from supervisors who deny having told service representatives that they had to log in prior to the start of their shifts and who say they did not know that any representatives logged in before their start time.  In fact, some coaches testified that representatives were timely so long as they were at their desk by their scheduled start time and that they did not have to be on the phone right away.  Illinois Bell also argues that union stewards instructed employees to wait for the start of their tours to touch their keyboards.  If, however, union stewards and coaches gave differing instructions, employees may have felt pressured into logging into their computers prior to the start of their tours.

Illinois Bell also argues that employees could easily boot up their computers and log into the applications and that they did not have to open most or all of their applications in order to answer phone calls at the beginning of their shift.  The record supports plaintiffs' claim, however, that most plaintiffs understood from their coaches that they had be "open and available" by their start time.  Some plaintiffs testified that they load most applications prior to their start time in order to be "call ready" by the time they answer their phones for several practical reasons, including that they cannot know the needs of the first few callers.  L. Howard Dep., Pl.'s Ex. 13 at 53-54; Peoples Dep., Pl.'s Ex. 18 at 68-69; K. Howard Dep., Pl.'s Ex. 30 at 65-67; Peart Dep., Pl.'s Ex. 18 at 37.  Others testified that they were instructed to log into all applications prior to the start of their tour.  Burton Dep., Pl.'s Ex. 18 at 121 ("Q: [D]id any manager ever tell you you needed to open your applications before the start of your tour expressly? A: Expressly, open your applications, yes, when we were in training, when we were in cocoon."); Heaney Dep., Pl.'s Ex. 10 at 87.

20

Illinois Bell states that representatives are not pressured into logging in their computers prior to the start of their tours because they are allowed a three-minute grace period, which enables them to log in at the very start of their tour.  Illinois Bell also argues that computer delays are adjusted for purposes of adherence through an exception.  In other words, time spent logging into the computer does not count as tardy or towards adherence.  But although some plaintiffs testified that requested exceptions were granted, they also stated that exception requests are generally disfavored. Exceptions at the beginning of the shift are particularly frowned upon, as coaches think that representatives use computer problems to cover up tardiness.  Because the applications take more than three minutes to load, plaintiffs resist making exception requests and prefer logging in early to meet the "open and available" requirement.

Illinois Bell also contends that plaintiffs cannot identify a common practice or policy because the number of coaches who gave the "open and available" (or a similar) instruction is too small to establish a company-wide policy.  Rather, Illinois Bell contends, plaintiffs simply have a number of individualized claims that cannot be tried collectively.  Illinois Bell cites *Salinas* and *Bayles v. Am. Med. Response of Colo., Inc.*, 950 F. Supp. 1053 (D. Colo. 1996), to support its argument.  The facts in those cases, however, do not support decertification on that basis in this case.

In *Salinas*, for example, the evidence showed that few individual managers engaged in practices violative of the FLSA.  "[Plaintiff's] own testimony . . . show[ed] that her claims [were] limited to the misdeeds of a single manager at a single . . . store." *Salinas*, 2005 WL 3783598, at *5.  Plaintiffs' allegations in this case, however, do not involve one manager and one call center.  Indeed, plaintiffs' testimony shows that

employees at all four call centers understood they needed to be "open and available" by their start time. In fact, Illinois Bell identifies only two plaintiffs who are not claiming overtime for logging in pre-shift, opt-ins Louella Byrnes and Stephanie Ward. Similarly, in *Bayles*, "the evidence . . . reflect[ed] that only certain management personnel of defendant may have strayed from [the company's] policy." 950 F. Supp. at 1061. The evidence in this case is much different. Though supervisors deny telling representatives that they had to log in prior to the start of their shift, an e-mail from Onken shows that he directed employees to be open and available at their start time. Onken Dep., Pl.'s Ex. 14 at Ex. 4.

Plaintiffs across all call centers contend that coaches and trainers instructed them to be "open and available" at the start of their tours. The record sufficiently reflects that this practice was prevalent and involved more than just a few managers who failed to follow company policies. Therefore, plaintiffs have shown sufficiently for present purposes that a company-wide practice required employees to log into their computers prior to their start time.[5]

## 2.    Adherence and average handle times

Illinois Bell's call centers track how closely the work activity of employees matches a predetermined schedule set for each day, which the company refers to as "adherence." The schedule is designed to ensure that at all times someone is

_____

[5] It appears that one plaintiff may have a claim for post-shift unpaid overtime caused by the log out process. L. Howard Pl.'s Ex. 30 at 64. Plaintiffs, however, do not allege a company-wide policy or practice that requires employees to stay late and log out of the computer system. This appears to be an individualized claim that should be handled separately and not as part of a collective action.

answering the phone. Employees are also expected to meet their monthly average handle times, which measures how many minutes representatives on average spent with a caller; they are expected to average seven to ten minutes per call. *See* Pl.'s Ex. 47; Peoples Dep., Pl.'s Ex. 18 at 69; K. Howard Dep., Pl.'s Ex. 7 at 46. These are company-wide policies that apply to all plaintiffs.

Plaintiffs claim that Illinois Bell's adherence and average call handle time policies caused them to perform off-the-clock work during their unpaid lunch breaks. Illinois Bell argues that plaintiffs' claim is incorrect for a number of reasons. For instance, Illinois Bell contends that employees who worked during their lunch breaks did so out of their own personal preference. Moreover, Illinois Bell contends that requiring employees to follow a pre-established schedule is not a *per se* violation of the FLSA. The company's adherence and average handle time policies, however, may have caused FLSA violations to the extent they led employees to work outside their scheduled tours without pay.

There is evidence supporting plaintiffs' contention that Illinois Bell's policies did not budget time in scheduled tours for employees to do customer service-related work (e.g., call customers back, fix and complete orders, or finalize notes in account). *See, e.g.,* Moten Dep., Pl.'s Ex. 30 at 42-44 (managers wanted customer-related notes to get done while customer is on the phone, however, sometimes she was unable to take care of everything within the handle time required). E-mails from supervisors state that there is "zero tolerance for call work" and advise representatives that they should "only log[ ] off for breaks, lunch, training or development." Pl.'s Exs. 33, 47. Coach Daphne Ganahl, for instance, testified that if representatives are not open, they cannot sell the

product.  Ganahl Dep., Def.'s Ex. 13 at 33.  She also stated that the purpose of adherence is "[t]o be sure that if [representatives] had some offline activities that the time was covered so that it wasn't just time that they were closed for no reason." Ganahl Dep., Pl.'s Ex. 6 at 32.  Specifically, the importance of representatives being open is "[t]o take care of customers [and] . . . create[ ] more sales."  *Id.*

Some plaintiffs also testified that they did not report on overtime sheets time spent on customer service-related tasks because they understood that overtime was paid only for time spent on the phone with customers.  In fact, an e-mail from Onken states that only time spent on the phone with customers qualifies for overtime.  Onken Dep., Pl.'s Ex. 14 at Ex. 7.  Thus, company policies may not have authorized pay for overtime that plaintiffs spent on such customer service-related work.

Illinois Bell contends that because it does not require one hundred percent adherence, its policies do not demand off-the-clock work.  For instance, at the Rock Island facility, employees are allowed to deviate twenty-one minutes from their schedules, and all employees are provided two paid breaks and one unpaid lunch. Because plaintiffs testified that they met adherence and were never disciplined for their adherence or average handle times, Illinois Bell argues that its policies cannot be unlawful.  Most who testified they met adherence, however, are claiming unpaid overtime worked over their lunch break.  *See, e.g.,* C. Barnes Dep., Pl.'s Ex. 21 at 110; Gunsolley Dep., Pl.'s Ex. 30 at 127; K. Howard Dep., Pl.'s Ex. 43 at 65, Pl.'s Ex. 7 at 46-47 (opt-in testified that she was subject to disciplinary action because of average handle time); L. Howard Dep., Pl.'s Ex. 30 at 60-62; Ingram Dep., Def.'s Ex. 23 at 114; LaMarr Dep., Def.'s Ex. 28 at 144; Rashall-Jones Dep., Def.'s Ex. 39 at 67-68.  Illinois

24

Bell also argues that exceptions and call works enable employees to do other customer service-related activities during their scheduled tour without affecting adherence. The evidence, however, supports plaintiffs' contention that call works, like exceptions, were largely discouraged and cumbersome to secure. Pl.'s Ex. 47 ("Zero tolerance for call work [because it puts representatives out of adherence]"); Kepner Dep., Def.'s Ex. 27 at 52 ("We try and keep [call work] to a minimum because obviously they're there to handle customer calls."); Morgan Dep., Pl.'s Ex. 22 at 65 (expresses concern that call work would put her out of adherence); Rashall-Jones Dep., Pl.'s Ex. 29 at 68-69 (testified that only allotted a certain amount of call work).

Some plaintiffs testified that they never worked overtime (other than pre-shift log in) and yet met their adherence goals. *See, e.g.,* S. Barnes Dep., Def.'s Ex. 4 at 55-56, 119, 125; Heaney Dep., Def.'s Ex. 18 at 54, 100. Illinois Bell contends that if employees were forced to work off-the-clock to meet adherence, then no one would have met adherence goals without working off-the-clock.[6] Illinois Bell may use the fact that some plaintiffs did not work overtime to meet their adherence as evidence to support its contention that its policies are not contrary to the FLSA. For purposes of certification, however, plaintiffs alleging these claims were all subject to the same policies. The record reflects that all call centers receive a high volume of callers and that coaches expect representatives to move through the calls quickly. For instance, opt-in Terrence Frison testified that representatives who were on the phone for too long

---

[6] Illinois Bell attempts to bolster its argument by pointing out that some opt-ins testified they did not know what the word "adherence" meant. The fact that some were not familiar with the term, however, does not mean others were not compelled to work overtime. The two claimants Illinois Bell cites are making only pre-shift log in claims.

25

would hear a "beep," which encouraged them to get off the phone. Frison Dep., Pl.'s Ex. 7, 34-35. In addition, e-mails from various supervisors show that teams took adherence and average handle times seriously because the teams were monitored closely. *See* Pl.'s Ex. 47 ("As you know everything is being watched and tracked, so I need you all to adhere to your schedule and follow the policies set forth before you."); Pl.'s Ex. 33 ("Every minute that you log out early, or log in late counts against your adherence. Our customers depend on you being open and available to speak with them, not 1 or 2 minutes later."). Whether Illinois Bell's policies pressured plaintiffs to work unpaid overtime will be determined at a later time. For now, finding that common policies applied is sufficient.

### 3. Time-rounding policy

Illinois Bell's policy pays for overtime work amounting to more than eight minutes. If an employee works less than eight minutes in overtime in one day, however, he receives no compensation. The policy, therefore, does not incentivize employees to report on their time sheets amounts of extra time worked in increments of under eight minutes. Several plaintiffs across all call centers testified that they worked past the end of their tours because they were required to be prepared to answer phone calls and address callers' needs up until fifteen seconds prior to the end of their shift. Because the calls often took less than eight minutes, plaintiffs allege that they were deprived of several minutes of overtime pay per week.

Illinois Bell does not argue that its call centers apply different time-keeping or

time-rounding policies.[7]  Rather, it contends that time rounding is not *per se* unlawful "provided that [rounding] is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked."  29 C.F.R. § 785.48(b).  Moreover, Illinois Bell argues that the policy actually favors employees.  The Court, however, will not decide the merits of plaintiffs' claim at this time.

Illinois Bell also contends that it was incumbent on employees to record on their time sheets increments of overtime worked of less than eight minutes in one day because they would be paid if the total for the day amounted to eight minutes.  *See* Pasternak Dep., Def.'s Ex. 36 at 31-32.  This argument, however, misses the mark because it does not address plaintiffs' claim for post-shift unpaid overtime amounting to less than eight minutes past the end of their shifts.  If, as plaintiffs allege, Illinois Bell's time rounding and log out policies often caused plaintiffs to work unpaid overtime in increments of under eight minutes, then these company-wide practices may have resulted in unpaid overtime work.  As the court stated in *Burch*, "incidental overtime, as a category, is intended to cover overtime incurred finishing a customer call . . . ."  *Burch,* 677 F. Supp. 2d at 1119.  Plaintiffs have, therefore, sufficiently shown that all members of the collective action were subjected to policies that may have violated the FLSA.

## II.    Affirmative defenses available to Illinois Bell

The Court next considers "whether defendants' defenses could be applied

---

[7] To the extent there are some differences among the call centers, they are relatively minor and have more to do with the type of overtime sheet used rather than how overtime is calculated.  *See* Def.'s Br. at 3-4.

across the board to plaintiffs' claims and potential plaintiffs' claims or whether many and perhaps disparate defenses could be raised." *Duncan v. Phoenix Supported Living, Inc.,* No. 05-1, 2007 WL 1033360, at *2 (W.D.N.C. Mar. 30, 2007); *see also Moss v. Crawford & Co.*, 201 F.R.D. 398, 410 (W.D. Pa. 2000) ("[T]he district court has the discretion to determine whether the potential defenses would make the class unmanageable."). Illinois Bell asserts that its affirmative defenses are individualized and vary with each plaintiff. "[T]he availability of defenses to some but not all of the putative class members . . . poses significant case management concerns." *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 954 n.8 (11th Cir. 2007) (internal quotation marks and citation omitted). Courts have also noted, however, that "[i]f one zooms in close enough on anything, differences will abound; even for a single employee doing a single job." *Frank v. Gold'n Plump Poultry, Inc.*, No. 04-1018, 2007 WL 2780504 at *4 (D. Minn. Sept. 24, 2007). The Court will not assess the viability of Illinois Bell's defenses; rather, it examines whether its defenses are uniformly applicable to all plaintiffs or to subclasses.

Defenses relating to liability largely require an examination of company records or mechanical calculations. To the extent Illinois Bell's possible defenses involve the measure of damages, plaintiffs suggest bifurcating the case into separate liability and damages stages. The damages stage would involve examination of how any practices found unlawful affected each plaintiff. The number of minutes that plaintiffs spent opening applications prior to the start of their shifts, the amount of time plaintiffs were on leave and/or whether they worked forty hours in a given week, whether those who worked as temporary supervisors (or "T-10's") recover during the time they served in

that capacity, and whether liquidated damages are appropriate are issues that could be determined at the damages stage of a bifurcated case.[8]  Because each plaintiff's circumstances are likely to be different, "[v]ariations in damages . . . do not warrant decertification."  *Madden v. Corinthian Colleges, Inc.,* No. 08-6623, 2009 WL 4757269 at *3 (N.D. Ill. Dec. 8, 2009).

Illinois Bell argues, however, that most of its affirmative defenses go to liability, not damages.  To the contrary, the defenses Illinois Bell claims are individualized appear to be applicable to all plaintiffs or to subclasses.  Illinois Bell's arguments largely rely on the assumption that there is no common policy or practice at issue in this case. But the Court has decertified claims that fall outside one of the subgroups already identified.  Because the remaining allegations are based on "a common policy or practice [, they] can be shown by common proof."  *Burch*, 677 F. Supp. 2d at 1119.  For instance, determinations concerning what activities alleged in this case constitute "work" and "overtime" under the FLSA are applicable to all plaintiffs or entire subclasses. Likewise, because plaintiffs appear to have been subjected to common practices and policies, questions involving activities subject to the *de minimis* exception, the applicability of the Portal-to-Portal Act,[9] statute of limitations issues, whether generous

---

[8] If it is later proven that several managers engaged in similar unlawful practices, whether they acted in good faith would help determine damages, not liability.  Likewise, whether opt-ins who claim they were not aware of exceptions or the overtime sheet may recover can be determined once liability is established.

[9] Whether other activities plaintiffs admit to having done in the mornings are compensable will depend on whether they fall under the Portal-to-Portal Act and whether they can be considered *de minimis*.  Determinations made concerning the treatment of such activities would apply to those plaintiffs alleging they meditated, went

(continued...)

overtime pay properly compensates plaintiffs for increments of time worked amounting to under eight minutes, and contentions that plaintiffs who worked unpaid overtime failed to avail themselves of methods provided for compensation,[10] are not individualized inquiries.

Similarly, questions concerning individuals who did not report overtime for various reasons (e.g., they did not believe the work was considered overtime, did not know they could report an exception or fill out an overtime sheet, forgot or did not have time to report the overtime, were unaware that increments of under eight minutes in one day could be added together and paid, etc.) can be grouped together and decided across all plaintiffs or subclasses. Whether Illinois Bell management was or should have been aware of uncompensated overtime worked by its employees is a question that a fact finder can determine based on the evidence presented to it. For instance, company records may sufficiently establish the extent of Illinois Bell's awareness.

Although *Alvarez* counsels that in select cases, "despite common questions as to liability, the remedy is so tailored to each particular plaintiff that a collective action is inappropriate," this is not such a case. *Alvarez*, 605 F.3d at 449 n.1. The Court in *Alvarez* referred to *Anderson*, a case that required "unwinding the transaction in its

---

[9](...continued)
to the restroom, got coffee or water in the mornings prior to the start of their shift while (or before/after) their programs loaded.

[10] Plaintiffs who failed to seek compensation appear to have done so for similar reasons: they did not have time to fill out an overtime sheet or seek authorization for an exception; they believed segments of less than eight minutes worked in one day went unpaid; or they understood work was uncompensable as overtime. Determinations concerning these issues are applicable to the entire case or entire subclasses.

entirety" to make each plaintiff whole.  *Id.*  The issues in this case do not require such

individualized analysis to prove liability or damages.  Again, even assuming plaintiffs

had knowledge of policies banning off-the-clock work, the issue is whether, because of

other company-wide practices, they worked contrary to the official policies.  Illinois Bell

contends that supervisors who instructed employees to work off-the-clock did so

outside the scope of their authority and contrary to established policy and practice.  The

determination of these and similar issues would apply to the entire collective action,

particularly because the directions from management that plaintiffs claim to have

received are the same.

## III.   Fairness and procedural concerns

Illinois Bell contends that the Court should decertify the case because it would be

difficult for the court to manage plaintiffs' claims as a collective action.  Moreover,

Illinois Bell contends it would have inadequate notice of each plaintiff's individualized

claims, in violation of its due process rights, because the plaintiffs who have testified

thus far do not represent the entire group.

### A.    Manageability of claims

A collective action is "oxymoronic . . . where proof regarding each individual

plaintiff is required to show liability." *Gatewood*, 2009 U.S. Dist. LEXIS 113896 at *69

(internal quotation marks and citation omitted).[11]  Illinois Bell claims decertification is

---

[11] Illinois Bell also relies on the district court decision in *Caraballo v. City of Chicago* to support its contention that in a case where there are eight subclaims brought by twelve plaintiffs, "[s]orting through the morass . . . would defeat the . . . purpose of a collective action . . . mainly, to promote judicial economy."  *Caraballo v. City of Chicago*, Nos. 07-2807, 06-4639, 2009 WL 743315, at *6 (N.D. Ill. Mar. 18,
(continued...)

appropriate because plaintiffs cannot rely on common evidence to establish liability. The Court has, however, severed the truly individualized claims from the collective action. Other concerns Illinois Bell has expressed are manageable through the creation of subclasses. "Sifting through the subclaims of each of the myriad plaintiffs is an unenviable task. But plaintiffs are nonetheless entitled to their day in court." *Alvarez,* 605 F.3d at 450.

Illinois Bell argues that the many overtime claims require individualized proof because they are unique. Several plaintiffs testified, for instance, that they were given the "open and available" instruction. Thus, Illinois Bell expects each plaintiff to establish that she received the instruction or was unaware of the three minute grace period. To prove an FLSA violation, "[p]laintiffs will need to demonstrate that [the defendant] either had constructive or actual knowledge that Plaintiffs were working off-the-clock without pay." *Reed,* 266 F.R.D. at 460. Illinois Bell argues that plaintiffs who did not inform managers of their off-the-clock work or were specifically told not to work off-the-clock, but did so anyway, and individuals who did not report overtime for personal or careless reasons would have to prove that the company was aware of and "suffered or permitted" the off-the-clock work in violation of the FLSA. These and other issues, however, may be addressed collectively because the experiences alleged are similar across the case.

Illinois Bell contends that, as in *Reed*, individually assessing plaintiffs' claims

---

[11](...continued)
2009). *Caraballo*, however, was reversed and remanded by the Seventh Circuit recently in *Alvarez*. *See Alvarez*, 605 F. 3d at 445-47, 451.

"would . . . be unmanageable, chaotic and counterproductive." *Reed*, 266 F.R.D. at

462. In *Reed*, sheriff deputies alleged "a myriad of pre-shift and post-shift activities,

missed meal breaks and work taken home." *Id.* at 447. Plaintiffs' claims, however,

involve a limited number of issues that involve company-wide practices and policies.

Common questions predominate, which makes this case well-suited for certification.

Specifically, many plaintiffs allege that by "open and available," they understood

they had to log in prior to the beginning of their shifts, despite the three minute grace

period, because their computers and applications took more than three minutes to boot

up and load; they claim to have worked during their unpaid lunch break because they

did not have time during their scheduled tours to address customer service-related

tasks stemming from incoming calls; and they did not report certain post-shift work

because they did not get paid for increments of less than eight minutes. Moreover, the

plaintiffs share similar job duties, and the four call centers implement the same policies,

use similar time-keeping methods, and share a similar interest in having representatives

regularly answer incoming calls throughout the day. The Court is persuaded that these

common liability-related questions can be resolved in collective trials even though there

are some individualized questions. *See Chabrier*, 2008 WL 938872, at *3 ("The need

for individual factual determinations is not fatal to certification of a FLSA collective

action.").

The Seventh Circuit has directed district courts to "consider whether . . . other

mechanisms for judicial resolution of their claims are more or less efficient than a

collective action comprised of various subclaims." *Alvarez*, 605 F.3d at 450. Plaintiffs

state, and the Court agrees, that a collective action affords them "the advantage of

lower individual costs to vindicate rights by the pooling of resources." *Hoffmann-La Roche, Inc.*, 493 U.S. at 170. Because of the modest amounts likely involved, many of the plaintiffs would be unable to afford the costs of pursuing their claims individually. Because "[t]here are means to aid in making individualized determinations such as bifurcation for liability and damages, designating subclasses, and appointment of a special master," certification is appropriate. *Chabrier*, 2008 WL 938872, at *3; *see also Fravel*, 2008 WL 2704744, at *3 ("Resolving common questions as a class . . . remains inherently more efficient."). The Court is persuaded that a collective action including subclasses is the most efficient way to resolve the plaintiffs' claims.

There is some distance to go before the case or cases can be tried, and it is conceivable that as things develop, the case may become unmanageable in its current form. The Court believes that is unlikely, but if the case proves to be unmanageable, the Court reserves the right to reconsider the issue of decertification. *See Anderson*, 488 F.3d at 954 n.8 ("When, and if, the district court is convinced that the litigation cannot be managed, decertification is proper.") (quotation marks and citation omitted).

The Court also notes that a good deal of discovery remains to be done, including depositions of more individual plaintiffs. The Court intends to set a schedule for conducting that discovery at the next status hearing.

**B.      Due process concerns**

Illinois Bell also contends that allowing a collective action in a case in which there are individualized affirmative defenses violates its due process rights because it cannot fairly defend itself and its property. *See Lusardi*, 118 F.R.D. at 370-72. This case,

however, is much different from *Lusardi,* a collective action consisting of over 1300 Xerox employees in various Xerox organizations at numerous geographic locations in which the court found no company-wide practice or policy. *Id.* at 354, 357, 359. Given those considerations, the court in *Lusardi* questioned "the fairness, manageability and meaningfulness of 1325 separate jury trials under the guise of a class action before a single jury." *Id.* at 370.

In this case, by contrast, bifurcation and subclaims will, the Court's view, adequately address Illinois Bell's due process concerns. Specifically, each trial will involve a discrete policy or policies alleged to have violated the FLSA. Furthermore, "[defendant's due process] rights must be balanced with the rights of the plaintiffs, many of whom likely would be unable to bear the costs of an individual trial, to have their day in court." *Wilks v. Pep Boys*, No. 02-0837, 2006 WL 2821700, at *8 (M.D. Tenn. Sept. 26, 2006). The Court has decertified certain claims and divided the others into subclasses in an effort to avoid undue prejudice. For these reasons, the Court does not agree with Illinois Bell's contention that a collective action violates its due process rights.

### Conclusion

For the foregoing reasons, the Court grants defendant's motion for decertification [docket no. 217] with respect to select, individualized claims as described above, but

otherwise denies the motion.  The case is set for a status hearing on July 12, 2010 at

9:30 a.m.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: June 28, 2010